UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
WEST FELICIANA DIVISION

| | | |
|---|---|---|
| ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE, | * * * | CIVIL ACTION NO. 13-368 |
| PLAINTIFFS | * * | |
| VS. | * * * | SECTION _____ |
| JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, BURL CAIN, WARDEN OF THE LOUISIANA STATE PENITENTIARY, ANGELA NORWOOD, WARDEN OF DEATH ROW, AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, | * * * * * * * * * * * | JUDGE _____ MAGISTRATE JUDGE _____ |
| DEFENDANTS | * | |

**COMPLAINT**

**STATEMENT OF CLAIM**

1. Plaintiffs Elzie Ball ("Ball"), Nathaniel Code ("Code"), and James Magee ("Magee") (collectively, "Plaintiffs") bring this civil action for declaratory and injunctive relief, seeking redress from Defendants James M. LeBlanc ("LeBlanc"), Burl Cain ("Cain"), Angela Norwood ("Norwood"), and the Louisiana Department of Public Safety and Corrections (the "DOC") (collectively, "Defendants") for the constitutional violations taking place at the Louisiana State Penitentiary in Angola, Louisiana ("Angola").

2. Defendants LeBlanc, Cain, and Norwood are liable for the deprivation of Plaintiffs' constitutional rights under color of law and in violation of their Eighth and Fourteenth Amendment rights to protection from cruel and unusual punishment under 42 U.S.C. § 1983 ("Section 1983").

3. Defendant DOC is liable for the deprivation of Plaintiffs' rights under Title II of the Americans with Disabilities Act (the "ADA"), and the Americans with Disabilities Act

Amendment Act (the "ADAAA"), 42 U.S.C. § 12131, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"), which require public facilities, like Angola, to make reasonable accommodations for people with disabilities, like Plaintiffs.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 2201 (Declaratory Judgment Act).

5. Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred in this district.

## PARTIES

### A.) Plaintiffs

6. Plaintiffs are individuals currently incarcerated at Angola's Death Row.

7. Plaintiffs have exhausted the administrative remedies available to them at Angola.

### B.) Defendants

8. Defendant Cain is the Warden of Angola.

    a. He has been in that position since 1995.

    b. In this capacity, he exercises operational control over Angola by making staffing, budget, and administrative decisions.

    c. By law, he is responsible for protecting the constitutional rights of all persons held in Angola's custody.

    d. At all relevant times, Cain was acting under color of law and as the agent, and, as a matter of law, the official representative of Angola.

    e. He is sued in his official capacity for declaratory and injunctive relief.

    f. Since at least April of 2012, Plaintiffs have attempted, through letters and phone calls by their counsel, to engage Warden Cain in a dialogue about the risk of harm posed by excessive heat to those on Death Row and how Defendants might seek to alleviate the conditions on Angola's Death Row.

    g. After numerous letters and phone calls, Defendant Cain in a terse communication dismissed Plaintiffs' concerns in a conclusory fashion and asserted that conditions on Angola's Death Row are acceptable.

    h. He can be served at 17544 Tunica Trace, Angola, LA 70712.

9. Defendant Norwood is the Assistant Warden of Death Row.

    a. She has been in that position since 2011.

    b. In her capacity as Assistant Warden of Death Row, she exercises operational control over Death Row by making staffing, budget, and administrative decisions.

    c. By law, she is responsible for protecting the constitutional rights of all persons incarcerated on Angola's Death Row.

    d. At all relevant times, Norwood was acting under color of law and as the agent, and, as a matter of law, the official representative of Angola.

    e. She is sued in her official capacity for declaratory and injunctive relief.

    f. Since 2012, Plaintiffs, through their counsel, have discussed the problem of extreme heat on Death Row with Defendant Norwood.

    g. She has been aware of the ongoing suffering of Plaintiffs, as a result of Plaintiffs' Requests for Administrative Remedy and discussions with Plaintiffs' counsel about the conditions on Angola's Death Row.

    h. She can be served at 17544 Tunica Trace, Angola, LA 70712.

10. Defendant LeBlanc is the Secretary of Louisiana's Department of Public Safety and Corrections ("DOC").

    a. He was appointed to this position by Governor Piyush "Bobby" Jindal. In his capacity as Secretary, LeBlanc has control of the Louisiana Department of Public Safety and Corrections (the "DOC").

    b. By law, he is responsible for protecting the constitutional rights of all persons held in the DOC's custody.

    c. At all relevant times, LeBlanc was acting under color of law and as the agent, and, as a matter of law, the official representative of DOC.

    d. He is sued in his official capacity for declaratory and injunctive relief.

  e. He has been aware of the concerns surrounding extreme heat conditions on Angola's Death Row since at least April 2012, when Plaintiff's counsel copied him on their communication with Warden Cain.

  f. He can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

11. Defendant DOC, the Louisiana Department of Public Safety and Corrections, is the state prison system, a division of the State of Louisiana.

  a. It is charged with overseeing the custody and care of offenders in Louisiana.

  b. At all relevant times, the DOC operated Angola, a public facility with programs and services.

  c. The DOC is the recipient of federal funds.

  d. The DOC is sued for declaratory and injunctive relief.

  e. The DOC can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

## FACTUAL ALLEGATIONS

12. Plaintiffs' suit arises from the appalling and extreme conditions that Plaintiffs suffer each summer as a result of the extreme heat on Angola's Death Row, and the substantial risk of serious harm, including permanent injury and even death, to which these conditions expose them. Plaintiffs have no way of alleviating these conditions themselves, and what little means Defendants make available to Plaintiffs do little or nothing to alleviate the extreme heat conditions that Plaintiffs suffer.

**A.) Angola's Death Row Facility**

13. In 2008, with the use of federal funds, Angola constructed a new facility (the "Death Row Facility") designed to house individuals who had been sentenced to death and were to be incarcerated on Death Row.

14. The Death Row Facility is equipped with air ducts attached to a cooling system.

15. On information and belief, the entire Death Row Facility is outfitted with ductwork for climate control.

16. The areas of the Death Row Facility which house visitation rooms, guard towers, and administrative offices are routinely air conditioned.

17. The Death Row Facility tiers (the "Death Row tiers") that are occupied by the inmates have no climate control other than fans.

18. During the summer months, the temperature on the Death Row tiers regularly rises above 95°F and the relative humidity regularly exceeds 92%, according to local weather data tracked by the National Weather Service. By another measure, the heat index – i.e. the apparent temperature, which measures how hot it *feels* – was extremely high and regularly reached into the "danger" and "extreme danger" zones, according to the National Oceanic and Atmospheric Administration (the "NOAA"). At these "danger" and "extreme danger" zones, the NOAA warns of the risks of heat-related health hazards and disorders.

19. On information and belief, Angola staff do not measure or record relative humidity on-site.

20. On information and belief, in Summer 2012, the heat index on all six Death Row tiers reached into the "danger" and "extreme danger" zones – the two highest categories of NOAA's heat index table, where the perceived temperature is above 103°F – every day in August. On two of six tiers, the same was true for every day in July. Tier C, which appeared to be the hottest tier, reached the "extreme danger" zone – above 126°F – on 85 days between May and August 2012. On more than one occasion in 2011, the recorded temperature was 100°F the relative humidity 100%, putting the heat index at 195°F.

21. The heat conditions on the Death Row tiers are, simply put, extreme and unsafe.

22. Exposure to such heat conditions puts even a healthy individual at risk of heat stroke, which can precipitate permanent neurological damage and death.

23. Individuals with preexisting illnesses like hypertension, such as plaintiffs, are at greater risk of succumbing to these conditions when under heat stress.

24. Plaintiffs are forced to face these conditions virtually all of the time during the summer months because they are incarcerated in cells on the Death Row tiers for twenty-three out of twenty-four hours per day. Four times a week, as part of their one hour outside of their cells, Plaintiffs are permitted to go outside for exercise. Because of the lack of ventilation in Plaintiffs' cells, the temperature outside, while hot, is cooler than the temperature inside the cells.

25. During the summer, the bars of the cells are hot to the touch and the cinderblock walls release additional heat.

26. Plaintiffs have little to no ability to take steps to cool their bodies when heat levels on the Death Row tiers are extreme.

27. Although there are some fans on the Death Row tier, the fans merely blow hot air into Plaintiffs' cells and do not function to alleviate the high humidity levels inside the tiers. The fans feel like blow dryers blowing hot air into the cells.

28. During the hottest summer months, when temperatures remain uncomfortably high through the night, Plaintiffs resort to sleeping on the hard floor, in spite of the risk of bites from fire ants, because the floor is slightly cooler than their beds.

29. On information and belief, during the summer months, staff and visitors to the Death Row tier have complained about having to spend even a few minutes on the Death Row tiers where Plaintiffs are incarcerated.

30. When a door connecting a Death Row tier to the central part of the building opens, Plaintiffs rush to the front of their cells to feel the relief of just a few seconds' gust of cool air-conditioned air that quickly dissipates from the Death Row tier.

31. Showers are ineffective in alleviating Plaintiffs' suffering during the summer months because when the showers are available to Plaintiffs, the water is usually scalding hot.

32. On information and belief, water temperatures regularly exceed 115°F on the hottest days of the summer. Plaintiffs are unable to control the temperature of the water available to them in the shower facilities.

33. Drinking water within the Death Row facility is malodorous and contaminated with debris.

34. Ice is available to Plaintiffs only intermittently and can only be obtained when inmates choose to get ice for one another during the one hour, four times per week, that inmates are permitted outside of their cells. Defendants do not provide ice as a matter of course despite the extreme heat on the Death Row tiers. The ice machine regularly breaks down, further lessening Plaintiffs' capacity to obtain ice during the hottest hours of the day.

35. Even when ice is available, the ice provided to inmates, including Plaintiffs, contains debris and is infested with insects.

**B.) Health Risks of Extreme Heat and Risk Management**

36. According to the National Weather Service, heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year. On average, heat kills more people than "floods, lightning, tornadoes, and hurricanes combined."

37. Research has shown that people with age over 60 years, obesity, hypertension, pulmonary or cardiovascular disease, or long-standing diabetes are at increased risk of heat-related illness – heat cramps, heat exhaustion, and heat stroke – during prolonged heat events. Other contributing factors include homebound lifestyle, lack of contact with other people, and decreased mobility. These conditions characterize daily life on Angola's Death Row.

38. Heat-related illnesses occur when the body's temperature control system is overloaded. On information and belief, the risk for heat-related illness increases significantly when temperatures exceed 90 degrees, especially with high relative humidity.

39. Persistent heat stress can lead to heat stroke, in which the body's internal temperature rapidly increases. Heat stroke can cause organ damage, neurological damage, permanent disability, and death.

40. It is rudimentary that measures taken to control climate conditions can alleviate the risks posed by extreme heat. Plaintiffs have little if any ability to control the climate conditions posed by the extreme heat they face each summer. Defendants have failed to address Plaintiffs' needs to control the climate conditions they face on the Death Row tier.

**C.) Plaintiffs' Medical Conditions and Interactions with Extreme Heat**

41. Plaintiffs all suffer from hypertension.

42. Hypertension, or high blood pressure, is a chronic medical condition in which the blood pressure in the arteries is elevated. The high pressure of blood flow on artery walls can cause serious damage. Hypertension is a major risk factor for stroke, heart attacks, heart failure, aortic aneurysms, and peripheral arterial disease, and is a cause of chronic kidney disease. It can also cause severe headaches, fatigue, obesity, and vision problems. Even moderate elevation of arterial blood pressure is associated with a shortened life expectancy.

43. Hypertension increases susceptibility to heat stress by overloading the cardiovascular system to a point where the heart is not able to circulate blood at the rate needed to keep the body cool. Subjecting hypertensive persons to extreme heat can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier.

44. The use of antihypertensive medications including diuretics, vasodilators, and beta-blockers is necessary to protect Plaintiffs' health from their disability.

45. The use of these medications can significantly reduce heat tolerance and predispose the person taking them to severe heat-related illness because they depress cardiac function and impair cardiac output, lessening the body's ability to regulate its temperature by circulating blood to the skin.

46. Diuretic medications also increase the risk of dehydration by causing increased urination and thereby quickening the body's loss of water, electrolytes, and essential salts. Individuals taking diuretic medications need greater access to clean drinking water during periods of extreme heat in order to maintain adequate hydration.

**D.) Plaintiff Ball's Health Risk Factors and the Impact of Extreme Heat**

47. Plaintiff Ball is 60 years old. He suffers from hypertension, for which he takes a diuretic medication, as well as diabetes and obesity. These medical conditions increase Mr. Ball's vulnerability to the heat.

48. Diabetes is a metabolic disease. Diabetes causes increased urination, increased thirst and increased hunger. Absent adequate treatment, diabetes can lead to cardiovascular disease, renal failure and retinal damage.

49. Hypertension exacerbates the health risks associated with diabetes.

50. Diabetes makes Mr. Ball especially susceptible to dehydration, which is particularly dangerous during extreme heat because hydration is necessary to the body's internal temperature regulation.

51. Obesity is a medical condition characterized by the excessive accumulation of body fat. Lack of physical activity and a sedentary lifestyle can contribute to obesity by preventing the body from processing calories efficiently.

52. Obesity is a risk factor for heat stroke because obese individuals have more insulation and a lower surface-area-to-volume ratio, and therefore less capacity for dissipating heat.

53. While subjected to the extreme heat on Death Row, Mr. Ball experiences the symptoms of heat exhaustion, including dizziness and lightheadedness, headaches, blurred vision, chest pain, joint pain and stiffness, profuse sweating, and inability to sleep.

54. DOC has and continues to discriminate against Mr. Ball due to disability, including hypertension and diabetes, by denying reasonable accommodations necessary to allow him access to a safe living environment. The extreme heat on Angola's Death Row denies Mr. Ball "access" to DOC facilities under federal disability law.

**E.) Plaintiff Code's Health Risk Factors and the Impact of Extreme Heat**

55. Plaintiff Code is 57 years old. He suffers from hypertension, for which he takes a diuretic medication, as well as obesity and hepatitis. These medical conditions increase Mr. Code's vulnerability to the heat.

56. Obesity as a medical condition and heat risk factor is described above in paragraphs 51-52.

57. Hepatitis is a condition characterized by inflammation of the liver. Mr. Code treats his hepatitis with medicine.

58. While subjected to the extreme heat on Death Row, Mr. Code experiences symptoms of heat exhaustion including dizziness and lightheadedness, headaches, sensitivity to light, profuse

sweating, numbness in his hands, dehydration, loss of concentration, joint pain, and inability to sleep.

59. Defendant DOC has and continues to discriminate against Mr. Code due to disability, including hypertension and hepatitis, by denying reasonable accommodations necessary to allow him access to a safe living environment. The extreme heat on Angola's Death Row denies Mr. Code "access" to DOC facilities under federal disability law.

**F.) Plaintiff Magee's Health Risk Factors and the Impact of Extreme Heat**

60. Plaintiff Magee is 35 years old. He suffers from hypertension, for which he takes a diuretic medication, as well as high cholesterol and depression, for both of which he also takes medication.

61. These medical conditions and treatments increase Mr. Magee's vulnerability to the heat.

62. High cholesterol is a condition that increases the risk of cardiovascular disease through the thickening, narrowing or blocking of arteries. High cholesterol may exacerbate Mr. Magee's hypertensive symptoms.

63. Depression is a mood disorder characterized by profound feelings of sadness, lethargy and dread.

64. Mr. Magee treats his depression with medicine. On information and belief, this medicine that Mr. Magee must take because of his depression can exacerbate the negative psychological effects of the extreme heat conditions.

65. While subjected to the extreme heat on Death Row, Mr. Magee experiences symptoms of heat exhaustion including dizziness and lightheadedness, loss of appetite, inability to sleep, difficulty breathing, profuse sweating, weakness, nausea, anxiety, dehydration and loss of concentration.

66. DOC has and continues to discriminate against Plaintiff Magee due to disability, including hypertension, high cholesterol and depression, by denying reasonable accommodations necessary to allow him access to a safe living environment. The extreme heat on Angola's Death Row denies Plaintiff Magee "access" to DOC facilities under federal disability law.

### CAUSES OF ACTION

**I.    EIGHTH AND FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT**

(Against Defendants LeBlanc, Cain, and Norwood)

67. By subjecting Plaintiffs to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants LeBlanc, Cain, and Norwood are acting and have acted with deliberate indifference to Plaintiffs' serious health and safety needs, in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

68. The extreme temperatures Defendants allow at Angola put Plaintiffs at a substantial risk of serious harm to their health and safety.

69. Plaintiffs bring these claims through 42 U.S.C. § 1983.

## II.   AMERICANS WITH DISABILITIES ACT, AMERICANS WITH DISABILITIES ACT AMENDMENT ACT AND REHABILITATION ACT

(Against Defendant DOC)

70. Defendant DOC has been, and is, a recipient of federal funds, and thus is covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services, and programs to accomplish this purpose. 29 U.S.C. § 794 (2008).

71. Further, Title II of the ADA, and the ADAAA, apply to DOC and have the same mandate as the Rehabilitation Act. 42 U.S.C. § 12131 *et seq.* (2008).

72. Angola is a facility, and its operation comprises a program and service, for Rehabilitation Act, ADA, and ADAAA purposes. Plaintiffs are otherwise qualified to participate in the programs and services at Angola on Death Row.

73. For purposes of the ADA, ADAAA, and Rehabilitation Act, Plaintiffs are qualified individuals regarded as having physiological impairments that substantially limit one or more of their major life activities. 42 U.S.C. § 12102. Defendant DOC knows Plaintiffs suffer from hypertension and, respectively, diabetes, hepatitis, and high cholesterol, and are prescribed medications including diuretics. Despite this knowledge, DOC officers have and continue to intentionally discriminate against them, under the meaning of the ADA, ADAAA, and Rehabilitation Act, by failing and refusing to protect them from the extreme temperatures that put them at substantial risk of serious harm.

74. As alleged above, DOC has failed and refuses to reasonably accommodate Plaintiffs' disabilities while in custody, in violation of the ADA, ADAAA, and Rehabilitation Act. That failure and refusal put them at substantial risk of serious harm.

75. As alleged above, DOC has failed and refuses to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Plaintiffs' disabilities. These failures and refusals pose the risk of more-than-minimal injury.

## ATTORNEYS' FEES AND COSTS

76. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also request attorneys' fees, costs, and expenses against DOC for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §§ 12205 and 1983.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that the Court award the following relief:

A. Order Defendants to abate the risk of serious harm described above by taking steps including but not limited to:

   a. Maintaining a heat index along all Death Row tiers that does not exceed 88°F (calculated using the NOAA National Weather Service heat index table);

   b. Providing clean, uncontaminated ice and drinking water at regular intervals during the summer months;

   c. Providing shower water of a temperature that can reasonably provide relief.

B. Enjoin Defendants and their staff from retaliating against Plaintiffs in any manner for filing this complaint;

C. Grant declaratory and injunctive relief, as set out in this Complaint;

D. Find that Plaintiffs are the prevailing party in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

E. Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled.


Respectfully submitted,


/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287 (Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative

11

636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org


Mitchell A. Kamin, Ca. Bar No. 202788 (*Pro Hac Vice* Pending)
Jessica C. Kornberg, Ca. Bar No. 264490 (*Pro Hac Vice* Pending)
Nilay U. Vora, Ca. Bar No. 268339 (*Pro Hac Vice* Pending)
Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201- 2100
Fax (310) 201- 2110

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana 70113
Tel. (504)581-9322
Fax (504)581-7651
Email: steve@sswethicslaw.com