UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
WEST FELICIANA DIVISION

| | | |
|---|---|---|
| ELZIE BALL, NATHANIEL CODE, | * | CIVIL ACTION NO. 13-368 |
| AND JAMES MAGEE, | * | |
| | * | |
| PLAINTIFFS | * | |
| | * | |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF | * | JUDGE: BAJ |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS, | * | |
| BURL CAIN, WARDEN OF THE | * | |
| LOUISIANA STATE PENITENTIARY, | * | MAGISTRATE: SCR |
| ANGELA NORWOOD, WARDEN OF | * | |
| DEATH ROW, AND THE LOUISIANA | * | |
| DEPARTMENT OF PUBLIC SAFETY | * | |
| AND CORRECTIONS, | * | |
| | * | |
| DEFENDANTS | * | |

## MEMORANDUM IN SUPPORT OF THE MOTION FOR A
## PRELIMINARY INJUNCTION

### Table of Contents

1.   INTRODUCTION ................................................................................................ 1

2.   BACKGROUND AND PROCEDURAL HISTORY ........................................... 2

   A.   Extreme Heat at Angola ............................................................................... 2

      a.   Heat Indexes in the Death Row Tiers in 2011 and 2012 regularly exceeded 100°. ....... 3

      b.   Plaintiffs lack access to traditional forms of heat relief ................................ 4

      c.   Ineffective Heat-related prison and department policies ............................... 5

   B.   Defendants' Failure to Respond to Plaintiffs' Concerns About the Heat .......................... 6

3.   ARGUMENT ..................................................................................................... 9

   A.   Plaintiffs Meet the Legal Standard for Preliminary Injunctive Relief. ............................. 9

   B.   There Is a Substantial Likelihood of Plaintiffs' Success on the Merits. .......................... 10

i

a.  Plaintiffs are likely to succeed on claims of violations of the Eighth Amendment's ban on cruel and unusual punishment..................................................................................... 10

i.  Extreme heat such as that observed at Angola is a well-established Eighth Amendment violation................................................................................................. 10

ii.  Defendants Cain, Norwood, and LeBlanc's deliberate indifference to the extreme heat conditions also constitutes an Eighth Amendment violation. ........................................... 13

1.  Defendants have actual knowledge of the substantial risks Plaintiffs face and ongoing harms Plaintiffs endure as a result of extreme heat. ...................................... 14

2.  The extreme heat and associated risks are obvious and could be inferred by Defendants. .................................................................................................... 16

b.  Plaintiffs are substantially likely to prevail on their claim for relief under the ADA, ADAAA, and RA................................................................................................... 18

i.  Plaintiffs qualify as having a disability...................................................... 20

ii.  Plaintiffs have suffered a harm as a result of their disability..................................... 21

iii.  Defendant DOC receives federal funding. ................................................. 22

C.  There Is a Substantial Threat that Plaintiffs Will Suffer Irreparable Injury If the Injunction Is Not Granted. ........................................................................................... 23

D.  The Threatened Injury to Plaintiffs Outweighs the Threatened Harm that the Injunction May Cause to Defendants. ........................................................................................... 24

E.  Granting the Preliminary Injunction Will Protect the Public Interest by Barring Violations of Fundamental Constitutional and Statutory Rights............................................................. 25

F.  Plaintiffs' Proposed Preliminary Injunctive Relief is Consistent with Fifth Circuit Precedent and Narrow, Necessary, and Non-intrusive, as Required by the Prison Litigation Reform Act............................................................................................................. 26

G.  The Bond Requirement Should Be Waived.................................................... 29

4.  CONCLUSION........................................................................................ 29

## 1.  INTRODUCTION

Plaintiffs respectfully request that this Court immediately intervene to alleviate the extreme heat conditions on Louisiana's Death Row by ordering Defendants to take immediate action to maintain the temperature and climate of Plaintiffs' cells at safe and humane levels. Plaintiffs are suffering temperature and humidity conditions so severe they regularly reach into the category of "extreme danger" heat index as described by the National Oceanic and Atmospheric Administration of the United States Department of Commerce ("NOAA").

Evidence of these conditions is undisputed.  Defendants' own heat index level measurements, which reflect both temperature and humidity, clearly and consistently record conditions that exceed what the NOAA calls "Extreme Danger."

At its worst, in the summer of 2011, the heat index reached as high as 195°, and in the summer of 2012, as high as 183°.[1]  In 2012, the number of days that the heat index reached the "Extreme Danger" zone, where the heat index exceeds 125°, ranged from 21 days on Tier B to 83 days on Tier C, with an average of 47 days in the "Extreme Danger" zone on each tier.  On average, each tier saw 13 days where the heat index reached above 150°; Tier C had 31 such days.  Moreover, in Summer 2012, the heat index on all six Death Row tiers reached into the "Danger" and "Extreme Danger" zones – the two highest categories of NOAA's heat index table – every day in August. On two of six tiers, the same was true for every day in July.

According to NOAA, in the "Danger" zone, "heat cramps and heat exhaustion are likely" and heatstroke is possible.  In the "Extreme Danger" zone, heatstroke is considered "imminent."

---

[1] All temperature and heat index measurements contained herein are given in degrees Fahrenheit.  Heat index figures were calculated using the NOAA Heat Index Calculator, *available at* http://www.hpc.ncep.noaa.gov/html/heatindex.shtml (last visited June 17, 2013).  Heat index of 183° occurred on July 6, 2012 (Tier G recorded temperature of 100° at 3:58 pm with relative humidity of 94%). Ex. 1, Heat Index Chart Summer 2012.  Heat index of 195° occurred on Aug. 1, 2011 (Tiers B/C recorded temperature of 100° at 4:44 pm with relative humidity of 100%). Ex. 2, Heat Index Chart Summer 2011.

The conditions of confinement that Plaintiffs face make this extreme environment harsher still.  Plaintiffs are confined to their cells, where hot air stagnates, for 23 out of 24 hours each day.  When the heat is at its strongest during the summer months, the metal bars of the cells are hot to the touch, and the cinderblock walls retain and release heat throughout the day and night. Conditions are such that Plaintiffs brave fire-ant bites lying on the floor of their cells in boxer shorts, covered in wet towels, because the floors are just slightly cooler than the other parts of the cells. Plaintiffs suffer from cramps, rashes, nausea, headaches, dizziness, chest pain, profuse sweating, and sleeplessness as a result of this extreme heat.  Plaintiffs' other health problems, including hypertension, diabetes, and depression, are exacerbated by these extreme temperatures, increasing their serious health risks.

Under the present conditions and without this Court's intervention, Plaintiffs are at risk of heatstroke and numerous other health problems and complications – even potentially death. With each day that passes, the peak of summer approaches and the heat and the health risks it causes grow worse.

Because of the certainty of continued harm and serious risk of irreparable injury to Plaintiffs, including heatstroke and death, Plaintiffs ask this Court to issue a preliminary injunction against Defendants and require them to take measures to ensure that Plaintiffs' climate conditions while in confinement remain below a heat index of 88° by taking all necessary and reasonable measures to do so.

## 2.  BACKGROUND AND PROCEDURAL HISTORY

### A. *Extreme Heat at Angola*

The extreme heat and resulting danger that prisoners at the Louisiana State Penitentiary at Angola ("Angola") must endure has been a recognized issue for decades.  On May 13, 1991, the

2

Department of Justice ("DOJ") sent a letter to the governor of Louisiana indicating that the DOJ believed that the conditions inside of Angola violated the Eighth Amendment, *inter alia*, because of Angola's "[f]ailure to provide a safe environment." Ex. 3, Letter from Assistant Attorney General John Dunne to Charles "Buddy" Roemer, Governor of Louisiana (May 13, 1991) at 2. In the letter, under the heading of "Unsafe Environment," the Department of Justice detailed its concerns:

> The temperature in the majority of cells and dormitories at LSP was well over 90 degrees when we toured the prison in early September 1990. Fans were scarce; ventilation was inadequate. Bars were hot to the touch and inmates were observed lying nude on the concrete floor, ostensibly to stay cool. For those in extended lockdown, there is no way to seek escape from these unhealthy conditions. Such conditions put the inmates at risk for any number of heat-related maladies. In particular, excessive heat poses a danger to those LSP inmates on psychotropic medications whose high body temperatures can cause serious and life threatening side effects. This is especially true for LSP inmates on such drugs because, as has been noted above, there is inadequate oversight by qualified staff of inmates with chronic conditions.

*Id.* The concerns the DOJ expressed more than twenty years ago about all of the inmates at Angola still hold true on Death Row.

Notably, Plaintiffs, as Death Row inmates, are more susceptible to this kind of heat risk because they are required to spend 23 hours of each day in a single small cell, without cold showers or regular access to ice or cooling ventilation. Ex. 4, Declaration of Dr. Susi Vassallo ("Vassallo Decl.") at 4. They are not allowed to participate in work programs or other rehabilitative programming that would allow them access to fresh air or air-conditioned facilities.

### a. Heat Indexes in the Death Row Tiers in 2011 and 2012 regularly exceeded 100°.

Based on Defendants' own heat logs,[2] the Death Row tiers at Angola (the "Death Row tiers") regularly exceed temperatures of 88-90° and heat indexes over 125°. Ex. 1, Heat Index

---

[2] Plaintiffs do not waive raising the issue of the veracity of Defendants' heat logs, but accept it for the purposes of this motion since even these numbers depict outrageous conditions for the Plaintiffs.

3

Chart Summer 2012; Ex. 2, Heat Index Chart Summer 2011 (together, "Heat Index Charts").

Heat indexes are determined by the combination of temperature and humidity. As such, heat index readings are a better measure for determining health risks than temperature alone, because the body's ability to thermoregulate depends on how much humidity is in the air.[3] Ex. 5, Declaration of James Balsamo ("Balsamo Decl.") at 4-5. A high heat index may reflect either a high temperature or a high humidity level. The heat indexes regularly measured at Angola reflect both. For example, on June 26, 2012, Tier C reached a temperature of 104°; combined with the 41% relative humidity observed that day, the heat index was 120°. Just two days later, with a temperature of 98° and relative humidity of 91%, the heat index reached 165°. Ex. 6, Log for Tier C, June 26-28, 2012; Heat Index Chart Summer 2012 (see 6/26/12 and 6/28/12 entries).

### b. Plaintiffs lack access to traditional forms of heat relief.

Plaintiffs' ability to seek relief from the heat is extremely limited. Angola's Death Row consists of six tiers assigned letters A, B, C, F, G, and H. Ten to twenty inmates are housed individually in single cells on each tier. Each cell is outfitted with an air vent and there are windows and fans in the hallway outside of the cell. Defendants, in an effort to ameliorate conditions, have added additional fans in the last year. However, given the high humidity rates around Angola, fans do little or nothing to alleviate the heat. Vassallo Decl. at 2-3; Balsamo Decl. at 1.

On most tiers, the showers are scalding hot during the summer months. Ex. 7, Affidavit of Elzie Ball ("Ball Aff.") ¶ 13; Ex. 8, Affidavit of Nathaniel Code ("Code Aff.") ¶ 8; Ex. 9,

---

[3] NOAA's National Weather Service Heat Index (table), *available at* http://www.nws.noaa.gov/os/heat/images/heatindex.png (last visited May 28, 2013). Plaintiffs request judicial notice of the NOAA Heat Index chart and its indication of associated risk level under Federal Rule of Evidence 201(b), as beyond reasonable dispute because its accuracy cannot reasonably be questioned. *See, e.g.*, *Sadler v. Michigan Dep't of Corr.*, CIV.A. 09-11375, 2011 WL 2462028 (E.D. Mich. Apr. 21, 2011) (taking judicial notice of NOAA Heat Index chart in civil rights lawsuit against prison alleging extreme heat), *report and recommendation adopted sub nom. Sadler v. Monahan*, 09-11375, 2011 WL 2448004 (E.D. Mich. June 16, 2011).
.

Affidavit of James Magee ("Magee Aff.") ¶ 6; Ex. 10, Supplemental Affidavit of James Magee ¶ 2-6. The ice machines, which Plaintiffs can access just once a day, break regularly, and the available ice is often unsanitary and infested with insects. Ball Aff. ¶ 14; Code Aff. ¶ 9-10; Magee Aff. ¶ 7. Despite the presence of biting fire ants, in the summer, most men resort to sleeping on the concrete floor in a vain effort to ameliorate the extreme heat they must endure in their cells. Ball Aff. ¶ 3; Magee Aff. ¶ 2.

The six Death Row tiers fan out from a central building like spokes on a bicycle wheel. The central building, which consists of the guard towers, visiting area, and administrative offices, is cooled by air conditioning. When the doors to the tiers open, Plaintiffs feel a gust of cool air-conditioned air pass down the tier, providing momentary but fleeting relief. Ball Aff. ¶ 12.

### c.  Ineffective Heat-related prison and department policies

Angola and Defendant DOC each have policies relevant to summer heat that make clear the steps that need to be taken to alleviate the risk of heat related damage to inmates' health. LSP Directive No. 13.067 "Psychotropic Medication and Heat Pathology" (Feb. 1, 2010) describes the prison's policy for managing heat-related medical risk. DOC Corrections Services Health Care Policy No. HC-45 "Psychotropic Medication and Heat Pathology" (Aug. 13, 2009) sets out the statewide policy and is largely similar. Both policies state: "Offenders prescribed psychotropic medication will be educated, monitored and evaluated for potential adverse reactions concerning heat or photosensitivity related pathology. Implementation of appropriate measures will be taken, if indicated, to reduce the risk of heat or photosensitivity related complications." Ex. 11, LSP Directive 13.067; Ex. 12, DOC Policy HC-45.

LSP Directive No. 12.005 "Living and Work Area Temperature Checks" (May 9, 2005) establishes procedures "for the measurement of temperatures in inmate housing living and work

areas." Ex. 13, LSP Directive 12.005. It states that "[i]t is the policy of the Louisiana State Penitentiary to ensure that temperatures in indoor living and work areas are appropriate to the summer and winter comfort zones . . . ." *Id*. It further provides that temperature checks are to be conducted once weekly. *Id*.

In relevant part, both policies also provide for the issuance of a Heat Alert when temperatures exceed 90°. LSP Directive 13.067(B)(3); DOC Policy HC-45(4)(E)(3). Such a Heat Alert is to remain in effect until 7 p.m. unless reversed by the medical director in conjunction with the Warden. LSP Directive 13.067(B)(7); DOC Policy HC-45(4)(E)(4). During a Heat Alert, several measures are to be instituted for "offenders with a heat related duty status": "provisions of increased fluids and ice; allowance of additional showers and/or cold, wet towels; and increase[d] ventilation to the area as much as possible." LSP Directive 13.067(B)(5)(b)-(d); DOC Policy HC-45(4)(E)(3)(a)-(c). The LSP policy additionally provides "that all offenders who have a heat related duty status [be] returned to the housing unit or go inside into a cooler place." LSP Directive 13.067(B)(5)(a).

### B. *Defendants' Failure to Respond to Plaintiffs' Concerns About the Heat*

On April 30, 2012, Plaintiffs' counsel co-signed a letter to Defendant Burl Cain, copying Defendant Angela Norwood and Defendant James LeBlanc, outlining Plaintiffs' concerns about the extreme heat on the Death Row tiers. Ex. 14, Letter from Sarah Ottinger and Mercedes Montagnes to Warden Burl Cain (April 30, 2012). The letter cited concerns about the effect of heat on existing illnesses and the lack of proper cooling provisions. *Id*. The letter requested that Defendant Cain discuss these problems with Plaintiffs' counsel by May 15, 2012. *Id*.

Defendants did not respond to the letter. On May 22, 2012, Plaintiffs' counsel co-signed another letter to Defendant Cain, again copying Defendants Norwood and LeBlanc, reiterating

Plaintiffs' concerns and requesting a response.  Ex. 15, Letter from Sarah Ottinger and Mercedes Montagnes to Warden Burl Cain (May 22, 2012).[4]   On June 18, 2012, Defendant Cain responded, stating that the temperatures on Death Row are kept at "acceptable levels" and expressing an unwillingness to discuss the ongoing problems of the extreme heat conditions Plaintiffs faced.  Ex. 17, Letter from Warden Burl Cain to Sarah Ottinger (June 18, 2012).

On July 31, 2012, the Advocacy Center[5] sent a letter to Defendant Cain indicating their belief, based on probable cause, that disabled prisoners were being subjected to abuse and neglect, and stating their intention to investigate the conditions on Death Row pursuant to their federal statutory authority.  Ex. 18, Letter from Ron Lospennato to Warden Burl Cain, (July 31, 2012).  The Advocacy Center requested to conduct this visit on August 17, 2012.  *Id.*

As a result of Defendant Cain's failure to respond to the Advocacy Center's requests, the Advocacy Center filed a complaint in this Court on August 17, 2012, seeking injunctive relief in the form of a court order permitting the Advocacy Center to investigate the conditions on Death Row.  Ex. 19, Complaint, *Advocacy Center v. LeBlanc*, No. 3:12-CV-00508 (M.D. La. 2012); Ex. 20, Plaintiff's Memorandum In Support of Motion for Temporary Restraining Order and Preliminary Injunction, *Advocacy Center v. LeBlanc*, No. 3:12-CV-00508 (M.D. La. 2012). Following filing of that suit, the parties reached a settlement in which the defendants to that action, Warden Cain and Secretary LeBlanc, granted the Advocacy Center the access it originally requested.  Ex. 21, *Advocacy Center v. LeBlanc*, Sep. 6, 2012 Status Report.

Thereafter, each Plaintiff thoroughly and systematically pursued all possible

---

[4] Plaintiffs' counsel co-signed a third letter to Defendant Cain, copying Defendants Norwood and LeBlanc, on June 18, 2012, the same day that Defendant Cain responded to the previous letters. Ex. 16, Letter from Sarah Ottinger and Mercedes Montagnes to Warden Burl Cain (June 18, 2012).

[5] The Advocacy Center is the designated protection and advocacy office for individuals with disabilities in the state of Louisiana pursuant to the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. §§ 10801 *et seq.;* the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15001 *et seq.;* and the Protection and Advocacy of Individual Rights Program, 29 U.S.C. §§ 794e *et seq.*

administrative relief from the excessive heat conditions through the Administrative Remedy Procedure.  Plaintiff Ball submitted a Request for Administrative Remedy ("ARP") on July 28, 2012 (Ex. 22, Ball First Step ARP), describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications. Angola, through Warden Norwood, issued a Response denying the ARP on October 12, 2012.  Ex. 23, Ball First Step Response Form and Appeal to Step Two.  Plaintiff Ball appealed Warden Norwood's response on October 17, 2012.  *Id*.  The DOC, through Secretary LeBlanc, denied the appeal December 14, 2012.  Ex. 24, Ball Second Step Response Form.  Plaintiff Ball's grievance process was thereby exhausted. *See* La. Admin. Code § 22:I:325 ("Administrative Remedy Procedure").

Plaintiff Code submitted Request for Administrative Remedy ("ARP") on July 24, 2012 (Ex. 25, Code First Step ARP), describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications. Angola, through Warden Norwood, issued a Response denying the ARP on September 5, 2012.  Ex. 26, Code First Step Response Form.  Plaintiff Code appealed Warden Norwood's response on September 13, 2012, reasserting his grievances and outlining why LSP's First Step Response was inadequate. Ex. 27, Code ARP Appeal to Step Two.  The DOC, through Secretary LeBlanc, denied the appeal on November 21, 2012.  Ex. 28, Code Second Step Response Form.  Plaintiff Code's grievance process was thereby exhausted. LAC § 22:I:325.

Plaintiff Magee submitted a Request for Administrative Remedy ("ARP") on August 28, 2012 (Ex. 29, Magee First Step ARP), describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his

medical diagnoses and medications. Angola, through Warden Norwood, issued a Response

denying the ARP on November 6, 2012.  Ex. 30, Magee First Step Response Form and Appeal to

Step Two. Plaintiff Magee appealed Warden Norwood's response on November 7, 2012.  *Id.*

The DOC, through Secretary LeBlanc, denied the appeal on January 3, 2013.  Ex. 31, Magee

Second Step Response Form.  Plaintiff Magee's grievance process was thereby exhausted. LAC

§ 22:I:325.  Because Defendants have failed to respond to Plaintiffs' requests for relief from the

extreme heat and its associated health risks, Plaintiffs request that this Court issue a preliminary

injunction against Defendants.

## 3.  ARGUMENT

### A. Plaintiffs Meet the Legal Standard for Preliminary Injunctive Relief.

"The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve

the court's ability to render a meaningful decision on the merits." *Mississippi Power & Light Co.

v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir. 1985) (citations omitted).  This Court

has "broad power to restrain acts which are of the same type or class as unlawful acts which the

court has found to have been committed or whose commission in the future, unless enjoined,

may be fairly anticipated from the defendant's conduct in the past." *N.L.R.B. v. Express

Publishing Co.*, 312 U.S. 426, 435 (1941).  In determining whether to issue a preliminary

injunction, the Court must find that Plaintiffs have met four factors:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat of
> irreparable harm if the injunction is not granted; (3) that the threatened injury
> outweighs any harm that may result from the injunction to the non-movant; and
> (4) that the injunction will not undermine the public interest.

*Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). "While the movant need

not always show a probability of success on the merits, he must present a substantial case on the

merits when a serious legal question is involved and show that the balance of the equities, [i.e.,

the other three factors] weighs heavily in the favor of granting the stay." *United States v. McKenzie*, 697 F.2d 1225, 1226 (5th Cir. 1983).  Plaintiffs seek a preliminary injunction to avoid "risks of serious heat-related illness and permanent injury."   Vassallo Decl. at 4-5.   This equitable relief is the only way of ensuring that the serious ongoing constitutional violation is remedied. Plaintiffs plainly meet all the requirements for issuance of a preliminary injunction.

### B.  There Is a Substantial Likelihood of Plaintiffs' Success on the Merits.

In evaluating the likelihood of success on the merits, courts evaluate Plaintiffs' ability to meet the requirements of the substantive law governing their causes of action.  *See, e.g., Mississippi Power & Light Co.*, 760 F.2d at 622 ("To evaluate the plaintiff's likelihood of success we determine what is the proper standard to be applied in evaluating plaintiff's claims, and then we apply that standard to the facts presented in the record.").  In demonstrating its substantial likelihood of success, Plaintiffs are permitted to use evidence that would normally be inadmissible at trial such as hearsay evidence and declarations.  *See Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. . . . Thus, the district court can accept evidence in the form of deposition transcripts and affidavits.").

Here, Plaintiffs claim violations of the Eighth Amendment and violations of the Americans with Disabilities Act and related statutes.  For the reasons detailed below, Plaintiffs are highly likely to succeed on each of these claims.

> **a.  Plaintiffs are likely to succeed on claims of violations of the Eighth Amendment's ban on cruel and unusual punishment.**
>
> > **i.  Extreme heat such as that observed at Angola is a well-established Eighth Amendment violation.**

The Eighth Amendment to the United States Constitution states: "Excessive bail shall not

be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The

Eighth Amendment applies "to the States by reason of the Due Process Clause of the Fourteenth

Amendment." *Robinson v. California,* 370 U.S. 660, 675 (1962). Extreme heat as a condition of

confinement in prison is a well-established Eighth Amendment violation in the Fifth Circuit.

      "The Constitution does not mandate comfortable prisons, but neither does it permit

inhumane ones." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (citing *Farmer v. Brennan,*

511 U.S. 825, 832 (1994)). Defendants must "provide humane conditions of confinement," must

"ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take

reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting

*Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). "The Supreme Court has made clear that the

standards against which a court measures prison conditions are 'the evolving standards of

decency that mark the progress of a maturing society' and not the standards in effect during the

time of the drafting of the Eighth Amendment." *Gates*, 376 F.3d at 332-33 (quoting *Estelle v.

Gamble*, 429 U.S. 97, 102 (1976)).

      It is likewise well-established that extremely hot or cold conditions in confinement can

rise to the level of an Eighth Amendment violation. *See, e.g.*, *Wilson v. Seiter*, 501 U.S. 294, 304

(1991) ("low cell temperature at night combined with a failure to issue blankets" could rise to the

level of an Eighth Amendment violation); *Blackmon v. Garza,* 484 F. App'x 866, 869 (5th Cir.

2012) ("Allowing a prisoner to be exposed to extreme temperatures can constitute a violation of

the Eighth Amendment."). The Fifth Circuit has frequently held that extreme heat is a violation

of the Eighth Amendment's ban on cruel and unusual punishment.

      Just last summer, the Fifth Circuit overturned a district court's dismissal of a Texas

inmate's § 1983 claims that the heat levels in his dormitory exposed him to substantial health

risks. *Blackmon* at 872 (finding an Eighth Amendment violation where "extreme heat in [plaintiff's] dorm caused substantial health risks to [plaintiff]" and where remedial measures taken by defendants were inadequate). Notably, the Fifth Circuit reached this decision without the benefit of any heat measurements from the actual facility in question, relying instead on historic heat levels in the area, which reached NOAA danger and extreme danger levels during summer months. *Id.* at 870.

The *Blackmon* decision is consistent with prior Fifth Circuit jurisprudence, which has established that heat indexes far lower than those present at Angola constitute a proper basis for a preliminary injunction mandating heat relief. For example, in 2004 in *Gates v. Cook*, the Fifth Circuit affirmed a Mississippi district court finding that the summer temperatures in the Mississippi Delta combined with the lack of cooling ventilation or other heat alleviation measures in a Mississippi death row facility violated the Eighth Amendment and warranted mandatory injunctive relief. *Gates*, 376 F.3d at 339-40; *see also Valigura v. Mendoza*, 265 Fed. Appx. 232, 235 (5th Cir. 2008) ("[T]emperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment.").

In the case of conditions at Angola, not only are the documented temperatures even higher than those observed in *Blackmon, Gates,* and *Valigura*, but they have been taken within the facility in question as opposed to inferred from the historic temperatures of the surrounding area. In the Fifth Circuit's prior cases, temperatures in the high 80s and 90s were sufficient to warrant relief. Here, measured temperatures regularly exceed 100°, while heat indexes soar above 150°. And just like the facilities in *Blackmon, Gates,* and *Valigura*, these extreme temperatures are exacerbated by the other conditions of confinement on death row, including the

12

lack of access to ventilated areas and the lack of access to ice, cold water, or cold showers.

In essence these temperature readings confirm what the *Blackmon, Gates,* and *Valigura* courts suspected: that the heat alleviation measures currently available in these facilities fall woefully short of the measure necessary to bring Angola within objectively reasonable heat conditions.  Angola presents a case that is, therefore, not only consistent with but more dire than prior precedents ordering heat relief.

> **ii.  Defendants Cain, Norwood, and LeBlanc's deliberate indifference to the extreme heat conditions also constitutes an Eighth Amendment violation.**

Defendants Cain, Norwood, and LeBlanc violated – and are continuing to violate – Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment.  "A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate. . . . Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Gates*, 376 F.3d at 333 (citing *Farmer,* 511 U.S. at 833-34, 842).

Given the extraordinary heat that Plaintiffs must endure for at least 23 out of 24 hours a day, as well as Plaintiffs' preexisting medical conditions, Plaintiffs are at high risk for serious and irreparable harm.  Indeed, in addition to the harms Plaintiffs presently endure, the evidence shows that Plaintiffs face a risk of heatstroke and even death.  Vassallo Decl.  The risk for heat-related illnesses soars when air temperatures exceed 88°, especially with high relative humidity, as occurs most days during the summer at Angola.  Vassallo Decl. at 2; Heat Index Charts. High humidity also means that fans are inadequate to create reasonably safe conditions. Balsamo Decl. at 4-5.   The conditions documented on Death Row would be potentially life-

threatening to even a young healthy person.  For Plaintiffs, the risk is even greater.  Vassallo Decl. at 6.  *See also Gates* 376 F.3d at 340 (finding that where "[t]he summer temperatures . . . average in the nineties with high humidity [and] ventilation is inadequate to afford prisoners a minimal level of comfort [and t]he probability of heat-related illness is extreme [and]  the medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature," absent adequate remedial measures, "this condition presents a substantial risk of serious harm to the inmates.").

It is equally clear that Defendants have, thus far, shown deliberate indifference to the dreadful conditions Plaintiffs are forced to endure.  Faced with communications and administrative remedy requests asking for alleviation of these horrific conditions, Defendants Cain, Norwood, and LeBlanc exhibited a subjective deliberate indifference to the conditions. Defendants are properly found liable "under the Eighth Amendment for denying an inmate humane conditions of confinement where the [prison] official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  *See also Blackmon*, 484 F. App'x at 873 (knowledge of extreme heat's risks attributed to prison officials where the risk of heat related illness is "obvious").  As shown below, the evidence of Defendants' deliberate indifference is abundant.

### 1.  Defendants have actual knowledge of the substantial risks Plaintiffs face and ongoing harms Plaintiffs endure as a result of extreme heat.

Here, it is plain that Defendants were and are aware of the risks Plaintiffs face.  First, Plaintiffs, through their counsel, have repeatedly communicated with Defendants about the substantial adverse risks that Plaintiffs have faced each summer because of the extreme heat to which they are subjected.  From April 2012 through June 2012, Plaintiffs communicated these

14

concerns in a series of letters to Defendants.  In June 2012, Defendant Cain provided a terse and conclusory response denying the existence of any issues and indicating that the temperatures in the cells on the Death Row tiers were maintained at acceptable levels.  Letter from Warden Burl Cain to Sarah Ottinger (June 18, 2012).

Second, as a result of their failure to respond to these conditions, Defendants Cain and LeBlanc were the subject of a lawsuit by the Advocacy Center (the "Advocacy Center litigation").  *Advocacy Center v. LeBlanc*, 3:12-cv-508.  That suit arose out of Defendants' refusal to allow the Advocacy Center to investigate the extreme heat conditions on the Death Row tiers.  Defendants ultimately resolved that suit with the Advocacy Center and permitted the Advocacy Center to investigate conditions on Death Row tiers on a limited basis.  Balsamo Decl. at 1.  Thus, Defendants had further knowledge of the extreme heat and potential risks to Plaintiffs as a result of the Advocacy Center litigation and resolution.

Third, Defendants had knowledge of the extreme heat and consequential substantial risks to Plaintiffs because Plaintiffs raised these issues through the Administrative Remedy Procedure.  Indeed, Plaintiffs were only permitted to bring this suit after they had exhausted Angola's internal grievance process (the "ARP process") – further ensuring that Defendants' knowledge of the risk of the substantial harms Plaintiffs endure each summer.[6]  Plaintiffs' exhaustion of the ARP process and Defendants' failure to respond is by itself sufficient to constitute knowledge showing deliberate indifference.  *See Blackmon*, 484 F. App'x at 873 (deliberate indifference found where plaintiff testified as to "numerous grievances complaining about the heat, its effect on his health, and [defendants'] failure to address his concerns").

---

[6] *See supra* at 8-9 (summarizing Plaintiffs' exhaustion of the ARP process).

**2.  The extreme heat and associated risks are obvious and could be inferred by Defendants.**

Even assuming, *arguendo*, that Defendants had no knowledge of the extreme heat in spite of the communications relaying such concerns, the substantial risk to Plaintiffs is obvious and Defendants inferred the substantial harm of such risk as a result of the Advocacy Center litigation, the ARP requests outlining such concerns, and the numerous communications that Plaintiffs had with Defendants to communicate their concerns.  It is unquestionably obvious that cells with little or no ventilation, with no climate control mechanisms, and with no means to alleviate the heat in South Louisiana during the summer – where temperatures routinely exceed 88-90° and where relative humidity regularly exceeds 80-90% – will pose a substantial risk of injury to Plaintiffs who are confined in such conditions for 23 hours each day.

Furthermore, prison policies adopted by the DOC and Angola themselves demonstrate Defendants' knowledge of the substantial risk of harm Plaintiffs faced as a result of exposure to such extreme heat.[7]  LSP Directive No. 12.005 was signed and issued by Defendant Cain in 2005 and states that "[i]t is the policy of the Louisiana State Penitentiary *to ensure that temperatures in indoor living and work areas are appropriate to the summer . . . comfort zones . . . and to assure the safety of inmates*."  LSP Directive No. 12.005.  This regulation makes clear that Defendant Cain was aware of the risk of extreme heat indoors during the summer.

Similarly, DOC Corrections Services Health Care Policy No. HC-45 was signed and issued by Defendant LeBlanc in 2009 and indicates that its purpose is the "reduction of psychotropic medication related heat pathology and photosensitivity."  DOC Policy No. HC-45. The regulation defines heat pathology as "heat induced syndromes such as heatstroke, muscle cramps and heat exhaustion due to a failure of the heat regulating mechanisms of the body."

---

[7] Plaintiffs contend that the DOC and Angola policies related to heat are facially inadequate in addressing the risks that plaintiffs face and, even by their own terms, appear to be under-enforced.

While this regulation's stated purpose is to mitigate the risks for inmates who require psychotropic medication, it is plain that Defendant Le Blanc was aware of the risk of "heat pathology" as a result of extreme heat in confinement.  Similarly, Defendant Cain signed and issued LSP Directive No. 13.067 in 2010, which prescribed substantially similar steps to mitigate the risk of heat pathology for inmates who required psychotropic medication.  LSP Directive No. 13.067.  Again, this demonstrates Defendant Cain's knowledge of the risks associated with extreme heat in confinement.

Defendants have further demonstrated their deliberate indifference by failing to enforce even these facially inadequate policies.  The prison policies are facially inadequate in that they only require heat-related risk management for individuals on psychotropic medications.  Plaintiffs Ball and Code, who take non-psychotropic medications that increase their susceptibility to heat-related illness, are not provided for under the policies.  The policies provide that a Heat Alert must be issued whenever the temperature exceeds 90°, and remain in effect until 7 p.m. unless the Medical Director and/or Warden decide otherwise.  The temperature logs demonstrate, however, that temperatures regularly exceed 90° well past 7 p.m.  Heat Index Charts.  With heat index levels regularly reaching the NOAA "Extreme Danger" zone, the remedial measures provided for in the policies would almost certainly be insufficient to address the grave health risks created by the heat, so the policies as written are inadequate.

Moreover, these facially inadequate policies are themselves under-enforced.  Plaintiffs – including Plaintiff Magee, who takes psychotropic medication – have not regularly been provided with the relief detailed in the policies when temperatures exceed 90°.  At that temperature, the policies mandate the increased provision of fluids and ice, the allowance of additional showers and/or cold, wet towels, and increased ventilation to the area.  Plaintiffs

17

believe that Defendants have failed to provide these measures to Plaintiffs even though temperatures exceeded 90° most days in Summer 2011 and Summer 2012, and, on information and belief, have exceeded that level repeatedly to date in 2013. Heat Index Charts; Code Aff. ¶ 12. The policies as enforced do not adequately address the health risks to which Defendants subject Plaintiffs. As such, Defendants' failure to enforce even these policies provides further proof of their deliberate indifference to the substantial risks Plaintiffs face.

In conclusion, given the obviousness of the extreme heat that Plaintiffs are forced to endure, the Advocacy Center litigation, the ARP complaints, the other communications in which Plaintiffs expressed their concerns relating to the extreme heat, and Defendants' own policies indicating knowledge of the risk of heatstroke from extreme heat, Plaintiffs have plainly shown that Defendants violated the Eighth Amendment by exhibiting deliberate indifference to the substantial risk of harm Plaintiffs face in their conditions of confinement. *See, e.g.*, *Hadix v. Caruso*, 492 F. Supp. 2d 743, 753 (W.D. Mich. 2007) ("Plaintiffs have shown success on the merits because the requirements of safe Eighth Amendment custody are violated by housing high-risk inmates in facilities which are routinely at heat index levels above 90 during summer months when it is known that such heat conditions will reliably cause heat injury and death.").

> **b. Plaintiffs are substantially likely to prevail on their claim for relief under the ADA, ADAAA, and RA.**

The ADA and related statutes protect incarcerated individuals in state facilities. Title II provides that no qualified individual with a disability is to be, by reason of such disability, excluded from participation in or denied the benefits of the services, programs, or activities, of a public entity, or be subjected to discrimination by such entity. 42 U.S.C.A. § 12132. A "public entity" includes any State government and any department agency or other instrumentality of a State. *Id.* at § 12131(1)(A)-(B). State agencies, including Defendant DOC, can be sued under

18

Title II.  *United States v. Georgia*, 546 U.S. 151 (2006) (Title II authorizes suits against states even with respect to complaints concerning conditions of confinement).[8]

The Rehabilitation Act likewise applies to Plaintiffs. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides in pertinent part that: "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C.A. § 794(a).  Title II of the ADA is substantially similar to Section 504 of the Rehabilitation Act, and Congress intended "that Title II extend the protections of the Rehabilitation Act 'to cover all programs of state or local governments, regardless of the receipt of federal financial assistance' and that it 'work in the same manner as Section 504.'" *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).  Further, Title II of the ADA specifically provides that its remedies, procedures, and rights shall be the same as those available under Section 504 of the Rehabilitation Act. *Id*.  Thus, cases interpreting either Title II of the ADA or Section 504 of the Rehabilitation Act are applicable to both. *Id.*

The tests for determining success under the Rehabilitation Act and the ADA are substantially similar. To establish a prima facie case under § 504 of the Rehabilitation Act a plaintiff must prove: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in, denied benefits of, or subjected to discrimination under the Defendant's program solely because of his disability; and (3) that the program in question receives federal financial assistance.  29 U.S.C.A. § 794(a).  Similarly, to establish a prima facie case of discrimination under Title II of the ADA, a plaintiff must prove: (1) that he is a qualified individual with a disability; (2) that he has been excluded from participation in, or denied the

---

[8] It should be noted that the ADA and related requirements are indicative of the contemporary standards of decency under the Eighth Amendment.  *See Schmidt v. Odell*, 64 F.Supp.2d 1014, 1031 (D. Kan. 1999) ("[T]he ADA reflects, to some degree, contemporary standards of decency concerning treatment of individuals with disabilities.")

benefits of the services, programs, or activities of a public entity, or otherwise discriminated

against by such entity or otherwise discriminated against by such entity; and (3) that such

exclusion or discrimination was by reason of his disability.  42 U.S.C.A. § 12132; *Lightbourn v.*

*County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).  Here, plaintiffs meet the

requirements for both tests.

### i.  Plaintiffs qualify as having a disability.

Plaintiffs are disabled under the terms of the statutes.  The ADA and Rehabilitation Act

define disability as "with respect to an individual-- (A) a physical or mental impairment that

substantially limits one or more major life activities of such individual; . . . ."  42 U.S.C.A. §

12102.  Major life activities include "caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

reading, concentrating, thinking, communicating, and working."  42 U.S.C.A. § 12102(2)(A)(1).

Here, Plaintiffs suffer from physical conditions that, especially if untreated, interfere with

major life activities including seeing, eating, walking, sleeping, breathing, and concentrating.

Moreover, the medication they take to manage those conditions makes them more sensitive to

heat exposure, compounding the interference with those activities.[9]  Vassallo Decl. at 3-6.

Each of the Plaintiffs suffers from the disability of hypertension.  Hypertension increases

susceptibility to heat stress.  *Id.*  The use of antihypertensive medications can significantly

---

[9]  To the extent Plaintiffs' disabilities are in doubt, the Americans with Disabilities Act Amendments Act ("ADAAA") clarifies that Plaintiffs' medical conditions are disabilities.  The ADAAA was passed in 2008 in response to Supreme Court rulings regarding the ADA that, in Congress's estimation, excessively curtailed the ability of disabled persons to vindicate their rights under the ADA.  The ADAAA's Rules of Construction provide that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals . . ." and "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as: (I) medication, medical supplies, equipment, or appliances . . ."  42 U.S.C.A. §§ 12102(4)(A), (E)(i)(I).  Congress's stated purpose in enacting the ADAAA was to "convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  *Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d 1173, 1184 (E.D. Tex. 2011).  Especially under the expanded terms of the ADAAA, Plaintiffs are subject to the protections of the ADA.

reduce heat tolerance and predispose the person taking them to severe heat-related illness. *Id.* Especially if untreated, hypertension at least episodically interferes with major life activities.[10]

Plaintiff Elzie Ball additionally suffers from the disability of diabetes. Diabetes is a metabolic disease. Diabetes substantially limits endocrine function. *See The ADA Amendments Act of 2008*, Job Accommodation Network, Office of Disability Employment Policy, U.S. Department of Labor 10.  Absent adequate treatment, diabetes can lead to cardiovascular disease, renal failure and retinal damage.  Diabetes prevents Plaintiff Ball from engaging in major life activities, thereby constituting a disability.[11]

Plaintiff Magee additionally suffers from the disability of depression.  He treats his depression with Prozac, a psychotropic medication.  Absent adequate treatment, depression can limit brain function and thereby interfere with several major life activities. *The ADA Amendments Act of 2008*, Job Accommodation Network, Office of Disability Employment Policy, U.S. Department of Labor 10.

### ii.  Plaintiffs have suffered a harm as a result of their disability.

Title II of the ADA requires public entities to "make reasonable modifications . . . when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 CFR 35.130 (2013). The failure to make a

---

[10] Few courts have considered hypertension as a disability based on facts occurring after implementation of the ADAAA on Jan. 1, 2009, in part because the ADAAA did not apply retroactively.  The mandates of the ADAAA make clear, however, that a condition like hypertension is to be considered a disability despite the fact that it may only episodically manifest serious symptoms, and despite the fact that it is treatable with medication. *See The ADA Amendments Act of 2008*, Job Accommodation Network, Office of Disability Employment Policy, U.S. Department of Labor 8-9 ("The fact that the periods during which an episodic impairment is active and substantially limits a major life activity may be brief or occur infrequently is no longer relevant to determining whether the impairment substantially limits a major life activity. . . .  examples of conditions that may be episodic or go into remission include  . . . hypertension, diabetes, . . . [and] major depressive disorder.").

[11] Plaintiffs acknowledge that there exists a split among courts on diabetes.as a disability.  *See, e.g.*, *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011)(diabetes not a disability because modest treatments ensure no changes to major life activities); *Kapche v. Holder*, 677 F.3d 454 (D.C. Cir. 2012) (diabetes is a disability).  The Court should note that such cases have generally predated the ADAAA and are therefore inapposite.

reasonable accommodation constitutes discrimination on the basis of a disability. *Tenn. v. Lane*, 541 U.S. 509, 536 (2004).

Plaintiffs are at increased risk of heat-related illness, heatstroke, and death.  Vassallo Decl. at 2-6.  Medications that treat hypertension, which all Plaintiffs are prescribed, increase the risk of heat-related illness by impairing the body's ability to shed heat.  *Id.*

The prison has an affirmative duty to provide an environment which accommodates these conditions. *See Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012) (reversing district court's dismissal of ADA claims where Department of Corrections refused to provide reasonable accommodations of inmates' disability in the form of meal and facility requirements).[12]

### iii.  Defendant DOC receives federal funding.

Defendant DOC receives federal funding and is therefore not immune from suit under the Rehabilitation Act.  *See* Ex. 31, Louisiana Dept. of Public Safety and Corrections, 2009-2010 Annual Report at 86.  Public entities that accept federal financial assistance expressly waive their Eleventh Amendment immunity from claims brought under § 504 of the Rehabilitation Act. 42 U.S.C. § 2000d-7(a)(1).  In *Pace v. Bogalusa City School Board*, 403 F.3d 272, 282 (5th Cir.) (en banc), the Fifth Circuit observed that § 2000d-7 "clearly, unambiguously, and unequivocally conditions receipt of federal funds . . . on the State's waiver of Eleventh Amendment immunity" for suits brought under the Rehabilitation Act, and held that the waiver condition set forth in § 2000d-7 is a constitutionally permissible exercise of Congress's spending power.  *Id.* at 285.

A state entity's receipt of federal funds is sufficient to waive Eleventh Amendment immunity even where the receipt of federal funds is unrelated to the particular program at issue. "For purposes of [§ 504 of the Rehabilitation Act], the term 'program or activity' means all of

---

[12] Through the Requests for Administrative Remedy, Plaintiffs have made Defendants aware of these concerns.  *See supra* at 8-9 (summarizing Plaintiffs' exhaustion of the ARP process).  Moreover, Defendants, through the doctors on Defendants' staff, have all of the Plaintiffs medical information readily at hand.

the operations of—. . . a department, agency, . . . or other instrumentality of a State . . . any part

of which is extended Federal financial assistance." 29 U.S.C. § 794(b)(1)(A). In *Miller v. Tex.*

*Tech Univ. Health Sci. Ctr.*, 421 F.3d 342 (5th Cir. 2005) (en banc), the Fifth Circuit explained

that "[i]f the involved state agency or department accepts federal financial assistance, it waives

its Eleventh Amendment immunity even though the federal funds are not earmarked for

programs that further the anti-discrimination and rehabilitation goals of § 504." *Id.* at 349.

### C. *There Is a Substantial Threat that Plaintiffs Will Suffer Irreparable Injury If the Injunction Is Not Granted.*

Issuance of a preliminary injunction is warranted where the prerequisite of prevention of

irreparable injury is met.  In the absence of a preliminary injunction, Plaintiffs face a substantial

threat of irreparable injury in the form of the continued violation of their Eighth Amendment

right to be free from cruel and unusual punishment. "It has been repeatedly recognized by the

federal courts that violation of constitutional rights constitutes irreparable injury as a matter of

law." *Springtree Apartments, ALPIC v. Livingston Parish Council*, 207 F. Supp. 2d 507, 515

(M.D. La. 2001) (citing *Elrod v. Burns*, 427 U.S. 347 (1976)).  Here, Defendants continue to

expose Plaintiffs to extreme conditions of confinement violating their Eighth Amendment rights.

Of course, Plaintiffs face more than irreparable injury in the form of rights violations.

Defendants continue to expose Plaintiffs to such extreme conditions of confinement so as to pose

a serious threat to the Plaintiffs' health and safety.  Plaintiffs face substantial risk of heat-related

illness, heatstroke, and death. The mortality from heatstroke is demonstrated to be between 30-

80%. Vassallo Decl. at 2.  Survivors of heatstroke may have significant heat-related morbidity,

such as inability to walk and talk. *Id.*  Permanent neurological damage occurs in up to 17% of

survivors. *Id.*  Individuals with illnesses such as hypertension are also more likely to succumb to

those conditions when under heat stress. *Id.*  Plaintiffs have already experienced symptoms that

23

indicate the early stages of such injuries, including profuse sweating, headaches, dizziness, difficulty breathing, increased heart rate. *Id. See also* Ball Aff. ¶ 4-10; Code Aff. ¶ 3-6; Magee Aff. ¶ 2-3.

At least one district court has found that conditions comparable to the ones present on the Death Row tiers were fatal. *Brock v. Warren Cty.*, 713 F. Supp. 238 (E.D. Tenn. 1989). *Brock* was a suit brought by the children of a deceased Tennessee inmate. Brock resided in a county jail for a single week in July 1986. *Id.* at 240. The court found that there was "a severe heat wave" at the time of Brock's incarceration, the cell had no air conditioning or fans, the cell had limited ventilation, and a thermometer in the adjoining hallway, which was cooler than the cell, "read as high as 110 degrees during the day and as high as 103 degrees to 104 degrees at night." *Id.* at 240-41. Brock ultimately became ill and died of heatstroke. *Id.* at 241. The conditions in *Brock* were substantially similar to the conditions in this case, and the risk of death or other serious health risk is apparent and imminent.[13]

The threatened injuries to Plaintiffs are sufficiently serious that mandatory injunctive relief is warranted. Defendants' past conduct in not providing adequate remedial measures or any other relief from the heat should be considered in anticipating their future conduct. Defendants have done little to alleviate heat conditions on Death Row tiers beyond installing some number of fans, which themselves are insufficient to correct the egregious conditions. This Court should, therefore, issue a preliminary injunction so as to avoid further risk of substantial harm to Plaintiffs.

### D. The Threatened Injury to Plaintiffs Outweighs the Threatened Harm that the Injunction May Cause to Defendants.

---

[13] *See also McCollum et al. v. Livingston et al.*, 3:12-cv-02037. In *McCollum*, a 58 year old man with hypertension was housed in a dormitory during a heat wave when temperatures exceeded 100° and heat index levels were in the "Extreme Danger" zone, and as a result of the heat suffered multi-system organ failure resulting in death. *Id.*

The threatened injury to plaintiffs, as articulated in the declarations of the two experts, is serious, irreparable, and even potentially fatal. Vassallo Decl. at 2, 6; Balsamo Decl. at 9.  These injuries are among the greatest prices an individual could pay as a result of the State's refusal to meet it constitutional obligations. Should these harms occur this summer as the temperatures continue to rise, the Plaintiffs would have no adequate remedy at law.

 In contrast to the irreparable harms Plaintiffs risk, including serious health problems and death, the hardship on the state would be solely financial.  As the managers of the prison and its buildings, Defendants are best positioned to generate plans to address the extreme heat Plaintiffs face.  While Plaintiffs acknowledge the costs of any plan to address these horrifying extreme heat conditions, such costs are outweighed by Plaintiffs' interests in remaining free from cruel and unusual punishment.  "Inadequate resources can never be an adequate justification for depriving any person of his constitutional rights."  *Smith v. Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977).  "Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts." *Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1974).  *See also Cohen v. Coahoma County*, 805 F. Supp. 398, 407 (N.D. Miss. 1992) (risk of bodily harm and anxiety are sufficient to outweigh Sheriff's interest against being "unfairly brand[ed] as perpetrators of unconstitutional conduct.").

### E.  Granting the Preliminary Injunction Will Protect the Public Interest by Barring Violations of Fundamental Constitutional and Statutory Rights.

Plaintiffs seek a preliminary injunction to end the ongoing and dangerous violation of their rights under the Eighth Amendment.  This Court prohibiting further violations of Plaintiffs' rights will promote the public interest.  As the Fifth Circuit has stated, "the public interest always is served when public officials act within the bounds of the law and respect the rights of the

citizens they serve." *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992). Courts have also recognized that barring discrimination on the basis of disabilities is wholly protective of the public interest. *See, e.g.*, *Rush v. Nat'l Bd. of Med. Examiners*, 268 F. Supp. 2d 673, 679 (N.D. Tex. 2003) (issuing preliminary injunction because "injunction . . . will further the public interest in prohibiting discrimination by public entities.").

In the instant case, Plaintiffs ask this Court to issue an injunction whereby Defendants – who are public officials – will be required to act within the bounds of the Eighth Amendment and statutory laws governing accommodations for those with disabilities. It is plain that, should this Court grant Plaintiffs' preliminary injunctive relief and end Defendants' current practice of subjecting inmates to stifling heat that poses serious risk of heat-related illness or death, the Court will be acting in the public interest.

### F. Plaintiffs' Proposed Preliminary Injunctive Relief is Consistent with Fifth Circuit Precedent and Narrow, Necessary, and Non-intrusive, as Required by the Prison Litigation Reform Act.

Plaintiffs seek injunctive relief in the form of an Order that will require the heat index on the Death Row tiers to be maintained at or below 88° – a level that will prevent the substantial harms from which Plaintiffs currently suffer and the continued risk of even more serious irreparable harm. Plaintiffs submit that the Defendants are in the best position to craft the means by which this requirement is best met.  Plaintiffs, therefore, specifically request that this Court direct the Defendants, within three days of entry of the Court's Order, to present to the Court and to Plaintiffs the proposed means by which the heat index on the Death Row tiers will be maintained below 88°.  The Court should then require Defendants to (1) implement such means and (2) cooperate with Plaintiffs' experts to ensure that implementation properly maintains a heat index lower than 88°. As detailed below, such relief is consistent with the relief authorized by

26

federal district courts and approved by federal courts of appeal.

In *Gates v. Cook*, 376 F. 3d 323 (5th Cir. 2004), the Fifth Circuit Court of Appeal approved a district court's injunctive relief relating to extreme heat in prisons.  *Gates* was a class action involving multiple subclasses and challenging a range of conditions in a Mississippi facility under the Eighth Amendment.  One Plaintiff subclass successfully sought the district court's issuance of an injunction requiring the prison to provide individual fans, ice water, and showers when the heat index exceeded 90°.  *Gates,* 376 F.3d at 336.  In the instant case, Plaintiffs' conditions are in many ways worse than those that led to an injunction in *Gates*, and this Court should therefore issue similar injunctive relief.[14]

In *Hadix v. Caruso*, 492 F.Supp.2d 743, 749-51, 753-54 (W.D.Mich. 2007), in response to plaintiffs' lawsuit alleging violations of the Eighth Amendment due to extreme heat, the district court ordered that high-risk prisoners must be housed where the summer heat index is below 90°. In the present case, the evidence shows that heat index levels have reached above 175°, thereby creating a substantial risk of harm to Plaintiffs and justifying this Court's authorization of similar relief. Heat Index Charts; Vassallo Decl. at 2; Balsamo Decl. at 4-7.

The requested relief is also consistent with the requirements of the Prison Litigation Reform Act of 1995, 18 U.S.C. § 3626(a)(2) ("PLRA"). The relevant provisions of the PLRA require that, in order to grant injunctive relief, the Court find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.*  The PLRA further

---

[14] Other portions of the *Gates* ruling are inapplicable here for at least two reasons.  While *Gates* challenged a range of conditions of confinement pertaining to multiple subclasses and relief was fashioned only for one sub-unit at the Mississippi prison, in this case the men on Death Row, including Plaintiffs, can be moved from one tier to another, and conditions are substantially uniform across all tiers.

stipulates that the court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C.A. § 3626(a). Under the PLRA, a preliminary injunction expires after 90 days without further order of the Court. *Id.*

Here, the relief requested is narrowly drawn, extends no further than necessary to correct the violation of the federal right, and is the least intrusive means necessary to correct the violation of a federal right. Plaintiffs ask this Court to order Defendants maintain a heat index along the Death Row tiers[15] that, pursuant to the evidence accompanying this motion, does not pose substantial risk to their health – i.e. maintain a heat index below 88°; provide clean ice and drinking water during the summer months; provide shower water at temperatures that can reasonably provide relief from excessive heat; and refrain from retaliating against Plaintiffs for bringing this action.[16]

Plaintiffs' proposed relief merely outlines broad results that should be achieved so as to prevent further harm to Plaintiffs. Importantly, Plaintiffs do not ask this Court to order Defendants to undertake highly specific steps to achieve such results, but rather to permit Defendants to determine the means by which specific heat alleviation goals can be achieved to prevent the substantial risks that Plaintiffs presently face. Plaintiffs' requested relief – precisely because it permits Defendants to craft the implementation of narrowly tailored relief required to

---

[15] Such relief for all death row tiers is appropriate and within the Court's authority pursuant to the PLRA. *See, e.g.*, *Clement v. California Dept. of Corrections*, 364 F.3d 1148 (9th Cir. 2004) (single plaintiff obtained statewide injunction against prohibition on receipt of materials downloaded from the Internet); *Ashker v. California Dep't of Corrections*, 350 F.3d 917, 924 (9th Cir. 2003) (statewide injunction based on one inmate); *Williams v. Wilkinson*, 132 F.Supp.2d 601, 604, 608-09, 611-12 (S.D. Ohio 2001) (finding an informal policy of refusing to call witnesses in disciplinary hearings, rejecting defendants' argument that the PLRA limited relief to the individual plaintiff, directing defendants to promulgate a new policy).

[16] Plaintiffs acknowledge that in *Smith*, 553 F.2d at 381, the Fifth Circuit overturned a district court's order requiring temperatures to be maintained within a specific range. *Smith* is inapplicable to instant case for two reasons. First, *Smith* was decided prior to the enactment of the PLRA in 1996. 18 U.S.C.A. § 3626. Thus, *Smith* was not operating within the requirements of the PLRA that any injunctive relief be narrow, necessary, and non-intrusive. Second, the Court of Appeal in *Smith* made clear that requiring temperatures to be maintained within a specific range would be proper "[i]f the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health." *Id.* Here, Plaintiffs have provided such proof through two expert declarations, NOAA charts, and other evidence. *Smith*, therefore, is wholly inapplicable to the instant case.

prevent the risk of substantial harms Plaintiffs face – by definition meets the PLRA's

requirements that preliminary injunctions be narrow, necessary, and employ the least-intrusive

means.  18 U.S.C. § 3626(a)(2).[17]

### G.  *The Bond Requirement Should Be Waived.*

The Plaintiffs respectfully request that the Court waive the bond requirement contained in

Federal Rule of Civil Procedure 65(c), given the strength of the case, the Plaintiffs' indigence,

and the strong public interest involved.  *See, e.g.*, *Molton Co v. Eagle-Picher Industries, Inc.*, 55

F.3d 1171, 1176 (6th Cir. 1995) (approving waiver of bond given strength of case and "the

strong public interest" involved); *Campos v. INS*, 70 F. Supp. 2d 1296, 1310 (S.D. Fla. 1998)

(because plaintiffs were indigent and sought to vindicate their constitutional rights, consistent

with the public interest, the court did not require a bond).  Furthermore, the requirement of a

bond is contrary to the proposition that inadequate resources – under no circumstances – justify a

prison's deprivation of constitutional rights. *See, e.g.*, *Smith v. Sullivan,* 553 F.2d 373, 378 (5th

Cir. 1977) (inadequate resources can *never* be a justification for depriving an inmate of his

constitutional rights). Consistent with this well-established principle, this Court should not

require Plaintiffs, who are plainly indigent, to post a bond in order to protect their constitutional

rights and prevent the substantial harms that they risk facing as a result of the extreme heat.

### 4.  CONCLUSION

Because the Plaintiffs have satisfied all of the elements for the issuance of a preliminary

---

[17] At this time, Plaintiffs believe that the Death Row tiers may be equipped with facilities necessary for air conditioning based on the fact that there is duct work throughout the tiers, the rest of the building is air conditioned, and the building was built with federal funds in 2008.  It is facially implausible that anyone would construct a new building in south Louisiana in 2008 and not outfit that building with a proper cooling system.  Additionally, the architects of the building, Grace & Hebert, describe the facility as "state of the art," further suggesting that it is equipped with standard HVAC (Heating, Ventilation and Air Conditioning) systems (http://www.graceandhebert.com/Portfolio/Justice/Louisiana-State-Penitentiary-Death-Row-Complex.html, last visited May 14, 2013).  While Plaintiffs do not specifically seek use of air conditioning to maintain heat index levels below 88°, Plaintiffs highlight this fact to point out that Defendants are fully capable of preventing the risk of substantial harm to Plaintiffs.

injunction, the motion should be **GRANTED.**

Respectfully submitted this 18th day of June, 2013,

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287 (Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org


Mitchell A. Kamin, Ca. Bar No. 202788
Jessica C. Kornberg, Ca. Bar No. 264490
Nilay U. Vora, Ca. Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201- 2100
Fax (310) 201- 2110

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana 70113
Tel. (504)581-9322
Fax (504)581-7651
Email: steve@sswethicslaw.com