**Declaration of James J. Balsamo, Jr., MS, MPH, MHA, R.S., CSP, CHMM, DLAAS**

<u>Introduction</u>

My name is James J. Balsamo, Jr.  I have over 43 years of experience in environmental health and safety and have a BS in Pre-Med/Zoology, MS in Nutrition Research, MPH in Medical Care Administration (Institutional Environmental Health) and MHA in Hospital Administration.  I am credentialed as a Licensed Sanitarian, State of Louisiana, Registered Sanitarian thru the National Environmental Health Association, Certified Safety Professional by the Board of Certified Safety Professionals, Certified Hazardous Materials Manager by the Institute of Hazardous Materials Managers, Certified Healthcare Safety Professional by the International Board for Certification of Safety Managers. I am a Diplomate Laureate of the American Academy of Sanitarians and have been qualified in 5 different Federal Courts as an expert in Environmental Health and Safety.   I have been retained as a private consultant expert by the Advocacy Center and the Promise of Justice Initiative in New Orleans, Louisiana, to review documents, inspect the site, and make observations of my findings relative to the conditions of confinement in the area of environmental health and safety conditions at the Death Row Tiers at the Louisiana State Penitentiary (LSP) at Angola, Louisiana, with special emphasis on the heat related conditions of these facilities.  From my review, I was asked to opine as to my findings related to the subjects of concern noted above.

My on-site review at the Death Row Tiers at Angola was carried out with an attorney from the Advocacy Center on September 14, 2012, and my review of documents related to this facility continues through this report date. My inspection at Angola consisted of a walk-through of several cellblocks (approximately 5-6) of one housing unit where we were only able to observe the premises and not allowed to take any environmental measurements or take any notes. We were allowed to speak with the prisoners. I had prepared numerous environmental measurement devices including thermometers, relative humidity, air velocity and illumination measuring instruments for this inspection but the prison prohibited me from using these instruments that day.

My recollection of the conditions noted at these units is that they had some small thermometers mounted at the wall approximately five feet from the floor at the far end of the corridors along the front of the row of cells (approximately 6-10 + cells) in each unit. Each tier/cellblock had several wall mounted fans blowing hot room air toward the face of the cells. These fans merely moved the air that was present in each cellblock. They do nothing to alleviate humidity, especially at high humidity levels. There were some windows (5 to 6) on the wall opposite the cell face and door. Some of these windows were randomly open and some were closed. The outside walls of a couple of cellblocks were perceptibly warm to touch indicating transmission of radiant heat into these units. There was a small shower in each cellblock/tier which adds moisture and heat to the air in these units which in-turn elevates the temperature and relative humidity in these cellblocks.

Not having air conditioning in the cellblocks means that the temperature and relative humidity outside these cellblocks/tiers is the starting point for the noted levels of temperature and relative humidity

inside them. Also there is body heat and moisture being given off by the prisoners through respiration. Radiant heat penetrates through the walls and windows in the cellblocks. All of these conditions contribute to the hot environmental conditions of each unit. On very hot and humid days that do occur in Louisiana, all these environmental conditions contribute to the level of the Heat Index (HI) which is the temperature the body feels when heat and humidity are combined and affects the health of the inmates in these cell-blocks/tiers.

Our bodies dissipate heat by varying the rate and depth of blood circulation, by losing water through the skin and sweat glands, and as a last resort, by panting, when blood is heated above 98.6°F. Sweating cools the body through evaporation. However, high relative humidity retards evaporation, robbing the body of its ability to cool itself. When heat gain exceeds the level of heat the body can remove, body temperature begins to rise, and heat related illnesses and disorders may develop.

Possible Heat illnesses/disorders are:

- Fatigue
- Heat cramps
- Heat exhaustion
- Heat stroke

Heat related literature indicates that the above listed heat related disorders/illnesses can be very serious, especially if combined with the fact that many prisoners are elderly, immune-compromised, have other underlying medical conditions and/or are taking certain medications affecting their heat tolerance. All three Plaintiffs meet one or more of these additional risk factors, which could exacerbate the heat situation and lead to the illnesses/disorders noted above. The Plaintiffs' affidavits note that they have already experienced the early symptoms of heat related illness, including headaches, dizziness and profuse sweating.  For these reasons, the heating issue in hot months is critical to prisoners' health, including that of Plaintiffs, and accurate environmental monitoring and heat emergency contingency plans must be provided in order to properly, accurately and adequately respond to these very serious and even potentially life-threatening situations.  It all starts with accurately monitoring the environmental temperature and humidity in the cellblocks, properly prioritizing each inmate's health conditions to tolerate increased heat, and providing precautionary steps to prevent the inmates from overheating and developing heat related medical illnesses or disorders.

My findings and comments are herein limited to the following issues: Heat Related Standards, Heat Index Chart, Description of Housing and Ventilation at LSP Angola, Temperature, Humidity and Heat Index, Heat Related Illnesses and Precautionary Measures.

## Materials Consulted

Not having any Angola generated heating data except the temperature logs generated in Cellblocks/Tiers (A,B,C,F,G,H) to use to determine if the environmental conditions in the above noted Cellblocks/Tiers during the months between May, 2012 and August, 2012 caused or contributed to the

harm of the inmates in these Cellblocks/Tiers, I was able to access the needed data from the nearest reliable weather reporting station and that was at the Baton Rouge, Ryan Airport, approximately 39 miles from Angola, Louisiana. This reporting station was used because it is the nearest one that records and preserves Relative Humidity data which is necessary to calculate the Heat Index (HI) which provides a means to show what the combination of heat and humidity actually feels like to the human body and the relative danger of these conditions causing heat illnesses such as heat cramps, heat exhaustion, heat stroke. Using the inside Cellblock/Tier temperature readings provided by Angola and the relative humidity provided by the Ryan Airport Weather station, the Heat Index (HI) for inside the Cellblocks/Tiers A,B,C,F,G,H was calculated at the times the heat and humidity readings were taken.  The historical data from the Baton Rouge Ryan airport and the Angola provided cellblock/tier temperature readings covered the period of time from May 1, 2012 to August 31, 2012. I also reviewed affidavits of the Plaintiffs regarding the heat conditions and health effects they experience.

Additionally, I reviewed the LSP Directive #12.005 entitled Sanitation and Hygiene which covers "Living and Work Area Temperature Checks" at the LSP Angola facility; LSP Directive #13.067 entitled "Psychotropic Medication and Heat Pathology;" and DOC Health Care Policy HC-45, also entitled "Psychotropic Medication and Heat Pathology." I also made reference to Table 3 of the ANSI/ASHRAE 55-1992 Standard, (Thermal Environmental Conditions for Human Occupancy), NOAA- National Weather Service Heat Index Chart/Matrix, the American Correctional Association, Adult Correctional Institutions Standards, Fourth Edition and an American Housing Survey for the United States – 2009, USDHUD, HI 50/09, 3/20/2011.

The American Correctional Association, ACA Standard 4-4152, states that air circulation should be at least 10 cubic feet of fresh or recirculated filtered air per minute per occupant for inmate rooms/cells in existing facilities. ACA is an organization of professionals in corrections that have adopted some reasonable non-binding standards that these professionals feel are acceptable to run a good and safe correctional facility. Correctional facilities can voluntarily apply for and achieve certification from ACA if they meet these standards. The air in the Death Row facility is not fresh air. It is really only recirculated (not filtered) air with possibly some unknown amount of outside make-up air if the wind blows the air into the tiers through the windows and if the windows are open. I noted some closed windows in the cellblocks/tiers I visited on 9/14/2012.

Also (ACA) Standard 4-4153, in the comment section states that the standard indicates that temperature and humidity should be capable of being mechanically raised or lowered to an acceptable comfort level. There was no way that this could be done in the cellblocks/tiers I visited with the equipment being used there.

**Findings: Conditions and Risks on Death Row**

**The Heat Index (HI)**

The National Oceanic and Atmospheric Administration (NOAA) provides the following description and categories of risk/danger regarding the use of the Heat Index:

> The NOAA Weather Heat Index (HI) is the temperature the body feels when heat and humidity are combined. Human bodies dissipate heat by varying the rate and depth of blood circulation, by losing water through the skin and the sweat glands, and lastly by panting, when blood is heated above 98.6 degrees Fahrenheit. Sweating cools the body through evaporation as stated earlier, however high relative humidity retards evaporation, and the body can't (or not efficiently-my emphasis\JJB) get rid of its heat. When heat gain by the body exceeds the level the body can remove, body temperature begins to rise and heat related illnesses and disorders can begin to occur. The Heat Index is based on temperature in the shade. Exposure to direct sunlight can increase the HI by up to 15 degrees Fahrenheit. The Heat Index (HI) provides, in an organized manner, what types of heat problems may occur and the relative severity of such a problem. This is based on the increasing HI which was obtained from the National Weather Service.

>  www.nws.noaa.gov/om/heat/index.shtml

**NOAA's National Weather Service**
**Heat Index**
Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity

☐ Caution    ☐ Extreme Caution    ☐ Danger    ☐ Extreme Danger

HI 80-90 degrees F. CAUTION: Fatigue possible with prolonged exposure and physical activity.

HI 90-105 degrees F. EXTREME CAUTION: Heat cramps and heat exhaustion possible.

HI 105-125 degrees F. DANGER: Heat cramps and heat exhaustion likely, and heat stroke possible.

HI 125 degrees F. or higher. EXTREME DANGER: Heat stroke is likely with continued exposure.

www.nws.noaa.gov/om/heat/index.shtml    See also www.Wikipedia.org/wiki/heat_index

It should be noted that when the human body temperature rises, air movement helps the body to get rid of body heat via sweating as long as the humidity is low enough to allow the heat to be lost to the air. High humidity impairs the body from getting rid of heat through evaporation.

Also, in a warm environment, where there is not enough difference between the body's temperature and its surroundings, then besides evaporative cooling, the other three cooling mechanisms (convection, conduction and radiation) may not be able to effectively help cool the body.  This is why just pushing around hot air inside the cells doesn't necessarily help cool the body and may increase the body temperature load if the air is hotter than the body temperature and evaporative cooling is impaired by high humidity levels.

See table 1 below to view Angola Heat Index (HI) Levels for different dates in certain cellblocks/tiers:

**TABLE 1**

| (2012) | (1) | (2) | (3) - (4)—(5) | | (6) | (7) |
|---|---|---|---|---|---|---|
| | Angola time | Angola Temp | Outside temp-Baton Rouge-Ryan Airport | | | Angola Heat Index |
| Date/Tier | logging temp. | in Logbooks | Min - Max | (AVG) Temp F. | % RH | Inside Cellblocks |
| 5/2/F | 3.01pm | 90 F. | 68 - 87 | (77.5) | 97 | 129 F.* |
| 5/31/F | 1.19pm | 90 F. | 71 – 90 | (80.5) | 93 | 125 F * |
| 7/6/F | 3.53pm | 95 F. | 74 - 93 | (83.5) | 94 | 152 F.* |
| 7/28/F | 3.41am | 91 | 78 – 92 | (85) | 88 | 125 F.* |
| 8/6/F | 9:30am | 93 | 74 – 94 | (84) | 97 | 145 F.* |

*The Heat Index readings above indicate that the inmates in this cellblock/tier on these dates and times were subject to very high heat levels which put them in the DANGER TO EXTREME DANGER Category, where heat stroke is highly likely. Prolonged exposure to high HI levels increases the risk of these adverse medical conditions occurring. Inmates experience during hot months, high HI levels daily and often even into the evenings. This is what the temperature feels like to an inmate's body on this tier on these dates and times.

Table 2 below contains some of the hottest Heat Index (HI) readings from May thru August 2012. These could be noted throughout most of the tiers/cellblocks during these three months in tiers B, C, F, G, and H.

## TABLE 2

| Date | Tier | Time | HI |
|---|---|---|---|
| 5/31/12 | G | 1:19pm | 162 degrees F. |
| 7/6/12 | G | 3:58pm | 183 F. |
| 7/6/12 | F | 3:53pm | 152 F. |
| 8/9/12 | C | 3:35pm | 163 F. |
| 7/19/12 | C | 6:20pm | 170 F. |
| 6/28/12 | B | 1:00am | 144 F. |
| 6/29/12 | A | 4:30pm | 165 F. |
| 7/19/12 | C | 6:20pm | 170 F. |

DOC Health Care Policy No. HC-45, 14 August 2009, page three, No. 4, states that "it is reasonable to assume that no area of the prison will exceed 90 degrees Fahrenheit by 6 p.m." This is not the case and LSP's temperature data shows the fallacy of this statement. Table 3 shows examples:

## TABLE 3

| Tier | Date-2012 | Time | Temperature F. |
|---|---|---|---|
| C | 6/11 | 11:42 pm | 94 |
|   | 6/16 | 11:45 pm | 92 |
|   | 6/20 | 11:30 pm | 94 |
|   | 6/22 | 9:46 pm | 94 |
|   | 7/2 | 9:38 pm | 98 |
|   | 7/5 | 9:00 pm | 98 |
| B | 6/25 | 9:15 pm | 92 |
|   | 6/27 | 7:00 pm | 95 |
|   | 7/2 | 9:38 pm | 94 |
|   | 7/3 | 10:46 pm | 92 |
|   | 7/5 | 9:00 pm | 92 |
|   | 8/1 | 9:30 pm | 92 |

| Tier | Date-2012 | Time | Temperature F. |
|---|---|---|---|
| G | 6/18 | 10:39 pm | 92 |
|   | 6/23 | 11:01 pm | 95 |
|   | 7/5  | 9:00 pm  | 99 |
|   | 7/18 | 11:53 pm | 95 |
|   | 7/19 | 9:28 pm  | 94 |
|   | 7/27 | 11:52 pm | 95 |

The data from the Angola Temperature Logs also show that comparable high temperatures (>90 degrees F.) extend into the early mornings such as 12:30 am until 4:30 am. There are numerous examples of this, but just to list a few in Table 4 should suffice to make this point.

**TABLE 4**

| Tier F | 6/30 | 1:30 am | 93 |
|---|---|---|---|
| Tier F | 7/28 | 3:41 am | 91 |
| Tier H | 7/3  | 12:30 am | 95 |
| Tier H | 7/26 | 3:00 am | 92 |
| Tier H | 8/5  | 1:30 am | 96 |
| Tier H | 8/9  | 4:30 am | 95 |

Making statements like the assumption stated in DOC Policy HC-45, that no area of the prison will exceed 90 degrees after 6 p.m., could lead to temperatures not being taken and incorrect heat precautions being taken to the detriment of the inmates in this facility.

**Consecutive or prolonged days of temperatures above 90 F.**

The following information shows how long prolonged exposures can be.

An example of this is Tier H where during the month of July, 2012 there were 19 of 31 days that had a high temperature at or above 90 degrees F. In the month of August, 2012 there were 21 consecutive days in Tier H with a high temperature of 90 degrees Fahrenheit or higher.

An example of the prolonged calculated Heat Index being in the Extreme Caution, Danger and/or Extreme Danger category is as follows:

> On Tier H from May 1, 2012 to August 31, 2012 (123 days), there were 98 days where the Heat Index was at EXTREME CAUTION, DANGER or EXTREME DANGER levels. Another example is Tier A where there were 87 of 123 days when the Heat Index was in the EXTREME CAUTION, DANGER, and EXTREME DANGER levels for heat illnesses of either heat exhaustion, heat cramps

or even heat stroke. The conditions in the other Tiers B, C, F and G are approximately the same during the period of May through August 2012.

It should be noted that these high Heat Index calculations and the resultant potential heat illness or disorders noted at various Heat Index levels are what can happen to healthy individuals. Those inmates who are elderly, morbidly obese, immune-compromised, or with underlying diseases or conditions such as hypertension, diabetes, mental conditions that require medications such a psychotropics, diuretics etc., are at earlier and possibly greater risk from high heating levels. Their heat tolerance is affected and they may not be able to safely handle high heat levels when the Heat Index is especially in the Danger or Extreme Danger levels.

### Precautionary Steps

The Health Care Policy No. HC-45, 14 August 2009, page two, item E.3 states that if the indoor temperatures reaches or exceeds 90 degrees, a heat alert will be declared and precautionary steps will be taken such as increased fluids and ice, allowing additional showers and issuance of cold wet towels, and increased ventilation to the areas as much as possible. LSP Policy No. 13.067 is nearly identical. It is notable that none of the three inmate affidavits noted in this report, even mentioned "cold wet towels" being provided during high heat times.

The above noted precautionary steps mentioned in Policy HC-45 do not take into account the advanced age, obese state, and health conditions of individuals such as Plaintiffs when planning to prevent heat related illnesses, but rather prevention is a "one size fits all" policy. Now, according to the policy, if individuals start to exhibit signs of heat related "pathology" they will be referred to the medical unit. With individuals who have been identified as elderly, morbidly obese, immune-compromised, or who have underlying diseases or conditions such as hypertension, diabetes, or mental conditions requiring certain medications such as psychotropics and diuretics, there is no good reason to wait until they start exhibiting heat related "pathology" before preventive steps are provided for them. This is what LSP's policy seems to be indicating. Also nowhere in this policy is there any consideration for prioritizing inmates with the conditions noted above, including Plaintiffs, and providing "respite areas" for them. Respite areas are cool environments and even multi-purpose rooms where air conditioning is provided for those who are especially at risk from high heating levels. These respite area can be an area where these types of individuals can go for an hour or so in some kind of order to cool down. These priority categorized inmates could be rotated through these rooms, i.e., respite areas.

It has been reported in the newspapers and evening news broadcasts how heat waves (events) have been detrimental to people's health. Most often it is reported that the sick and elderly are the ones suffering and dying during these adverse events. Public health officials give heat warnings to "free people" especially in the large cities when heat alerts are issued so as to help them protect themselves from high heat levels. They warn people with the kinds of illnesses and medical conditions previously discussed in this report and who do not have air conditioning available in their houses or apartments that they should go to the grocery store, library, movie theater, church, friend or relative's house or

some public areas that are air conditioned, even if only for a short period of time. However inmates like the Plaintiffs in this action are "not free" to seek their own "respite areas" and those who control their every movement must take such things into consideration. If these individuals can't be placed in an air conditioned dorm or cellblock/tier, then some type of respite area for them should be provided.

It needs to be emphasized that the Centers for Disease Control, CDC, states "Air-conditioning is the number one protective factor against heat-related illness and death." www.bt.cdc.gov/disasters/extremeheat/heat_guide.asp

## Conclusion

Because of the high temperature levels recorded for such protracted periods of time and because of the high humidity levels recorded for that general area, high "Heat Index" levels are often experienced at Angola in the Death Row Tiers and the inmates housed there are likely to suffer health related problems. The health risks faced by inmates at this prison as related to high heat (temperature) conditions are very serious including heat fatigue, heat cramps, heat exhaustion, and even heat stroke which can lead to the death of the so afflicted inmates. Health Precautions beyond those enumerated in Health Care Policy No. HC-45 – to which this prison does not appear to adhere, based on the information provided – are needed especially to protect those inmates who are in one manner or the other medically affected to a greater degree by heat than healthy individuals.

These high heat environmental conditions noted in my report contribute to the risk for heat stroke, heat cramps, and heat exhaustion up to and including death.

Remedial measures must be provided during high heat days. These conditions can adversely affect all the inmates including the healthiest ones, but especially the provision of limited air conditioned respite areas used on a rotating basis for high heat priority offenders such as Plaintiffs or the installation or use of air conditioning in housing units for these types of offenders (elderly, medically compromised, and/or those offenders taking certain types of medications) needs to be undertaken at this facility so future heat illnesses and even deaths do not occur. The full range of precautionary actions that need to be available to the prison officials during high heat (elevated Heat Index) times include the following actions:

- Risk rate the inmates on a priority basis as to which are most at risk of heat illnesses because of their physical and mental conditions.
- Monitor environmental temperatures and humidity each hour during all hours as long as conditions remain above 90 degrees F.
- Increase consumption of cool liquids during high heat days.
- Provide "ice" water for inmates during all hours of the day and night when temperatures are elevated to dangerous levels. This may mean providing ice more than

one time per shift at increased volumes as inmates are encouraged and need to drink more cool water during these high heat times.
- Allow for additional cooling showers with water temperatures remaining between 100 and 120 Degrees Fahrenheit. The shower temperatures should be monitored often to make sure the temperature remains between the above noted levels. Inmates should be allowed with proper security measures being taken to shower even late at night if temperatures remain high as was noted in my report.
- Allowance for the issuance of cold, wet towels.
- Assure all ventilation fans are working and moving fresh or recirculated filtered air into the cell housing area and into and through cells. Individual fans should be allowed and even provided to those who are listed as heat priority inmates because of their physical, medical and psychological conditions.
- Temperatures inside the housing units need to be monitored hourly and not every two hours as per Policy No. HC-45 and recorded in the unit log for consideration of enacting further precautionary steps. This is to be done until the temperature falls below 90 degrees Fahrenheit and not necessarily limit the temperature taking time from 10 am to 6 PM.
- The ideal situation to lessen or prevent any heat related illnesses is to house the inmates in air-conditioned housing units, however if this is not possible then respite areas should be provided for inmates when a "heat alert" is issued. These respite areas should be air-conditioned and the inmates, especially the high priority at risk inmates, should be allowed to rotate through the respite areas for at least one hour at a time. This is especially very important for those who because of illnesses, medical conditions, age, obesity, and the medications they are taking may make them more vulnerable (medically less heat tolerant) to heat illnesses up to and including heat stroke and death. If this cannot be done, then portable air conditioning units can be moved to the locked down cells and provided there on a rotating basis.

If such a comprehensive precautionary program is implemented, it is my opinion that the instances of adverse medical effects because of high temperature and humidity levels in correctional facilities can be reduced. The health and safety of the individuals in these areas is currently being compromised and could result in serious heat related consequences such as heat related illnesses up to and including death.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 17th day of June, 2013.

_____
James J. Balsamo, Jr., MS, MPH, MHA, R.S., CSP, CHMM, DLAAS

10