

**ADVOCACY CENTER**
SERVING PEOPLE WITH DISABILITIES AND SENIOR CITIZENS

July 31, 2012

Warden Burl Cain
Louisiana State Penitentiary
Angola, LA 70712

RE:   Excessive Temperature on Death Row

Dear Warden Cain:

    Recently, it has come to our attention that there are a number of prisoners with disabilities on death row, some with mental illness and a number of others with significant physical health problems, and that they have been subjected to excessive heat, particularly during the summer months. The information we have received is that temperatures on the Death Row tiers throughout July and August consistently range from 88 or 89 to 100 degrees and that on some occasions the temperature has risen to 105 or 108 degrees Fahrenheit during the hottest part of the day.

    It is our belief that such temperatures can have significant consequences to the health and well-being of persons on Death Row, particularly persons with disabilities. It is well-recognized that a heat index of 90 can result in heat illness, which in turn contributes to unnecessary death in two ways: by direct heat injury and by exacerbation of pre-existing illness, especially for high-risk groups including persons with cardiac and pulmonary disease, high blood pressure, the elderly, chronic invalids, persons taking certain medications such as diuretics, and persons suffering from severe obesity. In terms of setting the precise limits of safety for heat-related illness, the 90 heat index level was determined because data showed that heat injury risk begins at levels as low as an 80 heat index with a marked increase of heat-related injury and death at 90. *Hadix v. Caruso*, 492 F.Supp.2d 743, 745 (SD Mich. 2007).

    Based on the above information, the Advocacy Center (AC) is exercising our authority as Louisiana's designated "Protection and Advocacy System," or "P&A" to find that there is probable cause to believe that persons with mental illness and other persons with disabilities on death row are being subjected to abuse and neglect as a result of the prison's failure to take adequate steps to ameliorate the effects of high temperature. Pursuant to our authority under federal law, we will investigate the conditions on death row at Angola. In order to facilitate our investigation, we are first requesting a visit to the

504-522-2337 (Voice) • 1-800-960-7705 (Voice) • 1-855-861-3577 (TTY) • 504-522-5507 (Fax) • www.advocacyla.org

8325 Oak Street • New Orleans, Louisiana 70118

*The Protection and Advocacy System for Louisiana*

death row facility and an opportunity to meet with individuals with disabilities who are detained there. During the visit, we intend to be accompanied by Dr. Susi Vassallo, who currently teaches emergency medicine at the New York University medical school. Dr. Vassallo will assist us in determining whether these men are being subjected to excessive heat conditions that pose risk to their health. We propose making this visit on August 17, 2012.

Second, we request that a hydrometer (a device to measure humidity) be installed on death row and that prison staff take readings of it at the same time and frequency that they take temperature readings. As you probably know, temperature and humidity (the components of the heat index) are important to assessing the risk of heat-related injury to a particular person. Humidity is important because it interferes with effective cooling through use of the sweat glands. *Hadix v. Caruso*, 492 F.Supp.2d at 745.

Third, we request the opportunity to review inmate medical records at the time of our visit in order to obtain a clearer idea of which of them have medical issues that make them vulnerable to excessive heat conditions and to make recommendations on what steps can be taken to address their vulnerabilities.

Finally, we request that the following records be provided to us by August 6, 2012.

- Any and all documents pertaining to the temperature on death row for the months of June through September for the last 3 years.

- Any and all policies that describe efforts to ameliorate excessive heat on death row.

- Daily population logs listing the name, date of birth, and any identified medical condition of every person housed on death row between June 1, 2009 and the present.

- All requests for medical and mental health services completed by death row residents from January 1, 2009 until the present.

- All administrative grievance forms related to excessive temperature completed by death row residents from January 1, 2009 until the present.

To put these requests into context, the AC provides protection and advocacy services to people with a wide range of disabilities who are confined to institutions—including correctional facilities—throughout Louisiana, including persons who have a significant mental illness or emotional impairment, persons who have a developmental disability, and persons with a broad range of physical disabilities. *See* 42 U.S.C. § 10802

(4); 42 CFR 51.2; 29 U.S.C. § 794e (a)(1); 29 U.S.C. § 705 (20)(B). AC is part of a nationwide network of disability rights agencies, which are mandated, under various interrelated federal statutory programs, to provide legal representation and other advocacy services on behalf of all persons with disabilities. The programs (which collectively are referred to as the P&A statutes or programs) are as follows:

    (1)    Part C of Title I of the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (the DD Act), 42 U.S.C. 15041-15045;

    (2)    the Protection and Advocacy for Individuals with Mental Illness Act of 1986 (the PAIMI Act), 42 U.S.C. 10801 et seq.; and

    (3)    the Protection and Advocacy of Individual Rights (PAIR) Program of the Rehabilitation Act of 1973, 29 U.S.C. 794e.

The services AC provides pursuant to these statutes include the pursuit of legal, administrative and other remedies on behalf of persons with disabilities, on-site monitoring of health and safety conditions in both institutional and community settings, the dissemination of information on rights protection to facility residents and staff, and the investigation of allegations of abuse or neglect. As is now well established, the above statutes, and the regulations governing them, provide P&As with several important forms of access to enable them to effectively provide these services. As discussed in more detail below, P&As have access to facilities,[1] to residents of those facilities,[2] and to their records.[3]

## P&A Statute Applies to Prisons and Jails

The P&A Access Acts apply with full force to prisons and jails. The relevant federal regulation defining the facilities that covered under the Acts, provides "[f]acility includes any public or private residential setting that provides overnight care accompanied by treatment services. Facilities include, but are not limited to the following: general and psychiatric hospitals, nursing homes, board and care homes, community housing, juvenile detention facilities, homeless shelters, and *jails and prisons, including all general areas as well as special mental health or forensic units.*" 42 C.F.R. § 51.2. (emphasis added) *See also* 45 C.F.R. § 1386.19

---

[1] *See,* 42 U.S.C. § 10805(a)(3) and 42 C.F.R. § 51.42 (PAIMI); 42 U.S.C. § 15043(a)(2)(H) and 42 C.F.R. § 1386.22 (PADD).

[2] *See,* 42 C.F.R. § 51.42(d) (PAIMI); 42 C.F.R. § 1386.23(h) (PADD).

[3] *See,* 42 U.S.C. § 10805(a)(4) (PAIMI) and 42 U.S.C. § 15043(a)(2)(I) and (J) (PADD).

3

## Physical Access to Facilities and Jail Inmates

The federal statutes provide AC with the right and authority to have access to facilities and residents at 42 C.F.R. Part 51. This access authority includes, but is not limited to:

1. Reasonable unaccompanied access to all areas of the facility which are used by residents or which are accessible to residents. 42 C.F.R. § 42(a); 42 C.F.R. § 42(c).

2. Access to a facility for the purpose of providing information and training about individual rights and the protection and advocacy services available from the P&A system. 42 C.F.R. § 51.42(c)(1).

3. Access to monitor compliance with respect to the rights and safety of residents and to inspect, view and photograph all areas of the facility which are used by residents or are accessible to residents. 42 C.F.R. § 51.42(c)(2); 42 C.F.R. 51.42(c)(3).

## Authority to Access Records

P&As are authorized to investigate and access records related to allegations of abuse and neglect not only when they are directly reported to us by an individual; P&As may also investigate when there is a "complaint," such as a newspaper article or anonymous phone call [PADD regulations at 45 C.F.R. 1386.19], or where there is "probable cause" to suspect abuse or neglect. Courts have repeatedly ruled that the Protection and Advocacy System is the final arbiter regarding a determination of probable cause for the purposes of triggering the authority to access records. Protection and Advocacy System, Inc. v. David Freudenthal, 412 F.Supp.2d 1211 (D.Wy. 2006). It should also be noted that our authority to investigate and access information related to allegations of abuse and neglect is not dependant on the acquisition of client consent. Consent for release of such records to the P&A is not required. See, Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, et seq., and 42 C.F.R. 51.41(c); the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. Program of the Rehabilitation Act, 29 U.S.C. § 794e; Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center, 97 F.3d 492 (11th Cir. 1996); Arizona Center for Disability Law v. Allen, 197 F.R.D. 689 (D. Ariz. 2000).

The same statutes and regulations as cited above authorize this office to access reports prepared by facilities following an investigation that describes the incident, the steps taken to investigate and the information relied upon in making the report. Iowa

4

Protection and Advocacy Services, Inc. v. Rasmussen, 206 F.R.D. 630 (S.D. Iowa 2002). Federal Statutes authorize Protection and Advocacy Systems' access to *all* records of an individual prepared by any staff of a facility rendering care and treatment. 42 U.S.C. §§ 10805(a)(4)(A) and 10806(b)(3)(A); 42 U.S.C. §§ 15043(a)(2)(l)(ii) and 15043(c)(1). The P&A's authority to access documents extends to peer review records. Center for Legal Advocacy v. Hammons, 323 F.3d 1262 (10th Cir. 2003); Pennsylvania Protection and Advocacy, Inc. v. Houstoun, 228 F.3d 423 (3d Cir. 2000). You should also note that a state P&A is usually exempt from the requirements of the Health Insurance Portability and Accountability Act ("HIPAA"). See e.g. *Ohio Legal Rights Service v. The Buckeye Ranch, Inc.*, 365 F.Supp.2d 877 (S.D. Ohio 2005).

In sum, based on the information we have received and the authority granted by federal law, we intend to take a close look at the conditions on death row at Angola. We very much anticipate that you will fully cooperate with us in this matter. If you have any questions or any concerns about the timing of our planned visit, please do not hesitate to contact either of us.

Sincerely,

Ronald K. Lospennato,
Of Counsel

Miranda Tait
Managing Attorney

504-522-2337 (Voice) • 1-800-960-7705 (Voice) • 1-855-861-3577 (TTY) • 504-522-5507 (Fax) • www.advocacyla.org

8325 Oak Street • New Orleans, Louisiana 70118

*The Protection and Advocacy System for Louisiana*