UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
BATON ROUGE DIVISION

| | | |
|---|---|---|
| ADVOCACY CENTER | * | CIVIL ACTION NO._____ |
| PLAINTIFF | * | |
| | * | SECTION _____ |
| VS. | * | |
| JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS AND BURL CAIN, WARDEN OF THE LOUISIANA STATE PENITENTIARY | * | JUDGE _____ |
| DEFENDANTS | * | MAGISTRATE JUDGE _____ |

## **COMPLAINT**

### I. INTRODUCTION

1. Plaintiff is the designated protection and advocacy system for individuals with disabilities in the state of Louisiana pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801 *et seq.*; the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. §§ 15001 *et seq.*; and the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C. § 794e. (hereafter collectively referred to as the "P&A Acts"). The Advocacy Center has probable cause to believe that Defendants are subjecting prisoners with disabilities on Death Row, some with mental illness and a number of others with significant physical health related disabilities, to neglect and abuse by failing to take adequate steps to prevent them from being exposed to excessive heat, particularly during the summer months. Upon receiving notice of these conditions, Plaintiff informed Defendants that it intended to exercise its authority under the P&A Acts to investigate

1

these claims, but Defendants have repeatedly blocked its ability to carry out this investigation by (1) refusing to allow Plaintiff's attorneys to be accompanied by Dr. Susi Vassallo, a Clinical Associate Professor of Emergency Medicine, NYU School of Medicine to assist them in determining whether prisoners on Death Row are being subjected to excessive heat conditions that pose risks to their health (a copy of Dr. Vassallo's resume is attached to the complaint as Plaintiff's Exhibit 1 and incorporated herein by reference), (2) not allowing them to bring a hydrometer into the prison to measure humidity, and (3) by refusing to provide documents requested by the Advocacy Center as part of its investigation. Plaintiff brings this action pursuant to 42 U.S.C. §1983 to enforce its authority under the P & A Acts to investigate the conditions of excessive heat that it has probable cause to believe exist on Death Row at the Louisiana State Penitentiary at Angola.

## II.  JURISDICTION

2.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343 (3) and (4).  Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

## III.  PARTIES

3.    Plaintiff Advocacy Center is a non-profit corporation designated as an "eligible system" as those terms are used and defined in the P&A Acts.  Plaintiff provides protection and advocacy to people with disabilities.  Under the P&A Acts, Plaintiff has broad access rights to prisoners in Defendants' facilities and to facility records for the purpose of investigating allegations of neglect and abuse, monitoring facility conditions, and providing protection and advocacy services to specific prisoners. Such access includes "reasonable unaccompanied access" to facilities and to all areas of the facility

that are used by residents or accessible to residents at all times necessary to conduct a full investigation of abuse or neglect. 42 U.S.C. §§ 10805(a)(3), 15043(a)(2)(H); 42 C.F.R. 51.42(b) (PAIMI regulations).

4.    Defendant James M. LeBlanc is Secretary of the Louisiana Department of Public Safety and Corrections (hereinafter the "Department").  He is responsible for the policies of the Department, and for the administration, control, and operation of the functions, programs, and affairs of the Department, pursuant to L.R.S. §36:403.  He is sued in his official capacity.

5.    Defendant Burl Cain is Warden of the Louisiana State Penitentiary at Angola.  He is responsible for the operation and administration of the State Penitentiary. He is sued in his official capacity.

6.    Louisiana State Penitentiary at Angola is a "facility" as that term is used and defined in the P&A Acts.

7.    In connection with all actions and omissions alleged herein, Defendants were acting under color of state law.

IV.    FACTS

8.    On or about May 17, 2012, Plaintiff was contacted by Mercedes Montagnes, an attorney working with The Capital Appeals Project in New Orleans, regarding the conditions of excessive heat that prisoners on Death Row were being subjected.  She indicated that she had written a letter to Warden Cain requesting that he place a hydrometer on Death Row to measure humidity and to take steps to correct the excessive heat problem.  She also pointed out that a number of those prisoners had significant mental health and physical disabilities and that they were particularly vulnerable to excessive heat. A copy of the letter is attached to the complaint as

3

Plaintiff's Exhibit 2 and incorporated herein by reference. She asked the Advocacy Center to exercise its broad investigative authority to address this issue.

9.  A hydrometer is needed to adequately investigate the allegation of excessive heat because it is a critical tool in measuring the heat index. Both temperature and humidity (the components of the heat index) are important to assessing the risk of heat-related injury to a particular person. Humidity is important because it interferes with effective cooling through use of the sweat glands. Other important factors include: acclimatization (the human body's adjustment to a regular heat-level at a particular time); the length of exposure to extreme heat conditions; and the presence of heat-related illnesses which either interfere with effective cooling and/or may cause illness or death due to the body's inability to cope with the demands of extreme temperature.

10. In terms of assessing risks of heat-related illness, studies shows that heat injury risk begins at levels as low as an 80 heat index and heat-related injury increases markedly at a 90 heat index.

11. The extreme heat at Louisiana State Penitentiary has been a long-standing problem. In 1991, the US Department of Justice wrote a letter to prison officials pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA") which addressed a number of problems facing the Penitentiary. A copy of the letter is attached to the complaint as Plaintiff's Exhibit 3 and incorporated herein by reference. In that letter, the Department of Justice stated that "[t]he temperature in the majority of cells and dormitories at LSP was well over 90 degrees when we toured the prison in early September 1990." *Id.* at 5. It went on to describe the conditions: "Bars were hot to the touch and inmates were observed lying nude on the concrete floor, ostensibly to stay cool." *Id.* at 5-6. The letter concluded that "[s]uch conditions put the inmates at risk for any number of heat-related

4

maladies. In particular, excessive heat poses a danger to those LSP inmates on psychotropic medication whose high body temperatures can cause serious and life threatening side effects." *Id.* at 6.

12. Upon information and belief, many of the men held on Death Row have medical conditions and disabilities that put them at risk for heat related illness. In the past two years, several men held on Death Row who have underlying chronic health problems have required hospitalization and intensive care during the summer months, when temperatures are consistently dangerously high and high humidity impedes the body's natural cooling mechanisms.

13. Persons on psychotropic medication, with diabetes, and with pulmonary and cardiovascular illnesses are particularly vulnerable to excessive temperatures. These medications and medical conditions impede the body's ability to regulate temperature through sweating. Psychotropic medications and some medications given to treat chronic cardiac diseases can cause severe dehydration, increasing the potential for heat related illness and severe heart problems.

14. A heat index over 90 poses a significant health risk to the men taking psychotropic medications or with these underlying health problems.

15. The problems posed by excessive heat can have dire consequences for persons with diabetes. Diabetes can cause organ and nerve damage in all areas of the body, including sweat glands. Studies have quantified the decrease in sweat and cooling ability in persons with diabetes and have found that their core temperature was generally raised at least one degree Celsius above those in a control group. As a result, persons with diabetes frequently have more adverse health outcomes, i.e., hospital room visits or death, in high external temperatures.

16. For those with cardiovascular or pulmonary diseases, the effects of elevated temperatures and high humidity can also be fatal. The heart experiences increased strain because blood is pooled under the skin to increase cooling. However, this pooling reduces the efficiency of each heartbeat, requiring the heart to work harder in order to allow blood to pool near the skin and maintain normal operations of the body. Anyone with compromised cardiac function will be more likely to feel adverse effects of heat in part because of the stresses placed on the heart when the body is attempting to cool itself.

17. Subjecting prisoners to excessive heat is a form of neglect and abuse and, if proven, would constitute a violation of prisoner's rights guaranteed by the Eighth Amendment to the United States Constitution. See Gates v. Cook, 376 F.3d 323 (5th Cir. 2004).

18. On July 31, 2012, after receiving information that Warden Cain had failed to take adequate steps to address the issue of excessive heat, the Advocacy Center sent a letter to the warden indicating that it had probable cause to believe that prisoners were being subjected to abuse and neglect and stating that they intended to investigate conditions on August 17, 2012. A copy of the letter is attached to the complaint as Plaintiff's Exhibit 4 and incorporated herein by reference. The letter also stated that Plaintiff's attorneys would be accompanied by Dr. Vassallo and requested that prison officials install a hydrometer on Death Row to measure humidity. Dr. Vassallo is acting as an agent of the Plaintiff as is specifically permitted under federal law. 42 C.F.R. § 51.42(a).

19. In the July 31, 2012 letter, Plaintiff also requested that a number of relevant documents be disclosed to it on or before August 6, 2012, including:

6

- Any and all documents pertaining to the temperature on Death Row for the months of June through September for the last 3 years.

- Any and all policies that describe efforts to ameliorate excessive heat on Death Row.

- Daily population logs listing the name, date of birth, and any identified medical condition of every person housed on Death Row between June 1, 2009 and the present.

- All requests for medical and mental health services completed by Death Row residents from January 1, 2009 until the present.

- All administrative grievance forms related to excessive temperature completed by Death Row residents from January 1, 2009 until the present.

20. Plaintiff has not received a written response to the July 31, 2012 letter.

21. Defendants have failed and refused to provide the Advocacy Center with the records they have requested in the July 31, 2012 letter as required by the P&A Acts.

22. On August 10, 2012, having not received a response to the July 31, 2012 letter and needing to have travel arrangements made for Dr. Vassallo, including the purchase of a roundtrip airline ticket, Plaintiff's attorney contacted Warden Cain's office to determine whether the August 17, 2012 date for visit was acceptable and to determine the status of Plaintiff's other requests. Plaintiff's attorney learned that the matter was being handled by Warden Bruce Dodd.

23. Upon reaching Warden Dodd on August 10, 2012, Plaintiff's attorney was advised while he could visit and tour the Death Row facility he would not be allowed to have Dr. Vassallo accompany him and talk to prisoners about their experiences with heat and humidity. It was also unclear to plaintiff's attorney whether he would be allowed to visit and speak with prisoners.

24. During the August 10, 2012 telephone call, Plaintiff's attorney was led to believe that Warden Dodd had not seen or reviewed Plaintiff's July 31, 2012 letter and was unfamiliar with the legal authorities contained therein. Accordingly, Plaintiff's attorney agreed to speak to Warden Dodd again on Monday, August 13, 2012 after Warden Dodd had had an opportunity to review the letter.

25. Plaintiff's attorney called Warden Dodd's office repeatedly on August 13, 2012. Despite these repeated calls, Plaintiff's attorney was not able to speak with Warden Dodd. Instead, his secretary conveyed the message to counsel from Warden Dodd that the prison administration would not permit Dr. Vassallo to visit Death Row and interview prisoners and would not allow the Advocacy Center to bring the hydrometer into the Penitentiary.

26. As a result of Defendants' failure to provide the Advocacy Center and its agent, Dr. Vassallo, with access to prisoners and the prison records that have been requested, Plaintiff has been unable to fulfill its mandate under the P&A Acts. Without access to the facility with qualified medical personnel and appropriate equipment, such as a hydrometer, and access to the records requested, no determination can be made regarding whether prisoners on Death Row at the Louisiana State Penitentiary at Angola are being subjected to neglect and abuse by virtue of excessive heat, and therefore, no protection and advocacy assistance can be provided.

27. In order to enforce its right under the P&A Acts to access the facility and the records requested, Plaintiff has had to expend its limited resources in bringing this action, rather than providing the other protection and advocacy services that constitute its mission.

VII. CAUSE OF ACTION--§1983

28. Plaintiff realleges the matters set forth above in paragraphs 1 through 27.

29. The P&A Acts provide Plaintiff with the right and authority to have access to facilities and residents. 42 U.S.C. §§ 10805(a)(3), 15043(a)(2)(H) and 42 C.F.R. Part 51. This access authority includes, but is not limited to:

a. Reasonable unaccompanied access to all areas of the facility which are used by residents or which are accessible to residents. 42 C.F.R. § 51.42(b); 42 C.F.R. § 42(c).

b. Access to a facility for the purpose of providing information and training about individual rights and the protection and advocacy services available from the P&A system. 42 C.F.R. § 51.42(c)(1).

c. Access to monitor compliance with respect to the rights and safety of residents and to inspect, view and photograph all areas of the facility which are used by residents or are accessible to residents. 42 C.F.R. § 51.42(c)(2); 42 C.F.R. 51.42(c)(3).

30. Plaintiff is also authorized to investigate and access records related to allegations of abuse and neglect not only when they are directly reported to it by an individual, when there is a "complaint," such as a newspaper article or anonymous phone call [PADD regulations at 45 C.F.R. 1386.19], or where there is "probable cause" to suspect abuse or neglect. Plaintiff, not Defendants, is the final arbiter regarding a determination of probable cause for the purposes of triggering the authority to access records.

31. Plaintiff has the authority under federal law to access *all* records of an individual prepared by any staff of a facility rendering care and treatment and this authority to access documents extends to peer review records. 42 U.S.C. §§ 10805(a)(4)(A) and 10806(b)(3)(A); 42 U.S.C. §§ 15043(a)(2)(l)(ii) and 15043(c)(1).

32. Defendants' acts and omissions set forth above have violated 42 U.S.C. § 1983 by depriving Plaintiff of rights under the P&A Acts, including, but not limited to,

9

the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801 *et seq.*; the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. §§ 15001 *et seq.*; and the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C. § 794e.

33. Plaintiff is entitled to recover its attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. §1988.

## VIII. PRAYERS FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A. Declare that Defendants' failure to grant Plaintiff with sufficient access to fully investigate the conditions of heat and humidity on Death Row violates Plaintiff's rights under 42 U.S.C. §10805 (a) (4) (A), and 42 U.S.C. § 15043(a)(2)(B) and 42 U.S.C. §1983;

B. Declare that Defendants' failure to grant Plaintiff access to the records requested in its July 31, 2012 letter has violated his rights under 42 U.S.C. §10805(a)(1)(B) and (a)(4)(A) and 42 U.S.C. § 15043(a)(2)(I);

C. Declare that Defendants have an obligation to assure that the access rights granted to Plaintiff by the P&A Acts are fully and uniformly implemented at all of Defendants' facilities;

D. Grant Plaintiff a temporary restraining order and preliminary and permanent injunctions requiring Defendants to immediately provide Plaintiff access to the requested records, as set forth in paragraph 19 of this complaint;

E. Preliminarily and permanently enjoin Defendants from violating Plaintiff's rights under 42 U.S.C. § 1983 and the P&A Acts;

F. Waive the security requirement of Rule 65(c);

G. Order Defendants to pay Plaintiff's reasonable attorneys' fees and costs; and

H. Order any other and further relief, both legal and equitable, to which Plaintiff may be entitled.

Respectfully submitted this 17th day of August 2012,

s/ Ronald K. Lospennato
_____
Ronald K. Lospennato, La. Bar No. 32191
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-208-4679
504-335-2890
rlospennato@advocacyla.org

s/ Miranda Tait
_____
Miranda Tait, T.A., La. Bar No. 28898
Advocacy Center
600 Jefferson Street, Suite 812
Lafayette, Louisiana 70501
337-237-7380, ext. 313
337-237-0486 (fax)
mtait@advocacyla.org