UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
BATON ROUGE DIVISION

| | | |
|---|---|---|
| ADVOCACY CENTER | * | CIVIL ACTION NO._____ |
| | * | |
| PLAINTIFF | * | |
| | * | |
| | * | SECTION _____ |
| | * | |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF | * | JUDGE _____ |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS | * | |
| AND BURL CAIN, WARDEN OF THE | * | |
| LOUISIANA STATE PENITENTIARY | * | |
| | * | |
| DEFENDANTS | * | MAGISTRATE JUDGE _____ |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTIONS
FOR TEMPORARY RESTRAINING ORDER
AND A PRELIMINARY INJUNCTION**

**I.     SUMMARY OF ARGUMENT**

Plaintiff is the protection and advocacy system for individuals with disabilities in the state of Louisiana. The state receives funding from the federal government and in return must designate a protection and advocacy system under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801 *et seq.*; the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. §§ 15001 *et seq.*; and the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C. § 794e. (hereafter collectively referred to as the "P&A Acts").

The Advocacy Center, as a protection and advocacy program, has the authority to pursue legal, administrative and other remedies to ensure the protection of individuals

1

with disabilities who are receiving care or treatment in Louisiana. In order to ensure that P&A agencies, such as the Advocacy Center and its "authorized agents," 42 C.F.R. § 51.42(a), can carry out this authority, the P&A Acts provide them with broad access rights to prisoners in Defendants' facilities and to facility records for the purpose of investigating allegations of abuse and neglect, monitoring facility conditions and providing protection and advocacy services to specific prisoners. *See e.g.* 42 U.S.C. §§ 10805(a)(3) and 15043(a)(2)(H); 42 C.F.R. § 51.42(b) (PAIMI regulations). Likewise, individuals within Defendants' facilities have a broad right of access to the protection and advocacy services provided by Plaintiff.

The Advocacy Center has probable cause to believe that Defendants are subjecting prisoners with disabilities on Death Row to neglect and abuse by failing to take adequate steps to prevent them from being exposed to excessive heat, particularly during the summer months. Upon receiving notice of these allegations, Plaintiff informed Defendants that it intended to exercise its authority under the P&A Acts to investigate these claims, but Defendants have repeatedly blocked its ability to carry out this investigation by (1) refusing to allow Plaintiff's attorneys to be accompanied by Dr. Susi Vassallo, a Clinical Associate Professor of Emergency Medicine, NYU School of Medicine, to assist them in determining whether prisoners on Death Row are being subjected to excessive heat conditions that pose risks to their health, (2) by not allowing them to bring a hydrometer into the prison to measure humidity, and (3) by refusing to respond to their request for relevant documents.

Thus, the basic issue in the instant case concerns Plaintiff's right and authority under the P&A Acts to utilize effective measures, including authorized qualified agents,

necessary equipment, and access to records in order to investigate conditions on Death Row at the Louisiana State Penitentiary at Angola when it has probable cause to believe that prisoners are being subjected to neglect and abuse. Because Defendants are interfering with these rights and authority, Plaintiff is entitled to an injunction in order to fulfill its mandate under the PAIMI Act. Defendants' refusal to comply has created a "chilling effect" on Plaintiff's ability to promptly and effectively provide protection and advocacy to inmates with disabilities, thereby causing irreparable harm, which outweighs any harm to the Defendants in providing effective access and releasing the requested records. The P&A Acts are very explicit in granting Plaintiff the access they seek, virtually assuring that Plaintiff will ultimately succeed on the merits of its claim. Providing Plaintiff with this access would cause no harm to others and would enable Plaintiff to continue its responsibility to advocate on behalf of individuals with disabilities.

Although there is no requirement that Plaintiff exhaust remedies before bringing this suit, Plaintiff has tried to negotiate with Defendants to eliminate these illegal and inconsistent policies and practices. However, these efforts have been unsuccessful. Therefore, Plaintiff requests that this court order Defendants, in accordance with the P&A Acts, to immediately provide Plaintiff access to the Louisiana State Penitentiary with Dr. Vassallo, permit them to utilize a hydrometer to measure humidity at the facility, and provide the mental health records requested.

## II. STATEMENT OF FACTS

On or about May 17, 2012, Mercedes Montagnes, an attorney working with The Capital Appeals Project in New Orleans, contacted Plaintiff regarding the conditions of excessive heat to which prisoners on Death Row were being subjected.  See Declaration of Ronald Lospennato.  In April of this year, Ms. Montagnes had written a letter to Warden Cain requesting that he place a hydrometer on Death Row to measure humidity and to take steps to correct the excessive heat problem.  In that letter, she pointed out that a number of those prisoners had significant mental health and physical disabilities and that they were particularly vulnerable to excessive heat. She also noted that over the past two years, several men held on Death Row who have underlying chronic health problems had required hospitalization and intensive care during the summer months, when temperatures are consistently dangerously high and high humidity impedes the body's natural cooling mechanisms. Plaintiff's Exhibit 2.  Ms. Montagnes contacted the Advocacy Center due to her concern that Warden Cain would not act on this request and to inquire whether the Advocacy Center would exercise its broad investigative authority to address this issue.

On July 31, 2012, after receiving information that Warden Cain had failed to take adequate steps to address the issue of excessive heat, the Advocacy Center sent a letter to the warden indicating that it had probable cause to believe that prisoners were being subjected to abuse and neglect and stating that they intended to investigate conditions on August 17, 2012. See Plaintiff's Exhibit 4. The letter also stated that Plaintiff's attorneys would be accompanied by Dr. Susi Vassallo, a Clinical Associate Professor of

4

Emergency Medicine, NYU School of Medicine,[1] to assist them in determining whether prisoners on Death Row are being subjected to excessive heat conditions that pose risks to their health and requested that prison officials install a hydrometer on Death Row to measure humidity.

In the July 31, 2012 letter, Plaintiff also requested that a number of relevant documents be disclosed to it on or before August 6, 2012, including:

- Any and all documents pertaining to the temperature on Death Row for the months of June through September for the last 3 years.

- Any and all policies that describe efforts to ameliorate excessive heat on Death Row.

- Daily population logs listing the name, date of birth, and any identified medical condition of every person housed on Death Row between June 1, 2009 and the present.

- All requests for medical and mental health services completed by Death Row residents from January 1, 2009 until the present.

- All administrative grievance forms related to excessive temperature completed by Death Row residents from January 1, 2009 until the present.

The fact that allegations such as these would subject the Penitentiary to scrutiny by a Protection and Advocacy organization should have been a surprise to no one, particularly officials charged with the administration of the prison. First, Ms. Montagnes' letter of April 30, 2012 put prison officials on fair notice that conditions at the Penitentiary posed significant Constitutional issues and created a real threat of imminent harm to prisoners in that facility.

Second, it is well established in the Circuit that subjecting prisoners to excessive heat is a form of cruel and unusual punishment that, if proven, would constitute a

---

[1] Dr. Vassallo is acting as an agent of the Plaintiff as is specifically permitted under federal law. See e.g. 42 C.F.R. § 51.42(a).

5

violation of prisoner's rights guaranteed by the Eighth Amendment to the United States Constitution. See Gates v. Cook, 376 F.3d 323, 340 (5th Cir. 2004).

Third, the Louisiana State Penitentiary has encountered this concern before. In its 1991 Civil Rights of Institutionalized Persons Act ("CRIPA") letter on the problems facing the Penitentiary, the Department of Justice stated that "[t]he temperature in the majority of cells and dormitories at LSP was well over 90 degrees when we toured the prison in early September 1990." It went on to describe the conditions: "Bars were hot to the touch and inmates were observed lying nude on the concrete floor, ostensibly to stay cool." The letter concluded that "[s]uch conditions put the inmates at risk for any number of heat-related maladies. In particular, excessive heat poses a danger to those LSP inmates on psychotropic medication whose high body temperatures can cause serious and life threatening side effects."

Notwithstanding the fact that these issues should have been of grave concern to Defendants and should have engendered a more cooperative response to Plaintiff's requests, Defendants have never responded in writing to the July 31, 2012 letter and have failed and refused to provide the Advocacy Center with the records they have requested as required by the P&A Acts.

On August 10, 2012, having not received a response to the July 31, 2012 letter and needing to have travel arrangements made for Dr. Vassallo, including the purchase of a roundtrip airline ticket, Plaintiff's attorney contacted Warden Cain's office to determine whether the August 17, 2012 date for visit was acceptable and to determine the status of Plaintiff's other requests. Plaintiff's attorney learned that the matter was being handled by Warden Bruce Dodd.

Upon reaching Warden Dodd on August 10, 2012, Plaintiff's attorney was advised that while he could visit and tour the Death Row facility he would not be allowed to have Dr. Vassallo accompany him and talk to prisoners about their experiences with heat and humidity. It was also unclear to plaintiff's attorney whether he would be allowed to visit and speak with prisoners.

During the August 10, 2012 telephone call, Plaintiff's attorney was led to believe that Warden Dodd had not seen or reviewed Plaintiff's July 31, 2012 letter and was unfamiliar with the legal authorities contained therein. Accordingly, Plaintiff's attorney agreed to speak to Warden Dodd again on Monday, August 13, 2012, after he had had an opportunity to review the letter. Plaintiff's attorney called Warden Dodd's office repeatedly on August 13, 2012. Despite these repeated calls, Plaintiff's attorney was not able to speak with Warden Dodd. Instead, Warden Dodd's secretary conveyed the message that the prison administration would not permit Dr. Vassallo to visit Death Row and interview prisoners and would not allow the Advocacy Center to bring the hydrometer into the Penitentiary.

As a result of Defendants' failure to provide the Advocacy Center and its agent, Dr. Vassallo, with access to prisoners and to the prison records that were requested, Plaintiff has been unable to fulfill its mandate under the P&A Acts. Without access to the facility with qualified medical personnel and appropriate equipment, such as a hydrometer, and access to the records requested, no determination can be made regarding whether prisoners on Death Row at the Louisiana State Penitentiary at Angola are being subjected to neglect and abuse by virtue of excessive heat, and therefore, no protection and advocacy assistance can be provided. In short, Defendants are thwarting Plaintiff's

ability to fulfill its responsibilities under federal law, and individuals with disabilities are being denied meaningful access to Plaintiff's services.

## ARGUMENT

A. **PLAINTIFF HAS THE AUTHORITY TO EFFECTIVELY INVESTIGATE ALLEGATIONS OF NEGLECT AND ABUSE, TO MEET WITH INMATES IN JAILS AND PRISONS, AND TO OBTAIN ACCESSS TO PRISON RECORDS PURSUANT TO THE P&A ACTS.**

There are three Federal statutes that require each state to maintain a P&A system:

1. The Developmental Disabilities Assistance and Bill of Rights Act, Public Law 101-496, Part C, as amended ("DD Act");

2. The Protection and Advocacy for Individuals with Mental Illness Act, Public Law 99-319, as amended ("PAIMI"); and

3. The Protection and Advocacy for Individual Rights Act, Public Law 93-112, as amended ("PAIR").

Plaintiff is designated as Louisiana's "eligible [protection and advocacy] system," 42 U.S.C. §10802 (2), and is mandated to investigate and remedy abuse and neglect of persons with disabilities, and to provide them with legal representation and advocacy services. See, e.g. 42 U.S.C. §10805 (a) (1) (A) and (B), 42 U.S.C. §6042 (a) (2) (A) and (B). The Advocacy Center is part of a nationwide network of disability rights agencies which are mandated under the Act and its sister statutes to investigate and remedy abuse and neglect of persons with disabilities, and provide them with legal representation and advocacy services.

The first of these statutes, the DD Act, was enacted in 1975 on behalf of persons with developmental disabilities. Shocked by the inhumane and despicable conditions at New York's Willowbrook State School for persons with mental retardation and other similar facilities, Congress enacted the DD Act to protect the human and civil rights of

this vulnerable population. 42 U.S.C. 6000 *et seq.*[2] The P&A system was established, as an integral component of this Act, to ensure that these protections became a reality.[3]

The second of these statutes, the PAIMI Act, was passed in 1986 on behalf of persons with mental illness in response to congressional hearings and investigations that substantiated numerous reports of abuse and neglect in state psychiatric facilities. 42 U.S.C. § 10801 et seq. The congressional investigations found a myriad of examples from across the country of instances of abuse and neglect, including inadequate nutrition, health care and discharge planning, and generally deplorable living conditions. As stated in the PAIMI Act's Statement of Purpose:

> Congress finds that "[i]ndividuals with mental illness are vulnerable to abuse and serious injury" and that "State systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate."

42 U.S.C. 10801(a)(1) and (4). The PAIMI Act, which is modeled after the 1975 DD Act, provides parallel protections for individuals with mental illness using the same mechanisms as the DD Act.

The last of these statutes, the PAIR Act, was passed in 1992 as an amendment to the Rehabilitation Act on behalf of a broad spectrum of person with disabilities. Under PAIR, P&As are authorized to use the same mechanisms as provided under the DD Act to serve persons with disabilities who are not eligible under either the DD or PAIMI Act. 29 U.S.C. 794e.

---

[2] In 2000, Congress passed the Developmental Disabilities Assistance and Bill of Rights Act of 2000, which repealed and replaced in its entirety the 1975 Act. This amendment significantly enhanced the access authorities of P&As

[3] For a general discussion of P&A access authority See, e.g.,"Validity, Construction, and Operation of Protection and Advocacy for Mentally Ill Individuals Act, 42 U.S.C.A. Sections 10801 *et seq.*," 191 A.L.R. 205 (2003); Bowman, "Open Debate Over Closed Doors: The Effect of the New Developmental Disabilities Regulations on Protection and Advocacy Programs," 85 Ky. L. J. 955 (1997).

Courts have consistently held that the P&A Acts require states to permit the P&A agency to operate effectively, and with broad discretion and independence in gaining access to facilities and records. See, Mississippi Protection & Advocacy System, Inc. v. Cotten, 929 F.2d 1054 (5th Cir. 1991); Alabama Disabilities Advocacy Program v. Tarwater Developmental Center, 894 F. Supp. 424 (M.D. Ala. 1995); Michigan Protection & Advocacy Service, Inc. v. Miller, 849 F. Supp. 1202 (W.D. Mich. 1994); Robbins v. Budke, 739 F. Supp. 1479 (D.N.M. 1990). The court in Cotten expounded upon this obligation as follows:

> The Act not only describes the range of services to be provided by the protection and advocacy systems, it also states that the systems "must have the authority" to perform these services. The state cannot satisfy the requirements of the [DD Act] by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority.

929 F. 2d at 1029. (Emphasis added). As the court in Tarwater noted, any other reading "would attribute to Congress an intent to pass an ineffective law." 824 F. Supp. at 429. It was also Congress' intent that the DD and PAIMI Acts be applied in a like manner. See, e.g., S.Rep. No. 109, 99th Cong., 1st Sess. 3 (1986); S.Rep. 113, 100th Cong., 1st Sess. 24 (1987).

Because of the relative short window of opportunity, Defendants' actions in restricting Plaintiff's access severely hamper its ability to determine whether the charges of excessive heat are warranted. The summer months are fast winding down and fall is fast approaching. A significant delay may make it impossible to determine the extent of any issues of excessive heat. The court in Robbins held that delays of up to one month in processing requests for the release of records may preclude the P&A "from acting within

10

prescribed deadlines or may cause a violation to go unaddressed until it is too late to remedy." 739 F. Supp. at 1488.

In Robbins, the New Mexico P&A challenged, under the PAMII Act, a highly restrictive patient and records access policy imposed by a State mental health facility. The court ordered the facility to "provide immediate access to all records, including incident reports, medical referrals, seclusion and restraint logs, and internal investigation reports which may not be in residents' charts with informed consent provided by the resident or guardian or as provided [in the access provisions of the PAIMI Act]." *Id*. at 1489.

Though the instant case involves a prison rather than a psychiatric facility the P&A Acts clearly apply with full force to prisons and jails. The relevant federal regulation defining the facilities that covered under the P&A Acts, provides that "[f]acility includes any public or private residential setting that provides overnight care accompanied by treatment services. Facilities include, but are not limited to the following: general and psychiatric hospitals, nursing homes, board and care homes, community housing, juvenile detention facilities, homeless shelters, and *jails and prisons, including all general areas as well as special mental health or forensic units*." 42 C.F.R. § 51.2. (emphasis added)  *See also* 42 C.F.R. § 10802(3) and 45 C.F.R. § 1386.19.

In Office of Protection and Advocacy for Persons with Disabilities v. Armstrong, 266 F.Supp.2d 303 (D. Conn. 2003), the court, issued a permanent injunction against the State Department of Corrections, upholding the Connecticut P&A's right under the PAIMI Act to access records relating to the deaths of eight inmates, including seven who committed suicide. In granting access, the court accepted the P&A's determination that

11

the inmates had mental illness (and therefore, were covered under the PAIMI Act), and that the inmates had been subject to abuse and neglect.

On the coverage issue, the court found that the P&A need not make a threshold showing of mental illness regarding the inmates before it may access the records. *Id.* at 314. Here the court noted that a number of courts have concluded that evidence that a facility has previously housed individuals with mental illness as well as evidence that some current residents may have mental illness (the P&A submitted ample documentation on this point) is sufficient to merit access. *Id.* The court also accepted the P&A's argument that the fact that seven of the inmates committed suicide suggests that each had a mental illness, and noted that the DOC's own directives mandated special care for suicidal inmates. *Id.* at 315.

On the question of probable cause, the court rejected the DOC's argument that the P&A should defer its access until after the DOC completed its internal investigation, finding that the P&A's probable cause determination is based on its own monitoring and not that of other agencies. *Id.* at 320. Furthermore the court noted that "it is now a settled principle that the P&A is the 'final arbiter' of probable cause for the purpose of triggering its authority to access all records for any individual that may have been subject to abuse or neglect." *Id.* at 321. *See also* <u>Arizona Center for Disability Law v. Allen</u>, 197 F.R.D. 689 (D. Ariz. 2000) (State may not deny a P&A access to records, under the DD and PAIMI Acts and PAIR Program, by disputing the P&A's finding of probable cause to suspect abuse and neglect).

Indeed, this court has not hesitated in the past to issue injunctive relief on behalf of this plaintiff when its ability to access prisoners and their records was being hampered

12

or denied. Advocacy Center v. Stalder, 128 F.Supp.2d 358 (M.D. La. 1999). In Stalder, this court found that P&A's have a First Amendment right to "communicate and consult with the population it was created to serve," and that "timely access to records is essential for effective communication between the [P&A] and its clients just as it is for other advocates and attorneys." *Id.* The court concluded that any denial of access certainly occurred while the defendant was acting under color of state law, and thus found § 1983 an appropriate avenue to find relief. *Id.* at 366. This court also pointed out that § 1983 provides a cause of action for violations of federal statutes, unless Congress has "foreclosed" such an enforcement action, or where the federal statute "does not create enforceable rights, privileges or immunities within the meaning of § 1983." *Id.* (internal citations omitted). The Stalder court rightly noted that the PAIMI Act contains no express statement or comprehensive remedial scheme foreclosing a § 1983 action. *Id.* Instead, it cited PAIMI's express language to the contrary. *Id.*

Defendants no doubt will argue that the restrictions they are imposing are based on security concerns. These concerns, as important as they might be, do not trump federal law. *Id.* at 366-367. Moreover, there is nothing in Plaintiff's request that poses security concerns that cannot be addressed. There many less onerous means of accomplishing access than simply saying no. Prisoners on Death Row are allowed contact visitors with family, doctors, clergy and others upon request. They are allowed to visit with lawyers on a regular and frequent basis. Moreover, prison officials frequently conduct tours of Death Row and individuals on the tour often interact with prisoners. In fact, Tier A, which is the subject of many tours is called the "Hollywood Tier" because prisoners confined there are often on display. See Declaration of Ronald K. Lospennato at paragraph 15.

13

The law is abundantly clear that Plaintiff has the authority to investigate allegations of abuse and neglect and to access the records of the facility. Defendants' actions have prevented Plaintiff from fulfilling its federal mandate, and have prevented inmates with disabilities from accessing Plaintiff's services.

### B. PLAINTIFF IS ENTITLED TO A PRELIMINARY INJUNCTION TO FULFILL ITS MANDATE UNDER THE PAIMI ACT.

In granting preliminary injunctive relief, courts look at four factors to determine whether such a motion should be granted: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is undermined by the issuance of the injunction. Giddens v. City of Shreveport, 901 F.Supp. 1170 (W.D. La. 1995). Application of this analysis shows that Plaintiff is entitled to preliminary injunctive relief.

As argued above, the P&A Acts are explicit in defining jails and prisons as "facilities" for purposes of the PAIMI Act. 42 U.S.C. §10802 (3). Further, Plaintiff has the authority to investigate complaints, to utilize agents in carrying out its responsibilities, and to meet with prisoners in these facilities. 42 U.S.C. §§ 10805(a)(3) and 15043(a)(2)(H); 42 C.F.R. 51.42(b) (PAIMI regulations). It is also clear that Congress intended Plaintiff's access authority to supersede any conflicting state law Defendants may assert. Advocacy Center v. Stalder, 128 F.Supp.2d at 366-367.

Plaintiff will be irreparably harmed if the preliminary injunction is not issued. Plaintiff is unable to perform its statutory functions without the access rights at issue in this case. *Id.* at 369. Likewise, the inmates of Defendants' facilities will suffer irreparable

14

harm.  In Cotten, *supra*  the Fifth Circuit said that further imposition of undue limitations on P&A access presented an immediate and realistic threat of genuine harm to all facility residents.  929 F.2d 1058.

There is no risk of harm in granting the preliminary injunction, since Defendants provide access consistent with the P&A Acts at Louisiana State Penitentiary and other facilities.  Finally, the P&A Acts are evidence of a strong public interest in protecting the legal rights of individuals with disabilities. Issuance of a preliminary injunction in this case would only advance the public interest that is the very basis for the P&A Acts.

WHEREFORE, Plaintiff requests that this Court enter a temporary restraining order a preliminary injunction as prayed for in its Complaint.

Respectfully submitted this 17th day of August 2012,

s/ Ronald K. Lospennato
_____
Ronald K. Lospennato, La. Bar No. 32191
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-208-4679
504-335-2890
rlospennato@advocacyla.org

s/ Miranda Tait
_____
Miranda Tait, T.A., La. Bar No. 28898
Advocacy Center
600 Jefferson Street, Suite 812
Lafayette, Louisiana 70501
337-237-7380, ext. 313
337-237-0486 (fax)
mtait@advocacyla.org