UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **ELZIE BALL, NATHANIEL CODE AND JAMES MAGEE** | **CIVIL ACTION NO. 13-368** |
| **VERSUS** | **JUDGE BRIAN A. JACKSON** |
| **JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF CORRECTIONS, ET AL.** | **MAGISTRATE JUDGE STEPHEN C. REIDLINGER** |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Defendants' Proposed Findings of Fact**

1. In 2006, the Department of Public Safety and Corrections constructed a new facility at Louisiana State Penitentiary at Angola ("LSP") known as "Death Row" for the purpose of housing individuals who have been sentenced to death.

2. The Death Row facility has four wings, each wing containing two tiers.

3. Tiers A, B, C, F, G and H are the Death Row tiers.

4. Plaintiff James Magee is housed on Tier A. Plaintiffs Elzie Ball and Nathaniel Code are housed on Tier H.

5. Each tier on the Death Row facility is comprised of between twelve (12) and sixteen (16) cells, each of which house a single inmate.

6. The two tiers on each wing are arranged back-to back, with a "pipe chase" running between them which houses the plumbing, electrical and ductwork for that wing.

7. Each cell front is open air, consisting of one sliding panel of security bars, with no solid portion that would impede air movement.

8. Located directly across from the cells on each tier are screened windows which are capable of being opened and closed as weather and climate dictate.

9. The cells on Death Row are not exposed to direct sunlight.

10. Located immediately above the windows on the tiers are industrial size fans which are mounted on the external walls and directed at the cells.

11. There is one industrial-size fan mounted on the external wall for every two cells on the Death Row tiers.

12. The industrial-sized fans may be turned on or off at the request of inmates, but are generally on during the summer months.

13. The industrial-sized fans located on the tiers move air across the skin, making it feel cooler.

14. Plaintiffs admit that the air circulation resulting from the industrial-sized fans is effective in making the conditions on Death Row more comfortable.

15. Also mounted on the external walls across from the cells are televisions with cable access for the inmates to view.

16. There is one television for every two cells on the Death Row tiers and each inmate is assigned wireless headphones and a remote control for television usage.

17. The living areas on Death Row contain a cross-ventilation system to control the climate during summer months.

18. The living areas on Death Row were never outfitted or designed for the use of air conditioning.

19. The cross-ventilation system consists of exhaust vents located on the back wall of each cell.

20. Air enters the tiers through windows and passes over the walkways into the cells.

21. The air then travels through the vents in the cells and into the pipe chase before being exhausted through fans on the roof.

22. The ventilation system is designed to replace the air in each cell approximately 20 times per hour.

23. The common areas at the Death Row facility are air-conditioned which include the control room (where all electronic and security equipment are housed), the visitation rooms and the medical clinic.

24. Each cell is equipped with a sink with hot and cold running water, a toilet, a bed and a desk and chair.

25. Inmates are allowed unlimited use of water from the sinks in their cells.

26. The water available to inmates in their cells is sourced from and is the same water available to LSP employees and visitors to Death Row.

27. Inmates on Death Row are allowed to leave their cells one hour every day, at which time they may exercise or move freely on the tiers, including but not limited to taking a shower.

28. Inmates on Death Row are allowed to engage in outdoor recreation four times per week during their daily one hour "tier time."

29. Inmates on Death Row are sedentary and are not required to perform any prison labor.

30. Inmates on Death Row are not required to wear many clothes while in their cells and many only wear shorts in the summer months.

31. Inmates on Death Row are also allowed to leave their cell for visitation (with family, spiritual advisors and counsel) and for medical purposes.

32. Inmates are allowed to shower once every day throughout the year.

33. There are no adjustable controls for water temperature inside the shower.

34. The temperature controls are located outside the shower and may be adjusted by officers at the request of the inmates.

35. The water temperature has been adjusted upon the request of inmates.

36. The water temperature is also adjusted seasonally to be warmer during the colder months and to be cooler during the warmer months.

37. Inmates are provided ice throughout the day.

38. There exists at all times a large ice chest located on every tier, to which every inmate has access.

39. The large ice chest on each tier is regularly refilled throughout the day as needed with clean ice.

40. The ice provided to the Death Row tiers is made by an ice machine located at the Death Row facility.

41. The ice provided to inmates housed on the Death Row tiers is the same ice that is provided to and used by staff at Death Row.

42. The water used to make the ice at Death Row is from the same source as the water used throughout LSP and is used by inmates and staff alike.

43. The ice and the water used to make the ice at Death Row are not polluted and are free from insects and other debris.

44. Each inmate is provided with two (2) containers that they may fill with ice and keep within their cell.

45. Inmates are allowed to and frequently do fill the sink located in their cell with ice, in addition to the two containers.

46. Inmates may access ice from the ice chest located on the tier during their "tier time."

47. Inmates are allowed to and frequently do request ice from other inmates who are out of their cell exercising their "tier time" to refill their ice.

48. The other inmates currently housed on the same tiers as plaintiffs are generally willing to retrieve ice for everyone else on the tier, including plaintiffs.

49. Inmates are allowed to request ice refills from officers on the tier.

50. None of the plaintiffs have been deprived of water or ice upon request.

51. Each inmate is provided with towels in their cells and are allowed to and frequently do wet the towels with the running water in their cells to cool them and place on their body.

52. Inmates have access at all times cool water to drink, accessible from the water faucet in their cells.

53. No inmate has ever suffered heat-related injuries at the current Death Row facility.

54. Inmate Nathaniel Code has a history of hypertension, obesity and is a smoker.

55. Inmate Code has been ordered by physicians to lose weight but has failed to do so.

56. Inmate Code has had blood pressure fluctuations throughout the year and these fluctuations are not limited to the summer months.

57. Inmate Code's most recent blood pressure reading was optimal.

58. Inmate Code is noncompliant with his medications.

59. Inmate Code has never made sick calls, E/R visits, hospital visits, or complaints to medical personnel relating to heat-related issues since 2007.

60. Inmate Elzie Ball has a history of hypertension, diabetes and obesity.

61. Inmate Ball has had multiple extremely high blood pressure readings which are unrelated to seasonal changes throughout the year.

62. Inmate Ball is noncompliant with his medications.

63. Inmate Ball's canteen purchases include items that an individual with his medical history should not be eating, including but not limited to ice cream, chips, soups, spicy pork, canned oysters, pork rinds and cookies.

64. Inmate Ball has never made sick calls, E/R visits, hospital visits, or complaints to medical personnel relating to heat-related issues since 2009.

65. Inmate James Magee has a history of hypertension and obesity.

66. Inmate Magee was instructed by physicians to lose weight but has only lost three (3) pounds since 2010.

67. Inmate Magee's high blood pressure is unrelated to seasonal changes throughout the year.

68. Inmate Magee is noncompliant with his medications.

69. Inmate Magee's canteen purchases include items that an individual with his medical history should not be eating, including but not limited to ice cream, chips, popcorn, soups and sunflower seeds.

70. Inmate Magee has never made sick calls, E/R visits, hospital visits, or complaints to medical personnel relating to heat-related issues since 2009.

71. A review of the medical records of all three plaintiffs since 2011 does not indicate an elevated body temperature, objective data which negates the allegations that plaintiffs are predisposed to heat-related illness(es).

72. Plaintiffs have not been denied access to any facility, program or activity at LSP because of their medical condition(s).

73. Plaintiffs have not requested a reasonable accommodation based on any alleged disability.

74. Plaintiffs' illnesses have not substantially limited a major life function.

75. Plaintiffs have not been treated differently than any other offender on Death Row.

76. There is no evidence that the plaintiffs were retaliated against because of their engaging in protected activity.

77.     During the monitoring period, there have been no temperature readings in excess of 90 degrees Fahrenheit on Tiers A or H. There has only been one temperature reading in excess of 90 degrees Fahrenheit (90.6 degrees) and it was on Tier C.

78.     The heat index on the Death Row tiers frequently ranges between 86 degrees to 97 degrees Fahrenheit and very rarely exceeds 99 degrees Fahrenheit.

79.     The temperature and heat index readings by U.S. Risk Management are inconsistent with plaintiffs' allegations that the temperature regularly exceeds 95 degrees Fahrenheit and that the heat index exceeded 126 degrees Fahrenheit on 185 days in the summer of 2012.

80.     The temperature and heat index reading by U.S. Risk Management also contradict plaintiffs' allegations that on more than one occasion in 2011 the heat index was 195 degrees Fahrenheit.

81.     The alleged heat index of 195 degrees Fahrenheit is not attainable in Louisiana and is described as "off the charts."

82.     All three inmates were born, raised and lived in Louisiana.

83.     Plaintiffs have admitted that the bars on each cell are not hot to the touch and that they have never been burned or injured by touching the bars.

## DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

Applicable Law

1.     The Eighth Amendment to the U.S. Constitution provides that: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

2. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones." Farmer v. Brennan, 511 U.S. 825, 832 (1994).

3. "Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care and must take reasonable measure to ensure the safety of the inmates." Farmer, 511 U.S. at 832; Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004).

4. If prison conditions are "restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Chandler v. Crosby, 379 F.3d 1278, 1290 (11th Cir. 2004). An inmate's mere discomfort, without more, does not offend the Eighth Amendment. Woods v. Edwards, 51 F.3d 577, 581 (2004).

5. A prison official violates the Eighth Amendment when the official shows a subjective deliberate indifference to conditions posing an excessive risk of harm to the inmate. Farmer, 511 U.S. at 833-834; Gates, 376 F.3d at 333.

6. The U.S. Supreme Court has developed a two-part analysis for Eighth Amendment challenges to conditions of confinement. Under the "objective" component, an inmate must prove that the condition complained of sufficiently extreme to violate the Eighth Amendment. Hudson v. McMillan, 503 U.S. 1, 8 (1992). Under the "subjective" component, an inmate must show that prison officials knew of and disregarded an excessive risk to inmate health or safety. Farmer, 511 U.S. at 837.

7. "Extreme deprivations are required to make a conditions-of-confinement claim under the Eighth Amendment." Hudson, 503 U.S. at 9.

8.  The plaintiffs have failed to demonstrate any extreme deprivation at LSP death row sufficient for a claim under the Eighth Amendment.

9.  On death row at LSP, there is one large industrial fan for every two cells. In addition to the fans, there is a ventilation system which regularly pulls air through the windows, across the cells and into a vent to the exhaust system. The plaintiffs and all inmates on death row have free access to hot and cold running water in their cells and access to ice either directly or through requests of other inmates or correctional officers. The plaintiffs and all inmates on death row are allowed one shower per day during their "tier time." The temperature of the water in the shower is adjustable upon request.

10. The plaintiffs and all inmates on death row have access to health care on demand. None of the plaintiffs has been denied health care because of his inability to pay the cot one of the plaintiffs

11.

Application of *Gates v. Cook*

12. In <u>Gates</u>, the plaintiff was an inmate on death row at Mississippi State Penitentiary in Mississippi representing all similarly situated inmates on death row. The plaintiff complained of several conditions, including the temperatures on death row. The plaintiff claimed that relief from the heat could only be obtained by opening the windows and that the ventilation resulting from the windows and fans in the hallways was not adequate to afford a minimal level of comfort in the summer months.

13. The district court granted injunctive relief on the heat claim and directed the Mississippi Department of Corrections to provide fans, ice water and daily showers to death row

inmates when the heat index registered 90 degrees Fahrenheit or above. The U.S. Fifth Circuit affirmed. Gates, 376 F.3d at 340.

14. The plaintiffs and all inmates on death row at LSP currently enjoy all of the remedies ordered by the Court in Gates, including the use of fans, access to water, access to ice and daily showers regardless of the heat index.

Application of *Chandler v. Crosby*

15. In Chandler, the plaintiffs were inmates on death row at Union Correctional Institution in Florida. Although the death row facility in Chandler had a ventilation system similar to that at LSP, no fans were used to circulate the air. The plaintiffs in Chandler were only allowed three showers per week. Chandler, 379 F.3d at 1284.

16. In denying relief to the plaintiffs in Chandler, the district court found that the death row cells remained, on average, between 80 and 86 degrees, with temperatures over 90 degrees approximately nine percent of the time and sporadic readings over 95 degrees. Chandler, 379 F.3d at 1297.

17. The district court held that numerous conditions alleviated the heat, including lack of direct sunlight in the cells, sinks with hot and cold running water in each cell, sedentary behavior, minimal clothing requirements, and occasional ventures into air conditioned portions of the death row facility for visitation or medical care. Chandler, 379 F.3d at 1298.

18. The district court rendered judgment in favor of the defendants. On appeal, the Eleventh Circuit affirmed, holding that the plaintiffs failed to demonstrate "extreme deprivation" sufficient for an Eighth Amendment violation. Chandler, 379 F.3d at 1298.

19. The plaintiffs and all inmates on death row at LSP currently enjoy conditions more favorable than the plaintiffs in Chandler.

20. Title II of Americans with Disabilities Act, 42 U.S.C. §12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

21. Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding.

22. Both the ADA and the Rehabilitation Act provide that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

23. The ADA and the Rehabilitation Act generally are interpreted *in pari materia*.[20] *Frame v. City of Arlington*, 657 F.3d 215, 223-24 (5th Cir. 2011) *cert. denied,* 132 S. Ct. 1561.

24. The plaintiffs have failed to demonstrate that they were either excluded from participation in or denied in any service, program or activity.

25. Additionally, as a threshold requirement in an ADA claim, the plaintiff must establish that he has a disability. *Waldrip v. Gen. Elec. Co.,* 325 F.3d 652, 654 (5th Cir.2003).

26. A "disability" is defined under the ADA as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual...." 42 U.S.C. § 12102(1)(A).

27. EEOC regulations define a physical or mental impairment as: (1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or (2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities. 29 C.F.R. § 1630.2(h).

28. Simply having an impairment is insufficient to make one disabled under the statute; a plaintiff must also show that the impairment substantially limits a major life activity." *Garner v. Chevron Phillips Chem. Co.,* 834 F.Supp.2d 528, 537 (S.D.Tex.2011).

29. A "major life activity" includes functions such as "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

30. With respect to whether or not an impairment "substantially limits" a major life activity, the ADA Amendments Act of 2008 ("ADAAA") "directs that 'substantially limits' should not be as strictly construed as some courts have required in the past and should not require 'extensive analysis.'" *Toyota Motor Manufacturing v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (superseded by the ADAAA); *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (same).

31. Even under the ADAAA, however, an impairment is not considered a disability unless "it substantially limits the ability of an individual to perform a majority life activity *as compared to most people in the general population.*" 29 C.F.R. §1630.2(j)(1)(ii).

32. Plaintiffs have failed to demonstrate that they have a disability, as defined by the ADA, ADAAA, or Rehabilitation Act.

33. Plaintiffs have failed to demonstrate that any of their major life functions are substantially limited.