UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE, | * * * | CIVIL ACTION NO. 13-368 |
| PLAINTIFFS | * * | |
| VS. | * * | |
| JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, BURL CAIN, WARDEN OF THE LOUISIANA STATE PENITENTIARY, ANGELA NORWOOD, WARDEN OF DEATH ROW, AND THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, | * * * * * * * * * * * | JUDGE: BAJ MAGISTRATE: SCR |
| DEFENDANTS | * | |

**PLAINTIFFS' FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**FINDINGS OF FACT**

1) **Merits**

   a) **Claim 1: Violation of the Eighth Amendment Ban on Cruel and Unusual Punishment**

      i) *Findings of Fact Regarding the Objective Prong of the Eighth Amendment Violation*

         (1) Society recognizes that humane conditions of confinement include conditions that do not pose a risk of harm to the health of inmates as a result of extreme temperatures. This societal recognition is abundantly clear through the laws and regulations that have been instituted in

various states, including Louisiana, which provide that ambient temperatures must not exceed specific levels so as to maintain a safe, healthy environment.

(2) During the summer months, the temperature in the Death Row tiers at the Louisiana State Penitentiary at Angola ("Angola") regularly exceeds healthy levels.

(3) These high temperatures regularly persist into the night.

(4) The relative humidity on the Death Row tiers also is high according to local weather data tracked by the National Weather Service.

(5) Due to a combination of extreme heat and humidity, the heat index, which measures the relative temperature, regularly registers at or above risk thresholds set by the National Oceanic and Atmospheric Administration (NOAA).

(6) In the summer, the heat index on all of the Death Row tiers regularly reaches the level of "danger" or "extreme danger," the two highest categories of NOAA's heat index table.

(a) For example, In August 2012, the heat index was in the "danger" or "extreme danger" zone every day in all six tiers. The heat index was at the same level, in two of the six tiers, every day in July 2012.

(7) The risk of heat-related illnesses soars when air temperatures exceed 88°F, and exposure to extreme heat conditions such as those on the

tiers puts even a healthy individual at serious risk of heat stroke and even death.

(8) The risk of death from all causes increases under extreme heat conditions.

(9) Individuals, such as Plaintiffs, with preexisting illnesses like hypertension, diabetes, and obesity are at an even greater risk of heat related illness.

(10) Individuals, such as Plaintiffs, take prescription medications that also put them at a greater risk of heat related illness.

(11) Plaintiffs lack access to traditional forms of heat relief, and therefore are subject to these extreme temperatures for up to 23 hours a day while they are kept in their cells.

(12) Plaintiffs have little or no ability to cool their bodies because:

    (a) Although each cell is outfitted with an air vent, and there are fans in the cell block hallways, these features do not reduce humidity levels in the air and, at high temperatures, do nothing to alleviate the heat inside the cells.

    (b) Showers do not serve to alleviate Plaintiffs' suffering during the summer months because showers are available only one time per day and the water is often scalding hot.

    (c) The ice machines, which can be accessed by each Plaintiff only once a day, break regularly, and the available ice is often unsanitary.

    (i)  Although Plaintiffs can also obtain ice from other inmates who are willing to bring it to them during the other inmates' one-hour period outside of their cell, there is no practical way to store the ice in the Plaintiffs' cells due to the extreme heat.

    (ii) It is unsanitary for inmates to rely on other inmates for ice, as many other inmates on Death Row have communicable diseases or mental illness that prevents them from exercising good judgment with respect to personal hygiene.

    (iii)Delegating such responsibility to other inmates, and even corrections officers, is not a consistent or reliable way to ensure Plaintiffs' constitutional rights, as such individuals may arbitrarily and  impermissibly deny necessary relief such as ice and reduced shower temperatures.

(13) The heat and humidity are so unbearable during the summer that:

    (a) Despite the presence of fire ants, Plaintiffs resort to sleeping on the hard concrete floor in an effort to find incremental relief from the extreme heat in the cells that persists into the night;

    (b) Staff and visitors to the Death Row tiers complain about having to spend even a few minutes where Plaintiffs are incarcerated;

    (c) The cell bars are hot to the touch; and

    (d) When a door connecting a Death Row tier to the air-conditioned central part of the building opens, Plaintiffs rush to the front of

their cells to feel the relief of just a few seconds' gust of cool, air-conditioned air.

ii) *The Defendants have been deliberately indifferent to the Eighth Amendment Violation of extreme heat on Death Row.*

(1) Defendants are aware, and have been informed on multiple occasions since at least April of 2012, of the unconstitutional risk of harm posed by the heat conditions on the Death Row tiers.

(2) Defendants are, and have been, aware of Plaintiffs' medical conditions.

(3) Defendants are, and have been, aware of the increased risk of heat-related illness due to Plaintiffs' medical conditions and the medications used to treat the conditions.

(4) Heat and humidity in the Louisiana summer months present an obvious health risk to persons restricted to confined quarters with no air conditioning or other reliable and consistent means to cool the air.

(5) Despite this awareness, the Defendants have persisted in a pattern of turning a blind eye to, and denying relief from, the Plaintiffs' plight.

(6) When constructing the new Angola facility and the new Death Row facility, Defendants never considered an architectural design that would have included an HVAC system that could mechanically cool the tiers.

(7) Defendants likewise failed to incorporate non-mechanical features that could stave off heat and heat retention, including but not limited to

lighter roofing materials, awnings over windows, trees for shade, or higher ceilings.

(8) In fact, Defendants have only taken steps to alleviate Plaintiffs' suffering since the Plaintiffs filed this lawsuit.

(9) The Defendants have taken these remedial measures while Court-ordered data collection has been in progress on Death Row.

(10) The remedial measures that the Defendants have undertaken have likely altered the data that the Court ordered to be collected by the Court and as a result cast these data into question.

(11) The data during the Court-ordered monitoring period represents a bottom threshold of the conditions on Death Row, but likely does not reflect the most extreme conditions on Death Row.  Conditions on Death Row are likely no cooler than the amassed data indicate, but may well be hotter (absent remedial measures) than what the data indicate.

(12) The following policies, which are either ineffective or ineffectively executed, establish Defendants' awareness of the risk of the extreme temperatures at Angola to individuals with disabilities, such as Plaintiffs:

(a) LSP Directive No. 13.067 "Psychotropic Medication and Heat Pathology" (Feb. 1, 2010) describes the prison's policy for managing heat-related medical risks.

(b) DOC Corrections Services Health Care Policy No. HC-45 "Psychotropic Medication and Heat Pathology" (Aug. 13, 2009) sets out the statewide policy and is largely similar to LSP Directive No. 13.067.

(c) Both policies state: "Offenders prescribed psychotropic medication will be educated, monitored and evaluated for potential adverse reactions concerning heat or photosensitivity related to pathology. Implementation of appropriate measures will be taken, if indicated, to reduce the risk of heat or photosensitivity related complications."

(d) LSP Directive No. 12.005 "Living and Work Area Temperature Checks (May 9, 2005) establishes procedures "for the measurement of temperatures in inmate housing living and work areas."

　　(i) Directive No. 12.005 also states that "[i]t is the policy of the Louisiana State Penitentiary to ensure that temperatures in indoor living and work areas are appropriate to the summer and winter comfort zones."

　　(ii) The Directive further provides that temperature checks are to be conducted once weekly.

(e) The LSP Directives, as well as the DOC Policies, provide for the issuance of a "Heat Alert" when temperatures exceed 90°F.

       (i) During a Heat Alert, several measures are supposed to be instituted for "offenders with a heat related duty status": "Provisions of increased fluids and ice; allowance of additional showers and/or cold, wet towels; and increase[d] ventilation to the area as much as possible." LSP Directive 13.067(B)(5)(b)-(d); DOC Policy HC-45(4)(E)(3)(a)-(c

       (ii) Plaintiff Magee is entitled related duty status as a result of the medications he takes.

(13) The following events serve as evidence of Defendants' actual knowledge of, and deliberate indifference towards, the serious risks to Plaintiffs' health:

       (a) On April 30, 2012, Plaintiffs' counsel co-signed a letter to Defendant Burl Cain, copying Defendant Angela Norwood and Defendant James LeBlanc, outlining Plaintiff's concerns about the extreme heat and citing concerns regarding the effect of heat and lack of available relief on existing illnesses. Defendants did not respond to the letter.

       (b) On May 22, 2012, Plaintiffs' counsel co-signed another letter to Defendant Cain, again Copying Defendants Norwood and LeBlanc, reiterating Plaintiffs' concerns and requesting a response.

       (c) Defendant Cain responded to the letter on June 18, 2013, stating that the temperatures on the tiers are kept at "acceptable levels,"

and expressing an unwillingness to discuss ongoing problems and possible solutions.

(d) On July 31, 2012, the Advocacy Center sent a letter to Defendant Cain indicating their belief, based on probable cause, that disabled prisoners were being subjected to abuse and neglect, and stating their intention to investigate the conditions on Death Row pursuant to their federal statutory authority.

(e) In response to Defendant Cain's failure to respond to the Advocacy Center's requests, the Advocacy Center filed a complaint in this Court on August 17, 2012, seeking injunctive relief in the form of a court order permitting the Advocacy Center to investigate the conditions on the Death Row tiers.

(f) Following this suit, the parties to that lawsuit reached a settlement in which Cain and LeBlanc granted the Advocacy Center the access it originally requested.

(g) Plaintiff Ball submitted a Request for Administrative Remedy ("ARP") on July 28, 2012, describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications.  Angola, through Warden Norwood, issued a Response denying the ARP on October 12, 2012.  Ball appealed, and Angola, through Secretary LeBlanc, denied the

appeal on December 14, 2012, thereby exhausting Ball's grievance process.

(h) Plaintiff Code submitted a ARP on July 24, 2012, describing the excessive heat conditions, the adverse symptoms he was experiencing due to the heat, his inability to alleviate the conditions, and his medical diagnoses and medications. Angola, through Warden Norwood, denied his ARP on November 6, 2012. Code appealed, and the DOC, through Secretary LeBlanc, denied his appeal on November 21, 2012, thereby exhausting Code's grievance process.

(i) Plaintiff Magee submitted a ARP on August 28, 2012, also describing the deplorable conditions of confinement and his medical conditions.  Angola, through Warden Norwood, denied his ARP on November 6, 2012.  Magee appealed, and the DOC, through Secretary LeBlanc, denied his appeal on January 3, 2013 thereby exhausting Magee's grievance process.

(j) Finally, Plaintiffs have filed suit and obtained a preliminary injunction, based on the facts stated, i.e. the confinement conditions and the Plaintiffs' medical conditions.  As such, if the confinement at Angola is objectively unconstitutional, Defendants cannot claim to be unaware that such confinement conditions and health risks exist.

(k) In the summer of 2011, Warden Cain and the director the

Louisiana ACLU had a conversation about the extreme heat on

Death Row and as a result of that conversation, Warden Cain

agreed to include more fans on Death Row to try and help alleviate

the extreme heat.

**b) Claim 2: Violation of the ADA**

i)  Plaintiffs all suffer from disabilities, and each Plaintiff's respective

disabilities are expounded below.

ii)  Plaintiffs all suffer from hypertension, or high blood pressure, which is a

chronic medical condition in which the blood pressure in the arteries is

elevated.

(1) Hypertension is a major risk factor for stroke, heart attacks, heart

failure, aortic aneurysms, and peripheral arterial disease, and is a cause

of chronic kidney disease.

(2) Hypertension increases susceptibility to heat stress by overloading the

cardiovascular system to a point where the heart is not able to circulate

blood at the rate needed to keep the body cool.

(3) Subjecting hypertensive persons to extreme heat can cause impaired

motor and cognitive function, reduced blood flow, and a breakdown of

the blood/brain barrier.  It can also cause severe headaches, fatigue,

dizziness, and vision problems.

(4) The use of antihypertensive medications including diuretics, vasodilators, and beta-blockers is necessary to protect Plaintiffs' health from their disability.

    (a) The use of these medications can significantly reduce heat tolerance and predispose the person taking them to severe heat-related illness because they depress cardiac function and impair cardiac output, lessening the body's ability to regulate its temperature by circulating blood to the skin.

    (b) Diuretic medications also increase the risk of dehydration by causing increased urination and thereby quickening the body's loss of water, electrolytes, and essential salts.

    (c) Individuals taking diuretic medications need greater access to clean and cold drinking water during periods of extreme heat in order to maintain adequate hydration.

iii) *Plaintiff Ball's Health Risk Factors and the Impact of Extreme Heat*:

(1) Ball is 60 years old, and suffers from hypertension, for which he takes a diuretic medication, as well as diabetes and obesity.

(2) Diabetes is a metabolic disease that causes increased urination, thirst, and hunger, which, combined with extreme heat, leads to increased risk of health complications.

    (a) Hypertension exacerbates the health risks associated with diabetes.

(3) Obesity is a medical condition characterized by the excessive accumulation of body fat. Lack of physical activity and a sedentary

lifestyle can contribute to obesity by preventing the body from

processing calories efficiently.

    (a)  Obesity is a risk factor for heat stroke because obese individuals

        have more insulation and a lower surface-area-to-volume ratio, and

        therefore less capacity for dissipating heat.

(4) While subjected to the extreme heat on Death Row, Ball experiences

    the symptoms of heat exhaustion, including dizziness and

    lightheadedness, headaches, blurred vision, chest pain, joint pain and

    stiffness, profuse sweating, and inability to sleep.

(5) DOC has and continues to discriminate against Ball due to disability,

    including hypertension and diabetes, by denying reasonable

    accommodations necessary to allow him access to a safe living

    environment. The extreme heat on Angola's Death Row denies Ball

    "access" to DOC facilities under federal disability law.

iv) *Plaintiff Code's Health Risk Factors and the Impact of Extreme Heat*:

(1) Plaintiff Code is 57 years old. He suffers from hypertension, for which

    he takes a diuretic medication, as well as obesity and hepatitis.  These

    medical conditions and medications increase Mr. Code's vulnerability

    to the heat.

(2) Hepatitis is a condition characterized by inflammation of the liver.

    Mr. Code treats his hepatitis with medicine.

(3) While subjected to the extreme heat on Death Row, Mr. Code

    experiences symptoms of heat exhaustion including dizziness and

lightheadedness, headaches, sensitivity to light, profuse sweating, numbness in his hands, dehydration, loss of concentration, joint pain, and inability to sleep.

(4) Defendant DOC has and continues to discriminate against Mr. Code due to disability, including hypertension, by denying reasonable accommodations necessary to allow him access to a safe living environment. The extreme heat on Angola's Death Row denies Mr. Code "access" to DOC facilities under federal disability law.

v) *Plaintiff Magee's Health Risk Factors and the Impact of Extreme Heat*:

(1) Plaintiff Magee is 35 years old.  He suffers from hypertension, for which he takes a diuretic medication, as well as high cholesterol and depression, for both of which he also takes medication.

(2) These medical conditions and treatments increase Mr. Magee's vulnerability to the heat.

(3) High cholesterol is a condition that increases the risk of cardiovascular disease through the thickening, narrowing or blocking of arteries. High cholesterol may exacerbate Mr. Magee's hypertensive symptoms.

(4) Depression is a mood disorder characterized by profound feelings of sadness, lethargy and dread.

(5) Mr. Magee treats his depression with medicine.

(6) While subjected to the extreme heat on Death Row, Mr. Magee experiences symptoms of heat exhaustion including dizziness and

lightheadedness, loss of appetite, inability to sleep, difficulty

breathing, profuse sweating, weakness, nausea, anxiety, dehydration

and loss of concentration.

(7) DOC has and continues to discriminate against Plaintiff Magee due to

disability, including hypertension, high cholesterol and depression, by

denying reasonable accommodations necessary to allow him access to

a safe living environment. The extreme heat on Angola's Death Row

denies Plaintiff Magee "access" to DOC facilities under federal

disability law.

c) **Claim 3: Violation of the Rehabilitation Act**

i) As described above in regards to Defendants' violation of the ADA,

Plaintiffs' are all disabled and have been discriminated against by

Defendants.  Defendants denial of access to reasonable accommodations

necessary to allow Plaintiffs access to a safe living environment violates

the Rehabilitation Act ("RA").  The extreme heat on Angola's Death Row

denies Plaintiffs "access" to DOC facilities under The RA.

ii) Defendant Louisiana Department of Public Safety and Corrections

receives federal funding.

2) **Likelihood of Suffering Irreparable Harm**

a) Plaintiffs are at risk of serious illness and even death due to the heat

conditions on death row, which risk is exacerbated by their disabilities.

b) Defendants have continuously failed to alleviate the risk of serious injury to Plaintiffs and provide reasonable accommodations to Plaintiffs.

c) Defendants have taken steps, during the Court-ordered data collection period, to ameliorate the heat conditions on the Death Row tiers.

d) Defendants have continually denied that there is a problem with the conditions of Plaintiffs' confinement, and would be free to revert back to their old, indifferent ways absent an injunction.

e) Defendants' reluctance is shown by:

    i) Their initial refusal to grant the Advocacy Center's requests for access;

    ii) Their refusal to respond to letters from Plaintiffs' counsel;

    iii) Their continual denial of Plaintiffs' requests for relief; and

    iv) Their continual stance throughout these proceedings that the heat index in the tiers is at "acceptable levels," despite the ample evidence to the contrary, including their own temperature records.

f) Defendants will be free to revert to an indifferent mindset absent the legal relief that an injunction would provide, and the Plaintiffs will again be subjected to the serious risk of harm caused by the extreme summer heat in the tiers.

g) Many of the remedial measures that are proposed and have been or may have been enacted by the Defendants are within the complete discretion of the Defendants and provide no guarantee of consistent ongoing relief.

h) Whatever remedial measures Defendants have or may have instituted since the filing of this lawsuit may well be insufficient to remedy Plaintiffs' claims.

3)  **Balancing of the Potential Injury to Plaintiffs Versus Harm to Defendants**

   a)  Any harm to the Defendants, stemming from a grant of injunctive relief, is
       merely monetary.

   b)  By contrast, the harm to the Plaintiffs, if the injunction is not granted and they
       are subjected to the extreme heat in the tiers, is very high.  If relief is not
       granted, Plaintiffs will not only be left to suffer ongoing discrimination and
       violations of their constitutional rights, but they will continually be subject to
       extreme health risks, including death.

   c)  The Defendants have failed to present the Court with a single credible harm
       that would be caused by providing the Plaintiffs with the requested
       constitutional relief.

   d)  Defendants' claims that the cost of air conditioning is prohibitive is not
       supported by any evidence.

   e)  The duct work on the Death Row tiers would not need to be replaced in order
       to install air conditioning.

   f)  The Plaintiffs have consulted with an expert who roughly estimates the cost of
       installation to  be between $100,000-250,000.

4)  **The Injunction and the Public Interest**

   a)  No detriment is caused to the public interest by granting the injunctive relief
       Plaintiffs seek.  If anything, the public interest is benefited by affording
       citizens their constitutional rights and protecting them from discrimination
       based on their disabilities.

**CONCLUSIONS OF LAW**

1) **Plaintiffs Elzie Ball, Nathaniel Code, and James Magee are entitled to Permanent Injunctive Relief based on the following:**

    a) Plaintiffs have provided sufficient facts to support a finding by this Court in favor of Plaintiffs on the merits of the following claims:

        i) The extreme heat conditions on Angola's Death Row tiers violate Plaintiffs' Eighth and Fourteenth Amendment rights against cruel and unusual punishment.

        ii) The conditions of confinement on Death Row, coupled with the Plaintiffs' medical disabilities, constitute a violation of the Americans with Disabilities Act ("ADA");

        iii) The conditions of confinement on Death Row, coupled with the Plaintiffs' medical disabilities, constitute a violation of the Rehabilitation Act ("RA").

    b) That there is a substantial threat of irreparable harm to Plaintiffs if the injunction is not granted.

    c) That the threat of injury to Plaintiffs outweighs any harm that may result to the Defendants from the granting of injunctive relief.

    d) That the injunction will not undermine the public interest.

**2) Required Elements For Plaintiffs' Claims**

    **a)  Actual Success on the Merits**

In order to obtain a permanent injunction, Plaintiffs must succeed on the merits of

their claims.[1]  To do so, the Plaintiffs must prove:

       **i)  Claim 1: Violation of the Eighth Amendment Ban on Cruel and Unusual**
          **Punishment**

The elements required to establish a violation of the Eighth Amendment based on

conditions of confinement are as follows: [2]

       (1) The conditions of Plaintiffs' incarceration pose an objectively serious risk

           of harm according to "the evolving standards of decency that mark the

           progress of a maturing society" (objective prong);[3]

       (2) To determine whether an inmate faces an objectively serious risk of harm,

           the Plaintiffs must "establish that [the condition] is contrary to current

           standards of decency for anyone to be so exposed against his will"[4]

---

[1]  *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006) ("The party seeking a permanent injunction must meet a four-part test. It must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest.") (citing *Dresser–Rand, Co. v. Virtual Automation, Inc.,* 361 F.3d 831, 847–48 (5th Cir.2004)).

[2]  *See, e.g., Farmer v. Brennan*, 511 U.S. 825 (1994), *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004), *Hadix v. Johnson*, 367 F.3d 513 (6th. Cir. 2004)

[3]  *Gates*, 376 F.3d at 332-33 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). *See also Farmer*, 511 U.S. at 832 (Holding that defendants must "provide humane conditions of confinement [and] must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.") (citation omitted) (internal quotations omitted).

4 Helling v. McKinney, 509 US 25 (1993).

(3) To establish an 8th Amendment violation, "the inmate need not show that death or serious illness has occurred."[5]

    (a) It is well established that extremely hot or cold conditions in confinement can constitute an Eighth Amendment violation.[6]

    (b) Temperatures regularly in the high-80s or 90s (Fahrenheit degrees), without adequate measures to provide relief from the extreme heat such as mechanical cooling; clean, cold ice and water; cold showers; and adequate ventilation are recognized as an objectively serious risk of harm in violation of the Eighth Amendment.[7]

    (c) Standards of care throughout Louisiana reflect that climate control is regarded as an important feature for buildings. For example: Louisiana requires air conditioning in state residential settings including adult and juvenile residential care providers, independent living homes, "substitute family" homes, and adult day care facilities;

---

[5]   *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004), *citing Helling v. McKinney*, 509 U.S. 25, 32 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.")

[6]   *See, e.g., Wilson v. Seiter*, 501 U.S. 294, 304 (1991) ("low cell temperature at night combined with a failure to issue blankets" could rise to the level of an Eighth Amendment violation); *Blackmon v. Garza*, 484 F. App'x (5th Cir. 2012) ("Allowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment.").

[7]   *See, e.g. Blackmon*, 484 F. App'x at 869; *Valigura v.* Mendoza, 265 F. App'x 232, 235 (5th Cir. 2008) ("[Temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment."); *Gates*, 376 F.3d at 332 (granting injunction mandating that prison officials take reasonable measures to ensure inmates safety "[i]f the heat index reaches 90 degrees or above.").

in health care settings including hospital nurseries, substance abuse treatment centers, renal disease care facilities, and pediatric day health care facilities; in the correctional context in juvenile detention centers; and in animal shelters.[8]

(d) The American Corrections Association ("ACA") Standards for Adult Correctional Facilities state: "Temperatures in indoor living and work areas are appropriate for the summer and winter comfort zones." The comment to that standards states: "Temperature should be capable of being mechanically raised or lowered to an acceptable comfort level." Expected Practice 4-4153.

(e) The American Society of Heating, Refrigerating and Air Conditioning Engineers ("ASHRAE"), which is a national professional society for mechanical engineers specializing in HVAC, indicates that for "Justice Facilities," including jails and prisons "Indoor air should be at 74 to 78

---

[8] La. Admin. Code tit. 50, pt. VII, § 32501 (Intermediate Care Facilities for Persons with Developmental Disabilities -- Decertification); La. Admin. Code tit. 48, pt. I, § 8429 (End Stage Renal Disease Treatment Facilities -- Physical Plant Requirements); La. Admin. Code tit. 48, pt. I, § 6743 (Hospital nurseries); La. Admin. Code tit. 48, pt. I, § 5285 (Pediatric Day Health Care Licensing Standards -- Physical Environment); La. Admin. Code tit. 48, pt. I, § 7423 (Substance Abuse/Addictive Disorders Treatment Facilities -- Core Requirements for All Programs); La. Admin. Code tit. 48, pt. I, § 5094 (Home and Community-Based Services Providers Licensing Standards -- Supervised Independent Living Module); La. Admin. Code tit. 48, pt. I, § 5094 (Home and Community-Based Services Providers Licensing Standards -- Supervised Independent Living Module);  La. Admin. Code tit. 67, pt. V, § 7119 (Residential Licensing -- Child Residential Care, Class A); Admin. Code tit. 48, pt. I, § 5091 (Home and Community-Based Service Providers Licensing Standards -- Substitute Family Care Module); La. Admin. Code tit. 48, pt. I, § 5073 (Home and Community-Based Service Providers Licensing Standards -- Adult Day Care Module); La. Admin. Code tit. 48, pt. I, § 6945 (Licensing -- Juvenile Detention Centers); and La. Rev. Stat. Ann. § 3:2464 (Cruelty to Animals -- Minimum Standards for Animal Shelters).

d F and maximum 50% rh for summer conditions and occupancy…

unless otherwise noted."[9]

(f)   When temperatures exceed certain temperatures or because of energy

loss the population does not have access to cool spaces, various

governmental bodies establish shelters for citizens to utilize to cool

down.[10]

(g)   It is well recognized that particular medical disabilities, and some

medications taken to remedy them, increase the already heightened

risk of heat-related illness and death that exists at high temperatures.[11]

---

[9] American Society of Heating, Refrigerating and Air Conditioning Engineers, 2011 ASHRAE Handbook: Heating, Ventilation, and Air-Conditioning Applications (Inch-Pound Edition), 2011, at 9.3.

[10] See, e.g., Philip Allison, Entergy and the Governor's Office of Elderly Affairs Announce Cooling Centers, http://www.entergy.com/News_Room/newsrelease.aspx?NR_ID=1025 (last visited July 30, 2013); New Orleans Opens a New Cooling Center for Hurricane Isaac Victims, NOLA.com | THE TIMES-PICAYUNE, Sept. 2, 2012, http://www.nola.com/hurricane/index.ssf/2012/09/new_cooling_center_opened_for.html (last visited July 30, 2013); 2 Cooling Shelters Open in New Orleans, WDSU.com, Sept. 2, 2012, http://www.wdsu.com/weather/hurricanes/2-cooling-shelters-open-in-New-Orleans/-/12848220/16460046/-/13epdev/-/index.html (last visited July 30, 2013); Rhonda Nabonne, New Orleans Continues Cooling Shelter to Escape from Summer Heat, NOLA.com | THE TIMES-PICAYUNE, Aug. 21, 2011, http://www.nola.com/weather/index.ssf/2011/08/new_orleans_continues_cooling.html (last visited July 30, 2013); Carolyn Roy, Shreveport "Cooling Centers" to Remain Open, KSLA.com, July 27, 2011, http://www.ksla.com/story/15078287/shreveport-cooling-centers-to-remain-open (last visited July 30, 2013); Cooling Centers Open in Shreveport, KTBS.com, http://www.ktbs.com/story/22317639/cooling-centers-open-in-shreveport (last visited July 30, 2013); Joseph Wenzel, Cooling Center Opens in Bridgeport, WAFB.com, July 3, 2013, http://www.wafb.com/story/22767750/cooling-center-opens-in-bridgeport (last visited July 30, 2013).

[11]   See Gates, 376 F.3d at 340 (finding that where "[t]he summer temperatures . . . average in the nineties with high humidity [t]he probability of heat-related illness is extreme [and] the medications often given to deal with various medical problems

(h) The Defendants have an obligation to provide the Plaintiffs with all the necessary remedial measures required for compliance with the Eighth Amendment. The Defendants cannot rely on other inmates to supply these remedial measures.[12]

(i) States throughout the country require that temperatures in prison and jail facilities be kept between 65-85 degrees, including Arkansas, Kentucky, Maine, Nevada, Tennessee, and Texas.[13]

(j) Other states have similar measures or policies regarding the climate conditions to be maintained inside of prison facilities.[14]

---

interfere with the body's ability to maintain a normal temperature," and absent adequate remedial measures, "this condition presents a substantial risk of serious harm to the inmates.").

[12] "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. … The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 199-200 (1989).

[13] Ark. Criminal Det. Facility Review Comm'n, Jail Standards § 16-004 (1988) (requiring correctional facilities to maintain temperatures between 65 and 85 degrees Fahrenheit); 501 Ky. Admin. Regs. 3:050, § 10 (Westlaw through 2012), (requiring correctional facilities to maintain temperatures between 65 and 85 degrees Fahrenheit); 03-201 Me. Code R. Chp. 1, § II.a (2012) (requiring temperatures to be maintained between 65 and 85 degrees Fahrenheit); Nev. Admin. Code § 211.320 (Westlaw through 2012) (requiring correctional facilities to maintain temperatures between 65 and 85 degrees Fahrenheit); Tenn. Comp. R. & Regs. 1400-01.04 (WestlawNext through 2013) (requiring correctional facilities to maintain temperatures between 65 and 85 degrees Fahrenheit); 37 Tex. Admin. Code § 260.154 (WestlawNext through 2013) (requiring correctional facilities to maintain temperatures between 65 and 85 degrees Fahrenheit).

[14] Alaska Dep't of Corr., Policy and Procedure Manual § 801.03 (2012) ("Facility staff

shall strive to maintain ventilation and temperatures in each facility indoor living and
work areas appropriate to summer and winter comfort zones. When feasible,
temperatures shall be maintained between 65 and 80 degrees Fahrenheit."); Colo. Dep't
of Corr., Administrative Regulation no. 350-03 (2012) and Colorado Dep't of Corr.,
Administrative Regulation Form no. 1100-05 (2012) ("Temperatures are mechanically
raised or lowered to acceptable comfort levels"; "adequate, comfortable temperature".)
Colorado D.O.C. 350-03; Colorado D.O.C. 1100-05; D.C. Dep't of Corr., Directive no.
7500.1 (2008), which requires that the temperature be maintained within acceptable
levels of comfort. ("Temperature and humidity are mechanically raised or lowered to
acceptable comfort levels.") District of Columbia D.O.C. 7500.1; Ill. Admin. Code tit.
20, §§ 701.80, 720.40, 720.50, 720.160 (Westlaw through 2012) ("Detention areas shall
be comfortably heated and cooled according to the season with a system designed to
eliminate disagreeable odors and to routinely provide temperatures within the normal
comfort zone."); Iowa Code § 201-50.4 (WestlawNext through 2013) ("All detention and
living areas shall be reasonably heated and ventilated, with air flow sufficient to admit
fresh air and remove disagreeable odors, to ensure healthful and comfortable living and
working conditions for prisoners and staff. Fans and an adequate supply of cold liquids
will be made available and utilized when indoor temperatures exceed 85° Fahrenheit.");
Kan. Dep't of Corr., Internal Management Policy and Procedure § 09-102 (Amended
2006) ("Facilities shall maintain energy efficient thermostat settings, with such devices
located in housing, program, and exercise areas to be set not higher than 68 degrees
Fahrenheit during winter heating and, where tempered air is available, not lower than 78
degrees Fahrenheit during summer cooling. In other areas of the facilities, the settings
shall be set at not more than 72 degrees Fahrenheit for heating, or less than 72 degrees
Farenheit [sic] for cooling."); Mass. Dep't of Corr. 103 Mass. Code Regs. 920.10 (2012)
("At least every three years, an independent, qualified source shall document that all
living areas have … [t]emperatures appropriate to summer and winter comfort
zones…."); Minn. Dep't of Corr., Policies, Directives and Instructions Manual,
Instruction no. 300.400RW (2005) ("Heating, ventilation and acoustic systems ensuring
healthful and comfortable working conditions for offenders and staff."); Mont. Dep't of
Corr., Policy Directive no. 2.2.1 (2011) ("Lighting and ventilation throughout each
facility will be determined by the tasks performed in that area. Interior finishes and
colors, the type and placement of windows, and ventilation and lighting will take into
account the needs of staff and offenders and will comply with all applicable regulations
and codes.") (Montana also requires that all new buildings or renovations comply with
the ACA guidelines.  ACA Standards for Adult Correctional Institutions, § 4-4153, states
"Temperatures in indoor living and work areas are appropriate to the summer and winter
comfort zones," and adds in comment, "Temperature and humidity should be capable of
being mechanically raised or lowered to an acceptable comfort level."  *ACA Standards
for Adult Correctional Institutions*, 4th Ed., 2003.); N.M. Dep't of Corr., Policy no. CD-
163000 (2011) ("Temperatures in indoor living and work areas shall be appropriate to the
summer and winter comfort zone."); Ohio Admin. Code Ann. § 5120:1-8-04 (West 2013)
("Reasonable efforts shall be made to maintain temperatures in prisoner quarters within
the normal comfort zone (sixty-eight degrees Fahrenheit to eighty-five degrees

(k) Courts have punished people criminally and civilly for exposing

people and animals to extreme heat conditions.[15]

(4) That Defendants are subjectively culpable, i.e. showed "deliberate

indifference" to the risks to Plaintiffs' health (subjective prong).

(a) "Deliberate indifference" means that the Defendants had actual

knowledge of the substantial risk of serious harm. If the Defendants

strongly suspected that a risk existed, yet shut their eyes for fear of

what they would learn, they could be considered deliberately

indifferent.[16]

---

Fahrenheit) during daytime hours and not below sixty degrees Fahrenheit at night."); 6 Va. Admin. Code § 15-40-1160 ("Heat shall be evenly distributed in all rooms so that a temperature no less than 65°F is maintained. Air conditioning or mechanical ventilation systems, such as electric fans, shall be provided when the temperature exceeds 85°F.").

[15] *See, e.g., Lincoln General Ins. Co. v. Aisha's Learning Center*, 468 F. 3d 857 (5th Cir. 2006) (personal injury action brought against day care center for leaving two-year-old in a parked van for seven hours while external temperature reached 95 degrees Fahrenheit.); *Burchett v. Kiefer*, 310 F. 3d 937 (6th Cir. 2002) (holding that detention of plaintiff during the execution of a search warrant, for three hours in a parked police car with windows rolled up, while the external temperature was 90 degrees Fahrenheit, violated the plaintiff's Fourth Amendment rights, and finding that the police officers' refusal to even crack the windows upon plaintiff's request indicated a wanton indifference the plaintiff's safety); *Lopez v. State*, 720 S.W. 2d 201 (Tx. Ct.App., 1986) (Defendant was convicted of intentionally and knowingly confining an animal in a cruel manner for leaving his dog in his parked vehicle with the windows cracked for several hours, in an exposed parking lot on a hot, sunny day. The court found it was "definitely hotter inside the car than it was outside the car.")

[16] Federal Civil Jury Instructions of the Seventh Circuit No. 7.14, Comment c (2005) (citing Seventh Circuit Federal Criminal Jury Instructions § 4.06 (1999); *McGill v. Duckworth*, 944 F.2d at 351 (conscious avoidance can amount to deliberate indifference)).

(b) Because this matter is "concerned with future conduct to correct prison conditions . . . [i]f those conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong [of deliberate indifference] because the same information that would lead to the court's conclusion was available to the prison officials," and they would clearly be aware of the ongoing, and objectively unconstitutional, risks.[17]

(c) "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."[18]

### ii) Claim 2: Violation of the ADA

Under the ADA and relevant case law,[19] the elements required to establish the claim for violations of the ADA are as follows:

(1) That Plaintiffs are qualified individuals with a disability.

---

[17] *Hadix*, 367 F.3d at 526; *See, e.g., Helling v. McKinney*, 509 U.S. 25 (1993) (holding that the "subjective element, whether prison officials had shown deliberate indifference to hazards . . . was to be determined in light of officials' current attitudes."); *Farmer,* 511 U.S. at 827 ("In making the requisite showing of subjective culpability, the prisoner may rely on developments that postdate the pleadings and pretrial motions.").

[18] *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

[19] 42 U.S.C.A. § 12132; *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997).

(a) The ADA defines disability as "with respect to an individual – (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; . . . ."[20]

   (i) The Americans with Disabilities Act Amendments Act ("ADAAA") clarifies that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals . . ." and "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as: (I) medication, medical supplies, equipment, or appliances . . . ."[21]

(b) Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[22]

(2) That Plaintiffs have been excluded from participation in, denied benefits of, or subjected to discrimination under the Defendants' program solely because of their respective disabilities;

(3) That Defendant DOC receives federal financial assistance[23]; and

---

[20]  42 U.S.C.A. § 12102.

[21]  42 U.S.C.A. §§ 12102(4)(A), (E)(i)(I).

[22]  42 U.S.C.A. § 12102(2)(A)(1).

[23] *Schmitz v. State of Louisiana, ex rel. Dep't of Pub. Safety & Corr.*, 2008 WL 482598 (M.D. La. 2008).

(4) That the requested relief is necessary to avoid discrimination based on the

Plaintiffs' disabilities in violation of the ADA and does not

"fundamentally alter the nature of the service, program, or activity."[24]

### iii) Claim 3: Violation of the RA

Under 29 U.S.C.A. § 794(a), the elements required to establish the claim for violation

of the RA are as follows:

(1) That Plaintiffs are qualified individuals with disabilities;

(a) The RA provides the same definition of disability as the ADA, as

expanded by the ADAAA.[25]

(2) That Plaintiffs have been excluded from participation in, or denied the

benefits of, the services, programs, or activities of a public entity, or

otherwise discriminated against by such entity; and

(a) Under the RA, "the term 'program or activity' means all of the

operations of--. . . a department, agency, . . . or other instrumentality of

a State . . . any part of which is extended Federal financial

assistance."[26]

(3) That such exclusion or discrimination was by reason of Plaintiffs'

disabilities.

---

[24]  28 CFR 35.130 (2013).

[25]  *See* § 12102, § 12102(2)(A)(1).

[26]  29 U.S.C. § 794(b)(1)(A).

iv) **Defendants' post-filing remedial measures**[27]

(1) The actions Defendants have taken since the filing of this lawsuit have altered the data collected pursuant to this Court's order. The Plaintiffs have received reports of measures being considered or applied, including but not limited to awnings being added, doors to the air-conditioned hub of Death Row being propped open, experimentation with the effects of opening and closing the tier windows, and increased air vent air flow.

(2) At the July 2, 2013 hearing, the Court noted that it had concerns about the potential health effects on the Plaintiffs of not ameliorating temperature conditions on Death Row for at least a month to allow data to be collected, but felt that ordering the data collection was necessary. The Court's decision did not anticipate that the Defendants would begin to take steps to alter the conditions on Death Row during the data-collection period.[28]

(3) Furthermore, "[c]hanges made by defendants after suit is filed do not remove the necessity for injunctive relief, for practices may be reinstated as swiftly as they were suspended."[29]

(4) "In *United States v. Oregon State Medical Society*, 343 U.S. 326, 333 (1952), the Supreme Court stated: 'When defendants are shown to have

---

[27] The fact that these remedial measures were taken is not admissible as an admission of culpability under Fed. R. Ev. 407, but here, since they undermine the data collection, they are admissible.

[28] Elzie Ball, et al v. James LeBlanc, et al, No. 3:13 CV-00368-BAJ-SCR, Transcript of Motion for Preliminary Injunction Before the Honorable Chief Brian A. Jackson, United States District Judge, July 2, 2013, 9 a.m., at 52.

[29] *Gates v. Collier*, 501 F.2d 1291, 1310-1322 (5th Cir. 1974)

settled into a continuing practice . . . courts will not assume that it has been abandoned without clear proof. . . . It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.'"[30]

(5) Furthermore, Courts have noted, "It is significant that the improvements made at [the facility in question] were not undertaken until after the filing of this suit."[31]

(6) Voluntary cessation of unlawful conduct does not moot a case.[32]

**b) Likelihood of Suffering Irreparable Harm**

Under relevant case law,[33] Plaintiffs must prove:

i) That, in the absence of injunctive relief, the Plaintiffs will continue to suffer irreparable harm based on the conditions of their confinement with regard to extreme temperatures and lacking measures of relief.

(a) If the conditions of Plaintiffs' confinement violate their Eighth Amendment rights, it is axiomatic that allowing Defendants to

---

[30] *Id.*

[31] *Id.*

[32] "'Voluntary cessation even of all the conduct being challenged in a lawsuit does not moot a case.' *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 324 (5th Cir. 2009). 'A defendant, without court compulsion, could legally return to its former ways. The defendants, who are the ones asserting mootness, must convince us that there is no reasonable prospect that what the plaintiffs allege as the cause of their injury will recur.' *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000). We are not convinced. This suit is not moot." *K.P. v. LeBlanc*, 627 F.3d 115, 121 (5th Cir. La. 2010).

[33]   *VRC*, *supra* note 1.

continue to subject them to unconstitutional conditions, which put

them at extreme risk of illness and even death, would cause irreparable

harm.[34]

### c) Balancing of the Potential Injury to Plaintiffs Versus Harm to Defendants

Under relevant case law,[35] Plaintiffs must prove:

(1) That the harm to the Plaintiffs of not granting an injunction outweighs the

harm that the granting of the injunction will cause the Defendants.

(a) A Defendants' pure financial hardship, caused by the remedial

conditions of an injunction, never outweighs the harm caused to

plaintiffs who are deprived of their constitutional rights.[36]

### d) The Injunction and the Public Interest

Under relevant case law,[37] Plaintiffs must prove:

i) That the injunction will not undermine the public interest.

(1) It is well recognized that the public interest is served by:

---

[34]  *See Springtree Apartments, ALPIC v. Livingston Parish Council*, 207 F. Supp. 2d
507, 515 (M.D. La. 2001) ("It has been repeatedly recognized by the federal courts that
violation of constitutional rights constitutes irreparable injury as a matter of law.") (citing
*Elrod v. Burns*, 427 U.S. 347 (1976)).

[35]  *VRC*, *supra* note 1.

[36]  *See Smith v. Sullivan*, 533 F.2d 373, 378 (5th Cir. 1977) ("Inadequate resources can
never be an adequate justification for depriving any person of his constitutional rights.");
*Gates v. Collier*, 501 F.2d 1291, 1219 (5th Cir. 1974) ("Where state institutions have
been operating under unconstitutional conditions and practices, the defenses of fund
shortage and the inability of the district court to order appropriations by the legislature,
have been rejected by the federal courts."); *Cohen v. Coahoma County*, 805 F. Supp. 398,
407 (N.D. Miss. 1992) (risk of bodily harm and anxiety outweighed Sherrif's interest
against being "unfairly brand[ed] as perpetrators of unconstitutional conduct.").

[37]  *VRC*, *supra* note 1.

(a) Barring officials from depriving citizens of constitutional rights;[38]

(b) Barring discrimination on the basis of disabilities.[39]

---

[38] *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) ("[T]he public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve.").

[39] *See, e.g., Rush v. Nat'l Bd. Of Med. Examiners*, 268 F. Supp. 2d 674, 679 (N.D. Tex. 2003) (issuing preliminary injunction because "injunction . . . will further the public interest by prohibiting discrimination by public entities.").