UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ELZIE BALL, NATHANIEL CODE, | * | CIVIL ACTION NO. 13-368 |
| AND JAMES MAGEE, | * | |
| | * | |
|     PLAINTIFFS | * | |
| | * | |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF | * | JUDGE: BAJ |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS, | * | |
| BURL CAIN, WARDEN OF THE | * | |
| LOUISIANA STATE PENITENTIARY, | * | MAGISTRATE: SCR |
| ANGELA NORWOOD, WARDEN OF | * | |
| DEATH ROW, AND THE LOUISIANA | * | |
| DEPARTMENT OF PUBLIC SAFETY | * | |
| AND CORRECTIONS, | * | |
| | * | |
|     DEFENDANTS | * | |

## SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs Elzie Ball, Nathaniel Code and James Magee, who incorporate by reference their first set of Proposed Findings of Fact and Conclusions of Law (Rec. Doc. 53, attachment 9), and respectfully submit the following supplemental proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.  Injunctive Relief is Proper

To prevail on a claim for permanent injunctive relief, Plaintiffs must demonstrate success on the merits of their claims, a likelihood of irreparable harm in the absence of injunctive relief, that the balance of harms favors the Plaintiffs, and that an injunction serves the public interest.  Under the Prison Litigation Reform Act ("PLRA"), injunctive relief must be narrowly drawn, extend no further

than necessary to correct the violation of a federal right, and be the least intrusive means of correcting that violation.  Plaintiffs have met these burdens.

### a.   Plaintiffs have met their burden as to the Eighth Amendment Claim

Plaintiffs claim a violation of the Eighth Amendment ban on cruel and unusual punishment; Plaintiffs have met both the objective and the subjective prongs of this claim.

### i.   Plaintiffs Face a Substantial Risk of Serious Harm

### 1.   Temperatures and heat indices are excessively high

The data collected by United States Risk Management ("USRM"), the Court-appointed data collector, revealed inhumane conditions resulting in a constitutional violation.  All six Death Row tiers recorded conditions that pose a substantial risk of serious harm.  Temperature and humidity conditions varied from one tier to the next and some were consistently hotter.  Every tier recorded multiple stretches exceeding nine hours where the heat index did not dip below 100 degrees.  The heat index was at or above the "Caution" zone, as defined by the National Oceanic and Atmospheric Administration's ("NOAA") heat index chart, on every tier during the entire monitoring period; at least 70% of the readings on each tier were in the "Extreme Caution" or "Danger" zones. The NOAA charts' statements of caution, extreme caution, danger, and extreme danger are statements designed as guidelines to assist healthy individuals in dealing with extreme heat.  Because Plaintiffs are not ordinary, healthy individuals and are locked in their cells for virtually the whole day, NOAA's guidelines understate the risk actually faced by Plaintiffs.

USRM placed instruments inside one or more cells on each tier.  On Tier A, where Plaintiff Magee currently lives, the heat index reached 104.54 degrees in cell A-11.  On Tier B, the heat index reached 109.94 degrees in cell B-8.  On Tier C, the heat index reached 110.3 degrees in cell C-11. Tier C was one of two tiers on which Defendants mounted awnings above the windows and may have been spraying down the outer walls of the tier during some portion of the monitoring period.

The maximum heat index recorded on Tier C was recorded while the awnings were in place.  Had this tampering not occurred, the peak heat index on Tier C may well have been higher.  Even so, the heat index was at or above the "Extreme Caution" zone on Tier C for 99% of the monitoring period, and exceeded 105 degrees during a ten-hour stretch beginning at 6:30 p.m. on Aug. 2.  The Court inspected the awnings installed on Tier C and noted that after a mid-afternoon rainstorm it was noticeably cooler outside than it was on the tier.[1]  On Tier F, the heat index reached 106.16 degrees in cell F-6.

Tier G had two USRM measurement instruments, on in cell G-8 and one at the end of the tier in cell G-16.  Tier G was also a tier on which the Defendants mounted awnings above the windows and may have sprayed down the outer walls of the tier during some portion of the monitoring period.  In cell G-8, about halfway down the tier, the maximum heat index recorded was 107.42 degrees; in cell G-16, the maximum was 110.3.  During the three-week monitoring period, the heat index in cell G-16 averaged 4.38 degrees higher than that in G-8, and at points G-16 was as much as 10.08 degrees hotter than G-8.  This disparity along the tier, in which the cells farthest from the center of the building are the hottest, is likely true on every tier, as Plaintiffs' expert David Garon testified.  The instrument in cell G-8 recorded heat indices at or above the "Extreme Caution" zone for 80% of the monitoring period.  In G-16, the heat indices were at or above the "Extreme Caution" zone for the entire period the device was installed.  G-16 recorded a heat index exceeding 105 degrees from 7:30 p.m. on Aug. 2 to 3:30 a.m. on Aug. 3.  During the Court's site visit, the wall-mounted thermometer on Tier G read 94 degrees. On Tier H, where Plaintiffs Ball and Code currently live, the heat index reached 107.78 degrees in cell H-8.  Plaintiff Ball resides in cell H-5, while Plaintiff Code is in cell H-16, the last cell on the tier.

---

[1] Furthermore the Court was able to observe that the awnings mounted on the windows outside Tier C were made of water resistant material that was sewn or hemmed to suit wooden frames, suggesting that some amount of design work was put into the awnings before they were erected.

The results from the Court-ordered data collection do not represent the upper limit of the temperatures on Death Row.  Defendants interfered with the collection of data by installing devices designed to lower the ambient temperature (and thereby the heat index) on the two tiers whose monitoring devices were producing the highest readings.  Thus, the USRM data do not provide an accurate picture of the conditions of confinement endured by Plaintiffs prior to remedial measures being taken by the Defendants, but rather serve as a baseline against which conditions on the tiers should be evaluated.  In short, in the absence of remedial measures on the tiers it is no cooler, but it is probably hotter, than what the USRM instruments recorded.

Perhaps most tellingly, the highest outdoor temperature recorded by USRM was 95.9 degrees. Pl. Ex. 137. In her responses to the Plaintiffs' Administrative Remedy Requests ("ARPs"), Warden Norwood indicated that the temperature range for an average South Louisiana summer is **90-110** degrees Fahrenheit. Pl. Ex. 40, 43, & 47.  That temperature range means it regularly gets a full 14 degrees higher than what USRM recorded, indicating Plaintiffs regularly experience much higher temperatures.

Defendants also recorded substantially higher temperatures in their own logs than the temperatures reached during the three-week monitoring period as shown in the USRM data. Pl. Ex.49 & 50.  Before and after the filing of this lawsuit, Plaintiffs sought and were denied the opportunity to independently measure the temperatures inside the Death Row tiers.  Those efforts were summarized in a motion before the Court for imposition of sanctions for Defendants' spoliation of evidence. Rec. Doc. 63. The temperatures recorded by hand in the prison's tier logs are reasonably accurate and were prepared pursuant to Defendants' own policies governing the issuance of heat alerts and accounting for heat-related illnesses.  The Court finds the 2011 and 2012 temperatures collected by the Defendants to be accurate, and notes that it precluded evidence from Plaintiffs about the indicia of reliability of this data as a result of this finding.

Warden Norwood confirmed that she relies on those recordings and that the recordation is performed pursuant to policy. Brandy Perry testified that Heat Alerts, in accordance with LSP's own policy, are issued every day during the summer.

The USRM data indicates that temperatures recorded indoors are relatively consistent with the conditions outdoors.  This is consistent with the observations of third-party witness Frank Thompson and Plaintiffs' expert David Garon that there is no reason that the temperature and humidity should be different indoors than outdoors.  Frank Thompson also stated that there is no limit to how high the ambient temperature on the tiers can reach.

Steven Trauth, the representative of USRM, testified that the instruments USRM used to collect data were deliberately placed away from the walls in order to avoid the heat that emanates from the cell walls.  Mr. Garon confirmed that the Death Row building has a large thermal mass because of its steel-and-concrete construction, and a high capacity to retain heat. During the Court's site visit, the Court was able to observe that in the small cells, inmates are scarcely able to distance themselves from the walls. During the visit, correctional officers held open the doors between the tiers and the central hub in order to verify that the tier was secure and ready for the Court's visit, and in doing so allowed mechanically cooled air to enter the tiers for several extended moments. Nonetheless, the heat and stuffy air on the tiers, especially towards the far ends, was obvious.  The Court also noted that the inside tier wall was warm to the touch.[2]

Heat index is the best indicator of health and safety risks from prolonged heat exposure. Plaintiffs' expert Mr. James Balsamo explained that heat index represents the stress load that ambient heat and humidity place on an individual's body.  Plaintiffs' expert Dr. Susi Vassallo reinforced this point by citing to and relying on medical studies that evaluate the impact of both temperature and humidity (i.e. heat index) on the body.  Dr. Vassallo also based her remedy

---

[2] Plaintiffs make no argument as to anything that occurred at the site visit beyond what was physically observable to attorneys and the Court since the site visit was limited in its scope.

recommendations on heat index numbers. Furthermore, the EPA study cited by Defendants uses heat index to make recommendations to the general public. Pl. Ex. 127. Finally, NOAA also relies on heat index for its risk evaluations.

### 3. Plaintiffs are at risk

Plaintiffs Mr. Code, Mr. Ball, and Mr. Magee all take diuretic medications for hypertension, which make them susceptible to the heat illness as Dr. Vassallo and Defendants' witness Dr. Hal Macmurdo discussed. Pl. Ex. 94-96. Mr. Magee takes Prozac. Dr. Vassallo testified that Prozac is a psychotropic. Dr. Macmurdo declined to characterize Prozac as a psychotropic drug but did not explain why; Angola's own policy on psychotropic medications and heat pathology, LSP Directive No. 13-067, defines psychotropic medication as "any medication prescribed for the purposes of affecting the mind, emotions or behavior." Pl. Ex. 113. Dr. Macmurdo admitted that Remeron, which Mr. Magee takes, is a psychotropic medication. Warden Norwood confirmed that none of the Plaintiffs are on the list of inmates monitored for heat illness pursuant to LSP Directive 13.067 Pl. Ex. 113. Angola's heat pathology policy is troublingly under-inclusive as it leaves out inmates who are on diuretics or any non-psychotropic medications that make them more susceptible to heat-related illness.[3]

Dr. Vassallo, through her research, has discovered roughly 11 heat-related deaths in a Dallas prison that is substantially similar to Angola's death row. The Court takes note that the risks for inmates on the Death Row tiers is likely higher than that in the Dallas correctional facility, as Dr. Vassallo testified, because the inmates on the Death Row tiers are locked in their cells for twenty-three hours of the day.

---

[3] Dr. Vassallo testified that each of the Plaintiffs takes particular medications that heighten their risk for developing heat-related illness: Elzie Ball takes Cozaar, an angiotenzen receptor blocker; Lasix, a diuretic; Atenolol, a beta blocker; and Amlodopine, a calcium channel blocker. Nathaniel Code takes Cozaar; hyrodiuril, a diuretic; and Amlodopine. James Magee takes Fluoxetine (also known as Prozac, a psychotropic; and Amplodine.

Plaintiff Code testified that he tries to be as still as possible during summer to avoid overheating, but that when he lies in one position for too long, the part of his body that he's lying on gets too hot. He testified that temperatures on the tier do not cool down until around 2:00 am. He indicated that during the heat he feels dizzy and light-headed, he experiences more headaches, the heat "wreaks havoc" on his sleep patterns, he sweats profusely, and he gets more easily disoriented. He gave the example that although he has a small cell, he can easily misplace a small object. Mr. Code experiences the sensation of a wave passing over him and gets a rising tingling sensation from below his waist to his head, which never happens when the weather is cool. Mr. Code tries to manage the heat by drinking cool water and wrapping ice into towels as much as possible, but the relief this provides is fleeting at best and inadequate to remedy the extreme conditions on the tier.

Plaintiff Ball testified he experiences profuse sweating; swelling and tingling in his hands, feet and joints; dizziness, lightheadedness and headaches; and difficulty sleeping from the heat. Mr. Ball has also has keloid scarring that becomes inflamed and painful when it is hot. Mr. Ball has experienced multiple episodes of his blood pressure spiking during the summer; at most, the medical staff's response is to give him an additional dose of his medication, which has proved ineffective. Mr. Ball testified that Dr. Macmurdo told him, "Sooner or later you're going to stroke out." Dr. Macmurdo never contradicted this statement, and the Court believes that Defendants' own medical staff recognize the risk to Mr. Ball's health.

In order to deal with heat, Mr. Ball lies on the floor, wets towels, drinks ice water, and takes off his shirt. When these efforts are not enough, he prays. Mr. Ball also testified that in accordance with his doctors' advice, he tries to exercise whenever possible and eats things from the canteen recommended by the dietician to manage his diabetes. Both Dr. Macmurdo and Dr. Vassallo testified that Mr. Ball's health is not under control.

7

Mr. Magee described the tier as being like a sauna in the morning and an oven in the afternoon.  He is often hot and sweaty, nauseated, light-headed, dehydrated, and finds that he has difficulty sleeping and breathing.  In order to seek relief, he wears t-shirts that have been wetted in his sink, and he uses wet towels to wipe down the floor and walls of his cell.  The methods available to him are inadequate to secure relief from the heat.

All three Plaintiffs testified that they only have direct access to ice one hour a day and that they are dependent on the other inmates (some of whom are unsanitary or have communicable diseases) or correctional officers for access to ice during the day. Correctional officers do not always supply ice when asked. During the night, the tier shuts down and ice is rarely available.  The ice machine regularly breaks or the ice stored in the chest runs out. Mr. Ball testified that he does not fill all his containers with ice because if he did, there would be no ice left for other inmates on his tier.  The Court notes that Defendants introduced no evidence to contradict Mr. Ball's statements.

Plaintiffs do not have access to cooling showers. Plaintiffs only have access to one very hot shower every day.  Pl. Ex. 125. Showers are sometimes hot enough that inmates cannot stand directly under the flow of water.  The showers increase the humidity on the tiers.  Plaintiffs cannot manually control the temperature; a maintenance worker or correctional officer must adjust the temperature of the water heater.  Warden Cain acknowledged that the showers are not cooling. Plaintiffs do not dispute the need for a hot daily shower, with water temperatures between 100 and 120 degrees, for sanitary purposes in order to avoid rashes and other health conditions, as described in LSP Directive No. 12.005. Pl. Ex. 112.

The fans on the tiers are shared between every two adjacent cells.  The angle of the fans is such that both inmates cannot receive direct airflow.  As Plaintiff Magee testified, inmates repeatedly attempt to adjust the placement of the fans in order to maximize comfort in both cells, but find this difficult to achieve.  The fans break.  The Environmental Protection Agency, whose 2006 Excessive

Heat Events report was cited with approval by Warden Norwood in her ARP responses, indicates that when the heat index exceeds 99 degrees inside, fans increase thermal stress and associated health risks, as they serve only to blow hot air – hotter than the internal body temperature – across the surface of the skin. Pl. Ex. 127, at 49-51.  The EPA adds that the use of fans where heat indices exceed the high nineties cannot serve as a substitute for spending time in air-conditioned spaces and can actually accelerate the risk of heat exhaustion.  Even the motors of the fans could add to the extreme heat on the Death Row tiers.  Mr. Garon testified that when he measured the surface temperature of a fan motor, it was 135 degrees Fahrenheit.  At the heat index levels recorded on the Death Row tiers, this extra source of heat exacerbates the heat-related health risks to Plaintiffs because the fans do nothing but push hot air around.

The water from the faucets inside the cells is tepid and, while described as "room temperature," is likely to be hotter than what most would consider room temperature given the excessive heat. Mr. Garon's expert report shows that the drinking water temperature was measured to be 80.6 degrees. In order for it to be cooling, Plaintiffs have found that they have to add ice. Warden Norwood testified that the correctional officers drink bottled water.

As the Court observed on the site visit, the windows on the tiers do not open in a traditional sense to create a breeze, but rather the louvers on the windows merely tilt open to about a 45 degree angle. They do not capture the breeze of the fan and create air circulation.

The Plaintiffs testified that they can go several months without any access to any air conditioning. The Plaintiffs also testified that if they go out into the yard they might have 30 seconds to a few minutes of access to air conditioned space before they are escorted to an outdoor cage for an hour of exercise four times a week.

Mr. Code testified that when the inmates first arrived at the new Death Row facility there were no fans, so they assumed that air conditioning had been built in. The Plaintiffs are required to

wear shirts during their tier time and whenever there is a woman on the tier.  Mr. Code testified that the sun shines directly into his cell every evening, adding to the heat.  None of the Plaintiffs have ever been provided with a cooling towel.  The vents on the tiers often do not work and have a lot of dust inside of them.

Plaintiffs testified that they made numerous informal complaints and verbal comments to staff about the excessive heat on Death Row.  When these complaints did not help, Plaintiffs availed themselves of the only mechanism available to them, the ARP process.

Defendants' argument that a lack of written evidence of prior complaints in the medical charts shows that Plaintiffs never suffered from such symptoms is without merit.  First, the issue before the Court is whether Plaintiffs have a future risk.  Further, the Court finds the lack of medical documentation to be entirely understandable. Plaintiffs have experienced symptoms in the summer that could be characterized as heat-related. The fact that they are not noted as such in the charts is of no moment. Furthermore, Plaintiffs likely under-utilized medical services because of the fees associated with sick calls and the threat of disciplinary actions for declaring an emergency when one is found not to exist.  Indeed, when Mr. Ball required hospitalization, it took intervention from a non-medical staff to get him sent there.

The evidence overwhelmingly demonstrates that Plaintiffs are at serious risk of substantial harm to their health as a result of exposure to heat, both because it will worsen their underlying conditions and because of the risk of heat stroke. Dr. Vassallo, the only medical professional with a specialization in thermoregulation who testified in this matter, underscored these dual risks.

### ii. Conditions of Confinement on the Death Row Tiers Do Not Comport with Contemporary Standards of Decency

The Court finds that a number of professional and industry standards demonstrate society's recognition of the dangers and impropriety of exposure to the temperatures recorded on the Death Row tiers.  Warden Burl Cain in his testimony cited the Death Row facility's American Correctional

Association ("ACA") accreditation with pride as evidence that the facility comports with contemporary standards. LSP directive 12.005, which establishes the standards for temperature monitoring at Angola, references ACA standards 4-4139 and 4-4153, which were promulgated in 2003, three years before the Death Row tiers were constructed.  Standard 4-4153 states that "[t]emperatures in indoor living and work areas are appropriate to the summer and winter comfort zones," and adds in comment that "[t]emperature and humidity should be capable of being **_mechanically raised and lowered_** to an acceptable comfort level."  Pl. Ex. 97a.

Climatology studies indicate that heat-related mortality has decreased in communities around the country and particularly in the South because of the prevalence of air conditioning, with only 2% of households in the South being without air conditioning. Pl. Ex. 138.  The EPA discusses how acclimatization has driven the decrease in heat mortality in the South and Southwest, citing as examples of acclimatization changes in design structures of buildings – including air conditioning. Pl. Ex. 127.  The EPA confirms that those who do not have access to air conditioning are more likely to suffer heatstroke. Id.  The EPA finds that individuals with cardiovascular disease and other conditions; taking diuretic and psychotropic medications; and with sedentary lifestyles or decreased mobility, are at greater risk of suffering heatstroke.

As Mr. Garon testified, several recently constructed parish jails across Louisiana have been built to include air conditioning.  Neither Plaintiffs' nor Defendants' experts have worked on a building where human beings live and sleep that is not equipped with mechanical cooling.

Mr. Garon and Mr. Eyre testified as to the standards promulgated by the American Society of Heating, Refrigeration, and Air-conditioning Engineers (ASHRAE), which include provisions recommending temperature ranges inside of correctional facilities including prisons. The Death Row facility does not comport with ASHRAE standards.  The ASHRAE-defined comfort range for summer has an upper limit of 78 degrees Fahrenheit with 50% relative humidity, which is

significantly cooler than the relief Plaintiffs have requested here. The Court notes that these standards are not legally binding, but the Court nevertheless finds them to be persuasive examples of the evolving standards of decency.

The Court also takes judicial notice of the thirty administrative regulations and statutes Plaintiffs identified in their Motion to Request Judicial Notice relating to mandated temperature ranges and/or comfort requirements in public facilities, including adult correctional facilities outside Louisiana, as well as residential, health, and animal care facilities inside Louisiana. Rec. Doc. 55. Based on these indicators of contemporary standards, the Court finds that well established societal norms dictate that access to mechanically climate controlled environments should be provided to avoid risks to health and safety resulting from prolonged exposure to heat.

### i. **Deliberate Indifference**

The Death Row facility was built in 2006. Secretary LeBlanc testified that as a rule of thumb inmate housing units in the Louisiana Department of Corrections system are not air conditioned. The administrative area of the facility, housing staff offices and visitation areas as well as the central "hub" where the correctional officers are stationed, is air conditioned.  The execution chamber is air conditioned.  There is no evidence that anyone undertook any study to determine if providing only natural ventilation would provide a safe environment.  Features such as lighter roofing materials, longer eaves, strategically placed trees, and higher ceilings, which might have made the tiers cooler, were not included in the design.  Additionally there is no cross ventilation. Doctor Singh testified that Secretary LeBlanc signs and reviews all policies, including heat-related policies. Secretary LeBlanc was deliberately indifferent to the substantial risk of serious harm that the heat conditions on the Death Row tiers pose to Plaintiffs.

Warden Cain received letters from Counsel for the Plaintiffs outlining concerns about heat on Death Row in the spring of 2012. Pl. Ex. 32-34. Warden Cain read the letters. He responded in

June 2012 that temperatures are monitored and are at acceptable levels. Pl. Ex. 35.  He testified that he did not undertake an investigation of the heat other than continuing to walk the tiers as he always does. Warden Cain also testified that he was aware of 4 to 5 incidents of heatstroke at Angola while he has been Warden.  Warden Cain was the subject of a lawsuit in the summer of 2012 dealing with monitoring the health and safety of the inmates on Death Row from the heat. Despite all the complaints since the spring of 2012, Warden Cain has failed to provide any remedial measures to the Plaintiffs except those performed during the Court-ordered data collection.  Despite the fact that, for months prior to the trial, providing extra ice chests had been discussed by Warden Norwood, Warden Cain, and even Secretary LeBlanc, they were never provided.  The Court finds that Warden Cain was deliberately indifferent to the substantial risk of serious harm that the heat conditions on the Death Row tiers pose to Plaintiffs.

Warden Norwood testified that she understood Plaintiffs' ARPs to merely be complaints about the fact that it was too hot on the Death Row tiers and that Plaintiffs wanted air conditioning. She testified that she reviewed the ARPs carefully.  The ARPs include a series of health related concerns. Pl. Ex. 39, 42, and 46.  Warden Norwood also testified that she reviewed the Plaintiffs' medical records and thus she was presumably aware of their health conditions.

Warden Norwood described herself as the biggest champion of the inmates and said she does everything in her power to help them.  Nevertheless, despite having contemplated and discussed with Warden Cain providing extra ice chests to inmates, she has not done so.  Further, despite all the evidence that Plaintiffs are at serious risk for heat illness, Warden Norwood has still not placed the Plaintiffs on the heat precaution list.  Warden Norwood received e-mails from Nurse Hebert specifically asking that any additions to the list of offenders on precaution lists be provided to Nurse Hebert.  Warden Norwood never provided the Plaintiffs' names for additional monitoring of heat illness; even that of James Magee, who is required to be on the list pursuant to Defendants'

own heat policy because he takes Prozac and Remeron, both of which are psychotropic drugs. Warden Norwood was deliberately indifferent to the substantial risk of serious harm that the heat conditions on the Death Row tiers pose to Plaintiffs.

### iii.  **Defendants Lack Credibility**

The Court finds Warden Norwood's testimony to lack credibility for the following reasons. In her responses to Plaintiffs' ARPs, Warden Norwood either did not read and understand the EPA study she cited, or she chose to selectively cite it in a way that was misleading and did not accurately reflect its content.  She also plainly mischaracterized the contents of Plaintiffs' ARPs as containing no mention of medical symptoms or complaints.

Additionally, Warden Norwood said in an email to all Death Row supervisors on July 15, 2013:

> In order to ensure accurate and consistent temperature recording, all fans and windows are not to be adjusted in any manner. In addition, no offender and/or employee is to tamper with the recording devices placed on each tier. Only authorized persons will be allowed inside the cells with the recording devices.

Pl. Ex. 130 at 15.  Despite making this explicit caution to her staff, Warden Norwood testified that she was not concerned about the impact that the awnings and soaker hoses might have on the data collection.  She testified that it never crossed her mind that the installation of this equipment would interfere with the Court's order, and she never raised any concern.

The Court finds Warden Cain's testimony to lack credibility.  Warden Cain testified that he was using the awnings and soaker hoses as an opportunity to test whether or not these measures would be cool the tiers.  However, this argument is substantially undermined by even the most cursory review of the data, which shows that the temperatures and heat index vary by tier and location.  The notion that one tier could be used as a "control" tier while another is used to experiment with additional cooling measures is spurious, especially given that the Defendants chose to experiment on the two tiers that had been delivering the highest temperature readings up to that

14

point.  Even if Defendants had wanted to make a good-faith effort to experiment with potential cooling mechanisms while the data were being collected, they could have chosen to do so on the two tiers that are not part of Death Row, or they could have used some other method of tier selection that did not involve installing awnings on the two hottest tiers.  Warden Cain testified that he could not afford to buy a digital thermometer to conduct these sorts of experiments, but this argument is highly implausible given the low cost and wide availability of such instruments.  Finally, Warden Cain's continuous explanation of a desire to "experiment" reveals his total disregard for this Court's desire and authority to accurately measure the conditions on the Death Row tiers.[4]  Warden Cain's credibility is further undermined by his behavior in Court where he openly and obviously gesticulated in response to a witness who was testifying in Court.

Finally, Warden Cain testified that if he did not want Plaintiffs and the Court to know about the various tactics he had used to lower the temperatures during the Court-ordered data collection, he would not have discussed those tactics in his deposition.  This statement brazenly suggests that it is ever appropriate to not tell the whole truth in sworn testimony, which it is not.  Moreover, in both instances that Plaintiffs are aware of, Defendants did not inform Plaintiffs directly of their actions, but rather only admitted to them when confronted or directly asked by Plaintiffs.  This does not constitute candor.

The Court found that the testimony of Defendants' expert in meteorology Jay Grymes lacked credibility.  Mr. Grymes, Defendants' expert in meteorology who is Chief Meteorologist at Baton Rouge news station WAFB, attempted to testify that the heat index is not a "real" figure and

---

[4] Moreover, Defendants appeared to conclude that the awnings had no effect on temperatures inside the tiers, and were added only to increase the inmates' "comfort," but they did not explain how they reached such a conclusion or why such a distinction is even plausible.  Any measurement of the impact of the spoliation measures would require calculating the temperature spread between tiers, as Plaintiffs did and found a difference. Pl. Ex. 136.  Plaintiffs' analysis of temperature disparities between Tier A and Tier C as recorded in the USRM data both before and after the installation of the awnings showed that there was less disparity after the awnings were installed, particularly at times of day where the solar exposure of Tier C was at its highest.  It is therefore likely that, absent Defendants' improper installation of awnings on Tier C and Tier G, the heat index readings from those cells would have been higher during the monitoring period.

is just a communication tool that has less scientific value than temperature. However, this testimony was contradicted by two facts: one, that Mr. Grymes regularly conveys the heat index forecast to his viewing audience and explains that it represents the heat load to which the body is subjected, and two, that he worked with his mentor to develop heat index calculations.

The Court found that the testimony of Defendants' witness Dr. Hal Macmurdo lacked credibility.  Dr. Macmurdo testified that the Plaintiffs do not take steps to care for themselves. However, when asked about healthy options available to them for purchase from the Canteen, he suggested peanut butter and jelly sandwiches, which are high in saturated fat and sugar.

### b. Plaintiffs have met their burden as to the disability claims.

Plaintiffs have met their burden as to the disability claims by showing that Plaintiffs are disabled under the definitions of the federal disability statutes, Plaintiffs are suffering discrimination, and the discrimination results from their disability.  Additionally, for purposes of the Rehabilitation Act, Plaintiffs have shown that Defendant DPSC receives federal funds.  *See* Rec. Doc. 53-9 at 11-16.

### i. Plaintiffs qualify as disabled

Plaintiffs are disabled. Disabilities are medical conditions that interfere with one or more major life activities.  Major life activities as defined by the prison include: caring for self, interacting with others, performing manual tasks, breathing working, walking, standing, reaching, thinking, toileting, hearing, seeing, speaking, learning, sitting, lifting, sleeping, concentrating, and a section for other to be filled out.[5]  Peabody Dep. Tr. 21:19-23; Pl. Ex. 116.

Mr. Code's unrefuted testimony is that he has trouble breathing, sleeping, thinking and concentrating during times of extreme heat because of interactions between the heat and his medical conditions.  Mr. Ball's unrefuted testimony is that he has trouble breathing, sleeping, and seeing

---

[5] Through stipulation, the parties agreed to admit Warden Peabody's deposition.

during times of extreme heat because of interactions between the heat and his medical conditions. Mr. Magee's unrefuted testimony is that he has trouble breathing, sleeping, and concentrating during times of extreme heat because of interactions between the heat and his medical conditions.

Warden Peabody testified in deposition that staff receives academy training about the ADA. Dep. Tr. 10:6-7.  The training manual produced by the prison entitled "Special Needs Offenders," which describes how the prison must comply with the ADA, lists diabetes, cardiovascular conditions, and mental disorders (including depression) as conditions requiring accommodations. Pl. Ex. 119. Warden Cain further confirmed that he would expect correctional officers at Angola to recognize medical problems such as diabetes, heart disease, and mental illness as disabilities that could require Angola to provide accommodations to persons with such problems.  Dr. MacMurdo also testified that diabetes can require accommodations.

### ii.  The plaintiffs have been discriminated against and have been denied access to a safe environment

Warden Peabody testified that the ARP process is "the way a lot of [ADA claims] are filed." Dep. Tr. 12:18-24.   Requests for accommodation can take any form, and do not require any magic words. Dep. Tr. of Warden Peabody, July 25, 2013, at 14:12-14.  Requests for accommodation can be made orally and in writing. Pl. Ex. 115, p. 4.  There is no formal distinction between the ARP process and a request for accommodation. Dep. Tr. 15:14-19.  The Legal Programs department routes ARPs that implicate the ADA to Warden Peabody. Dep. Tr. 19:19.  He never saw Plaintiffs' ARPs. Dep. Tr. P. 31.  Warden Peabody was not familiar with the prison's own form which is supposed to be filled out by him in response to an ADA request.  Dep. Tr. at 20:8-12; Pl. Ex. 116; Dep. Ex. 2. He did not receive any specialized training to become the ADA coordinator. Dep. Tr. at 17:9-24.

Warden Peabody indicated that the prison's policy requires that accommodations be made for a variety of purposes including personal safety.  Pl. Ex. 116. Warden Peabody was not made

aware of the *Advocacy Center v. LeBlanc* litigation last year. Dep. Tr. 32:12. As the ADA Coordinator,

Warden Peabody would likely have reviewed the allegations in the lawsuit in his role as ADA

coordinator, if he had been made aware of that lawsuit.  Dep. Tr. 36:1-14. In reviewing Plaintiffs'

ARPs, Warden Peabody saw that Plaintiffs believed that they were at risk in the heat due to their

illnesses and were requesting a cooler environment to make them safe. Dep. Tr. at 36-41.

Warden Norwood testified that she received ARP requests relating to the heat both from

men who had health concerns and from those who did not.  She did not treat these two categories

of ARP requests any differently and did not direct those with health concerns to Warden Peabody,

the ADA coordinator, or a medical doctor.

Plaintiffs are presently being discriminated against because they are at a higher risk of heat-

related illness than individuals without Plaintiffs' disabilities would be, as Dr. Vassallo testified.

Subjecting the Plaintiffs to a higher risk of heat-related illness because of their disabilities constitutes

discrimination.  Plaintiffs require accommodations in the form of a lower ambient heat index during

confinement so as to address the higher risk of heat-related illness that is the result of their

disabilities.

### c.  Plaintiffs risk irreparable harm in the absence of injunctive relief

Dr. Vassallo, an expert in thermoregulation, testified that the heat conditions on Angola's

Death Row would subject even a healthy person to serious risk of heatstroke or other heat-related

illness.  Dr. Singh confirmed this when he testified that a six-year-old girl came down with

heatstroke at the semi-annual Rodeo.[6]  He also indicated that he had treated at least 14 other people

for heatstroke at Angola during a roughly five-year period when he worked there. Dr. Vassallo

thinks that the Plaintiffs are at imminent risk of severe physical harm from the heat on Death Row.

Dr. Vassallo testified that diabetes and cardiovascular disease (e.g. hypertension) increase the risk of

---

[6] The Court takes judicial notice of the fact that the Rodeo takes place in the spring and fall each year and not at the height of summer.

heatstroke and heat illness, as does taking diuretic and some psychotropic medications. Furthermore, the heat is likely to exacerbate their underlying conditions. Dr. Vassallo's testimony on future risk is unrefuted. Dr. Vassallo also testified that she worked on *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004), as an expert; that the temperatures recorded at Angola are higher than those in *Gates*; and that the unit at issue in *Gates* was subsequently closed.

Dr. Vassallo testified that heatstroke is a sudden very serious condition that can cause death without immediate and drastic intervention. Other heat-related illnesses include heat cramps and heat exhaustion. In addition to these heat-related illnesses, Dr. Vassallo testified that prolonged exposure to heat can exacerbate the Plaintiffs' underlying conditions including cardiovascular disease, even though a manifestation of that exacerbation might not be considered an episode of heat-related illness.

In her testimony, Warden Norwood indicated that an individual would need to present with symptoms of heat illness in order to be eligible for relief. This approach is directly contrary to the standards of care that society and medical experts recognize.

Dr. Raman Singh, a medical expert for Defendants, testified that headaches, weakness, nausea, dryness, dry mouth, blurred vision, and lightheadedness are all symptoms of heat-related illness. Plaintiffs must pay $3.00 for a doctor visit and $6.00 for an emergency medical visit. As confirmed by Warden Cain and the Defendants' own forms, if an inmate declares an emergency, that inmate risks a disciplinary action for malingering.

Mr. Balsamo, a public health professional and Tulane University professor, testified that the current conditions on Death Row present environmental health and safety risks to a general population – i.e. individuals who do not suffer from the types of medical problems that Plaintiffs do. Plaintiffs' medical conditions heighten their risk of adverse heat-related health effects, he explained.

Mr. Balsamo also explained that since prisoners have no freedom of movement to seek out cooler environments, they are at risk where there is no air conditioning.

### d. Relief and Balance of Harms

Dr. Vassallo stated that the best possible way to reduce risks to Plaintiffs would be to mechanically cool the Death Row tiers.  If building mechanical cooling into the tiers is not possible, she recommends the increased provision of ice, water and personal fans, cooling showers, and access to mechanically cooled spaces for at least 1-2 hours per day.  Mr. Balsamo made similar recommendations and also called for more effective monitoring.  The Court understands that while there is a need for hygienic showers between 100 and 120 degrees, the provision of any cooling showers would supplement the hygienic once-daily showers.

The Plaintiffs have all lived on more than one tier in the new Death Row building and can be moved by Defendants at will. Defendants provided no evidence that they could or would seek to isolate the Plaintiffs.

The budget for corrections in Louisiana is $496 million.  This does not include revenues generated directly by the prison Rodeo or Hollywood films shot on location.

Mr. Garon, a test and balance expert presented by Plaintiffs, testified that retrofitting the current HVAC system to add mechanical cooling might cost approximately $500,000.  There could be some additional electrical costs if more power and/or more equipment is needed to run air conditioning.  Mr. Garon consulted with installing contractors, mechanical installers, and electrical installers to formulate his estimate.  Mr. Garon also confirmed that the system he contemplated would likely be capable of cooling the tier to much lower than an 88 degrees heat index.

Mr. Garon also testified that the $1.86 million estimate provided by the Defendants seemed very high.  Mr. Eyre, expert for the Defendants, essentially agreed when he stated that the estimate he generated was to be considered a worst case scenario with maximum energy loads and equipment

costs.  His cost estimate provides for an air conditioning system that goes beyond what is required to maintain a heat index below 88 degrees on Death Row. Mr. Eyre further testified that "there is more than one way to skin a cat," and that there are likely several cheaper, effective ways to introduce mechanical cooling into tiers at substantially less cost.  Mr. Eyre testified that window air conditioning units or portable air conditioning units would be two other potential methods by which the heat index on the tiers could be lowered.  He allowed that things like inmate labor could further reduce construction costs.

## II.  The Injunction Sought Meets the Requirements of the PLRA.

The Prison Litigation Reform Act requires that an injunction be "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 USCS § 3626.  Here, Plaintiffs seek injunctive relief in the form of this Court's order that Defendants create and implement a plan that will successfully maintain a heat index on the Death Row tiers below 88 degrees.  Because Defendants are best positioned to generate a plan that is narrow and non-intrusive, the Court finds that the injunctive relief Plaintiffs seek is consistent with the requirements of the PLRA.

A Court appointed monitor is necessary to ensure that any order by the Court is properly implemented. The Defendants have demonstrated an at best causal attitude towards and at worse flagrant disregard for this Court's orders. The Plaintiffs fully endorse the Department of Justice's recommendation for the appointment of a monitor. See Rec. Doc. 64.

## CONCLUSIONS OF LAW

### 1. Eighth Amendment Claims

In 2011, Justice Kennedy on behalf of the Supreme Court found a violation of the Eighth Amendment as a result of the horrible conditions of confinement in California's prison system. In evaluating whether the conditions constituted an objective substantial risk of serious harm, the

21

Court measured the factual circumstances of the conditions of confinement against the "evolving standards of decency that mark the progress of a maturing society" to assess the conditions. *Brown v. Plata*, 131 S. Ct. 1910, 1926 n.3 (2011). *Brown* affirmed the Supreme Court's earlier application of this standard in *Helling v. McKinney*, 509 U.S. 25, 29 (1993), where the Court found that evolving societal standards and greater understanding of the risks associated with cigarette smoke were relevant to determining whether exposure to second-hand smoke amounted to a constitutional violation.

The Court finds that the Death Row tiers do not comport with the evolving standards of decency that mark the progress of a maturing society. The Court takes judicial notice of the numerous examples of statutes and regulations that require temperatures to remain within levels well below that which has been recorded on the Death Row tiers. Indeed, these statutes and regulations apply not only to hospitals and animal shelters, but also to correctional facilities substantially similar to the Death Row tiers.

### a. Impact of Spoliation

Defendants deliberately interfered and tampered with the Court-ordered data collection. Plaintiffs are entitled to favorable inferences as to the USRM data insofar as tier temperatures and heat indices are no cooler, but would normally be hotter, than what the USRM instruments recorded. *See* Plaintiffs' memorandum in support of a motion for imposition of sanctions for Defendants' spoliation of evidence, Rec. Doc. 63, at 6-7.

## 2. <u>Remedies</u>

The 1974 injunction in *Gates v. Collier*, which articulated the framework under which *Gates v. Cook* was later analyzed, explicitly contemplates "major physical facility renovations" that may be necessary to achieve constitutional conditions. 501 F.2d 1291, 1294 (5th Cir. Miss. 1974). Technological advances since that time, including those that had been made by 2006 when Angola's

Death Row facility was built and that DOC officials chose to forgo, are relevant to determining the appropriate remedy. Here, both Plaintiffs' and Defendants' experts state that mechanical cooling is feasible. An order requiring the Defendants to develop a plan to cool the Death Row tiers to below 88 degrees heat index therefore comports with the forms of equitable relief available for Eighth Amendment violations under *Gates v. Collier*.

The court in *Blackmon* found that varied conditions can necessitate varied remedies, even where there are some parallels in the conditions of confinement between two facilities. "Despite the existence of some parallels between the remedial measures in place in the instant case and those required in *Gates*, the conditions in *Gates* were not identical to those in Blackmon's dorm." *Blackmon v. Garza*, 484 Fed. Appx. 866, 872 (5th Cir. 2012). The Court's analysis is instructive in that it requires a thorough factual evaluation in order to craft an appropriate remedy. Here, there are several attributes of the Death Row facility that distinguish it from the facility in *Gates*. For example, on Angola's Death Row tiers, the windows do not actually open, but rather have several louvers about five inches high that slant upwards to a 45 degree angle while the windows are covered with thick metal screens. On Angola's Death Row tiers, inmates have no personal fans; the availability of cool water and showers is a disputed factual issue.

While the *Blackmon* court stated in dicta that air conditioning was not mandatory to meet the requirements of the Eighth Amendment, in the instant matter some mechanical cooling is necessary to create tolerable conditions. Plaintiffs have made a sufficient showing to prove this with expert testimony and the collected data. Even supplying all of the remedies ordered in *Gates* would be insufficient to address the risk of harm to the health of Plaintiffs for purposes of the Eighth Amendment.

The Court further finds that a remedy for all Death Row tiers is necessary to provide the required relief to Plaintiffs. Plaintiffs can be moved to a new cell by the prison at will. The remedial

measures currently offered to Plaintiffs are insufficient to remedy the constitutional violation. Adding additional fans and ice will likewise not remedy the problem of the Death Row facility being too hot in the summer, and additional fans could exacerbate the conditions for the reasons described above.  The Fifth Circuit has held that in this sort of circumstance, relief that incidentally affects people other than Plaintiffs is not overly broad on that basis alone.  "Intrusion of federal courts into state agencies should extend no further than necessary to protect federal rights of the parties. An injunction, however, is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit – even if it is not a class action – if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Prof'l Asso. of College Educators v. El Paso County Cmty. College Dist.*, 730 F.2d 258, 273-274 (5th Cir. Tex. 1984), citing *Meyer v. Brown & Root Const. Co.*, 661 F.2d 369, 374 (5th Cir.1981).  *Accord Gregory v. Litton Systems, Inc.*, 472 F.2d 631, 633-34 (9th Cir.1972).  The Court finds that a facility-wide remedy is necessary to adequately vindicate Plaintiffs' rights.

Additionally, the fact that Defendants could subject individuals other than Plaintiffs to the same constitutional and statutory violations is also grounds for the Court to order relief whose scope extends beyond the three Plaintiffs.  "The district court has 'broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.'" *Prof'l Asso. of College Educators v. El Paso County Cmty. College Dist.*, 730 F.2d 258, 273 (5th Cir. Tex. 1984), citing *NLRB v. Express Publishing Co.*, 312 U.S. 426, 435, 61 S. Ct. 693, 699, 85 L. Ed. 930, 936 (1941).

Other federal courts have similarly found that injunctions extending beyond the plaintiff in question are appropriate under the circumstances found in this case.  *See, e.g., Clement v. California Dept. of Corrections*, 364 F.3d 1148 (9th Cir. 2004) (single plaintiff obtained statewide injunction

against prohibition on receipt of materials downloaded from the Internet); *Ashker v. California Dep't of Corrections*, 350 F.3d 917, 924 (9th Cir. 2003) (statewide injunction based on one inmate); *Williams v. Wilkinson*, 132 F.Supp.2d 601, 604, 608-09, 611-12 (S.D. Ohio 2001) (finding an informal policy of refusing to call witnesses in disciplinary hearings, rejecting defendants' argument that the PLRA limited relief to the individual plaintiff, directing defendants to promulgate a new policy).

**IT IS HEREBY ORDERED** that Defendants shall create a plan to implement mechanical cooling to maintain a heat index below 88 degrees.  Defendants shall submit such plan to the Court within five business days of the issuance of this Order.  The Court shall, following an evaluation of Defendants' proposed plan, order any remedy it deems appropriate and consistent with the law in order to maintain a heat index below 88 degrees on the Death Row tiers.

**IT IS FURTHER ORDERED** that Defendants shall immediately provide Plaintiffs with personal ice chests, three cooling showers per day, amend their heat policy to include all medication which cause susceptibility to heat illness including diuretics (Pl. Ex. 113) , amend their heat monitoring policy to include heat monitoring throughout the night (Pl. Ex. 112) , waive fees and threats of disciplinary actions for medical visits when the heat index exceeds 88 degrees, install a dew point or humidity monitor on the grounds of Angola and record its reading hourly, develop an effective plan to respond to heat emergency in consultation with experts, re-train their staff regarding the ADA requirements and how to identify disabilities, create a policy which involves evaluating heat risk for all prisoners at Angola,  and provide two hours of access per day to an air-conditioned room for Plaintiffs until such time as a heat index below 88 degrees has been achieved.

**IT IS FURTHER ORDERED** that the Court will appoint a monitor. The parties will have a week in which to come up with an agreed upon candidate, subject to the Court's approval. If they are unable to do so, the parties will submit a list of no more than three names with resumes to the Court within a week and the Court will select the monitor.