UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
WEST FELICIANA DIVISION

| | | |
|---|---|---|
| ELZIE BALL, NATHANIEL CODE, | * | CIVIL ACTION NO. 13-368 |
| AND JAMES MAGEE, | * | |
| | * | |
| PLAINTIFFS | * | |
| | * | |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF | * | JUDGE: BAJ |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS, | * | |
| BURL CAIN, WARDEN OF THE | * | |
| LOUISIANA STATE PENITENTIARY, | * | MAGISTRATE: SCR |
| ANGELIA NORWOOD, WARDEN OF | * | |
| DEATH ROW, AND THE LOUISIANA | * | |
| DEPARTMENT OF PUBLIC SAFETY | * | |
| AND CORRECTIONS, | * | |
| | * | |
| DEFENDANTS | * | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO SET
ATTORNEYS' FEES AND COSTS REGARDING SANCTIONS PURSUANT TO RULE
37(A)(5)(A) AND THIS COURT'S ORDER**

NOW INTO COURT COME PLAINTIFFS Elzie Ball, Nathaniel Code, and James

Magee, through undersigned counsel, to provide a memorandum in support of Plaintiff's *Motion

to Set Attorneys' Fees and Costs Regarding Sanctions Pursuant to Fed. R. Civ. P. 37(a)(5)(A)

and This Court's Order of December 19, 2013*. Plaintiffs state as follows:

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

In this motion, Plaintiffs focus on the facts and procedure surrounding the motions for

sanctions that gave rise to this Court's sanctions order (Rec. Doc. 88). Plaintiffs will discuss in

separate filings the facts and procedure of the underlying civil action seeking redress for

excessive heat conditions on death row. This motion deals with the "independent, but related"

1

(Rec. Doc. 88 at 3) bases for imposing sanctions against Defendants based on (1) Defendants' spoliation of evidence by deliberately undermining the accuracy of the court-ordered data collection; and (2) Defendants' evasive, incomplete and untimely discovery responses regarding the cost of installing air-conditioning in the death row tiers and subsequent refusal to permit Plaintiffs' shadow expert to bring his own measurement instruments to death row.

Plaintiffs filed the complaint in this matter on June 10, 2013 (Rec. Doc. 1) and moved for a preliminary injunction on June 18, 2013 (Rec. Doc. 12). This Court heard oral argument on the motion for preliminary injunction on July 2, 2013. The Court deferred ruling on Plaintiffs' motion for preliminary injunction in order to allow for the collection of accurate on-site data over a three-week period, and ordered the parties to meet, confer and develop an accelerated joint discovery plan and schedule (Rec. Doc. 24). Pursuant to the Court's direction, the discovery schedule a stipulation to retain a neutral expert to collect, analyze and disseminate objective temperature and humidity data reflecting conditions on Death Row, recorded over a 21-day period to begin July 15 (Rec. Doc. 28).

### a. Defendants secretly alter Court-ordered data-collection

#### i. Defendants alter conditions during the court-ordered data collection

Immediately following the Court's data collection order and coinciding the neutral expert's beginning data collection, Defendants engaged in several temperature cooling efforts. First Defendants installed shade awnings above windows on the Death Row Tiers where measurements were being taken. Next, Defendants began sparing water on the exterior of the Death Row Tiers. And finally, Defendants began opening and closing windows in the Death Row Tiers in a manner inconsistent with prior practice. As discussed more fully below Defendants repeatedly concealed these temperature alteration measures during the data collection

period and from the litigation proceedings in general.

### ii. Defendants conceal temperature interventions during discovery

On July 15, 2013, Plaintiffs served Defendants with Interrogatories that asked for the disclosure of all activities that had taken place at Death Row relating to climate conditions since the Complaint was filed and any steps that had been taken, since the Complaint, related to altering climate conditions inside the facility. (Rec. Doc. 63-11.) Defendants were required pursuant to Rule 26(e) to supplement their answers whenever they were aware that information responsive to the interrogatories came to their attention.

That same day, Defendant Assistant Warden Angelia Norwood sent an email to her staff indicating: "In order to ensure accurate and consistent temperature recording, all fans and windows are not to be adjusted in any manner." (Rec. Doc. 63-17.)

On July 19, Defendants responded to Plaintiffs' interrogatories with objections and a statement that, "since the filing of the complaint, only routine maintenance and inspection were performed on the climate control systems." (Rec. Doc. 63-12.) The following week, Plaintiffs received reports of alterations to Death Row, although Defendants had not supplemented their interrogatories. On July 26, counsel for Plaintiffs sent an email to Defendants to inquire about these alterations. (Rec. Doc. 63-13.) Defendants responded to confirm that alterations had been made, specifically that awnings were being installed over the windows of two tiers, and asking Plaintiffs to waive the requirement of a formal supplemental discovery response. (Rec. Doc. 63-14.) Plaintiffs' counsel continued to ask that Defendants formally supplement the relevant interrogatories to include full details of the alterations. (Rec. Doc. 63-15.)

Finally, on July 29, 2013, Plaintiffs received a supplemental response from Defendants stating that temporary awnings had been added to Tiers C and G—the two hottest tiers on Death Row. (Rec. Doc. 63-16.) Plaintiffs had received no prior notice from Defendants that they would

be undertaking any alterations to the facility during the data collection period. Further,

Defendants' supplemental response did not disclose that they had undertaken other measures that

would affect the climate on Death Row, including "misting" the buildings and experimenting

with the opening and closing of the tier windows. These additional alterations were not

discovered by Plaintiffs until the deposition of Warden Cain on the afternoon July 31, 2013.

### b. Defendants conceal expert opinion on mechanical cooling costs in discovery

As part of their first request for interrogatories, dated July 15, 2013, Plaintiffs included

the following:

> INTERROGATORY NO. 11:
> DESCRIBE IN DETAIL how YOU would be willing ensure that the heat index
> on the DEATH ROW TIERS remains below 88 degrees Fahrenheit.

> INTERROGATORY NO. 12:
> DESCRIBE IN DETAIL the expenses associated with furnishing air conditioning
> on the DEATH ROW TIERS so as to ensure that the heat index on the DEATH
> ROW TIERS remains below 88 degrees Fahrenheit.

(Rec. Doc. 62-1.) These interrogatories directly relate to the issue of the balance of harms

between Plaintiffs and Defendants, an essential element of determining the propriety of

injunctive relief

In their initial response of July 19, 2013, Defendants refused to answer the

interrogatories, stating that they sought information not in defendants' possession, custody, or

control. (Rec. Doc. 62-2.) After receiving Defendants' responses, Plaintiffs immediately wrote to

Defendants with a request to meet and confer in a letter also dated July 19, 2013. (Rec. Doc. 62-

3.) The parties met and conferred but remained at an impasse on a number of issues and,

therefore, agreed to raise the issue with Judge Riedlinger. On July 23 and July 25, at discovery

conferences before Magistrate Judge Riedlinger, Plaintiffs raised the issue of Defendants'

continued failure to respond appropriately to Interrogatories 11 and 12. Judge Riedlinger

indicated during the July 23 discovery conference that in his mind, without this information being supplied by Defendants, the trial on the issue of balancing of the harms of the injunction sought by Plaintiffs would be very one-sided.

At the July 25 Conference, Plaintiffs indicated their intent to seek Rule 37 sanctions. Judge Riedlinger stated that Rule 37 evidentiary sanctions for purposes of trial would need to be considered by this Court. Plaintiffs requested from Judge Riedlinger an order compelling discovery so that in the event that Defendants continued to fail to respond to Plaintiffs' discovery requests, the record would be clear as to why Plaintiffs were seeking Rule 37 sanctions. Judge Riedlinger issued his order on July 29, 2013. The Order, dated July 29, 2013, states in relevant part:

> Interrogatory Number 11: defendants required to supplement, even if the substantive answer is that the defendants currently do not have a plan to keep the heat index below 88 degrees F on the Death Row tiers.
> Interrogatory Number 12: defendants required to supplement, even if the substantive answer is that the defendants currently do not have an estimate of the cost to air condition the Death Row tiers.

Rec. Doc. 49.

In pertinent part, Defendants' supplemental response as required by Judge Riedlinger's order reads:

> RESPONSE TO INTERROGATORY NO. 11:
> Defendants do not believe that the question of maintenance of the heat index below 88 degrees answers the ultimate question of how to ensure that Plaintiffs are not at risk of suffering heat-related medical problems. Defendants think a more appropriate inquiry is to consider various measures (in addition to those currently provided) designed to ensure that Plaintiffs' body temperatures are not elevated to a level that jeopardizes their health during the summer months. Defendants do not currently have a plan to keep the heat index below 88 degrees on the Death Row tiers.
> …
> RESPONSE TO INTERROGATORY NO. 12:
> Defendants have no personal knowledge as to the information sought in the request. However, the report of Defendants' expert, Henry C. Eyre, III, discusses

generally the services of various professionals and/or vendors needed to undertake such an enormous task. Specific costs associated with each of these professionals and/or vendors and the construction of the system desired by Plaintiffs would need to be obtained individually.

(Rec. Doc. 62-4.)

In short, Defendants' contended they had no knowledge of costs, but that they would furnish an expert, Mr. Eyre, to discuss generally what would be necessary to determine a cost. Defendants did not disclose that costs would be calculated or that an expert opinion would be presented.

On July 24, 2013, Defendants provided to Plaintiffs the expert report of Mr. Eyre. Notably, Plaintiffs and Defendants had been negotiating an extension for the expert report deadline. Plaintiffs asked that Mr. Eyre's report be provided on July 24, 2013 so that any cost figures provided in that report might be discussed during the settlement conference before Judge Riedlinger on July 25, 2013. The Eyre report—which was dated July 17, 2013—contained no mention of costs and expenses, specific or general. See Rec. Doc. 62-5.

Then, on July 31, 2013, on the eve of trial, Defendants produced to Plaintiffs an email dated July 24, 2013 in which Mr. Eyre received some cost estimate figures. Defendants stated that this cost figure email was "nothing new" but rather merely something that Mr. Eyre had relied upon in forming his expert opinion (again, an opinion Defendants had not previously disclosed). (Rec. Doc. 62-6.)

Plaintiffs relied upon The July 17th Eyre Report in preparing for and conducting the July 29, 2013, deposition of Mr. Eyre. In his deposition, Mr. Eyre twice stated that he was not qualified to provide cost estimates for renovations to Death Row:

I can't give you the entire job estimate because, like I said already, an electrical engineer would be involved. There would be an electrical aspect. You know, I believe I state that in my report, and I don't – I'm not qualified to estimate those

costs so I'm just one piece to the puzzle.

(Rec. Doc. 62-8 at 42:2-9.)

> There's so many different scenarios on how – the total construction cost estimate to give that I'm not qualified to give you on all of those other disciplines.

(Rec. Doc. 62-8 at 44:10-13.)

### c. Subsequent Proceedings Before This Court

#### i. The July 31, 2013 Pretrial Conference and Subsequent Cost Disclosures

At the July 31, 2013 pretrial conference before this Court, most of the conference was occupied with discussion of sanctions-related matters. Plaintiffs raised the issue of Defendants' temperature data spoliation. Plaintiffs sought and obtained leave of this Court to file motions pursuant to Rule 37 to seek evidentiary sanctions and to file a five-page brief regarding the impact of the spoliation on the data collected at Death Row. (Rec. Doc. 57.)

Plaintiffs also raised the issue of Defendants' nondisclosure on the issues of costs and balancing of the harms in the pre-trial conference. In response, Defendants' counsel indicated that no cost information would be forthcoming, and that such a lack of information from the Defendants would not prejudice Plaintiffs' case, as Plaintiffs' evidence regarding cost would be uncontested.

However, at 6:01 p.m. on Thursday, August 1, 2013, Plaintiffs received a "supplemental" report of Mr. Eyre contained within the body of an email from Defendants' counsel, which without any explanation or elaboration provided that:

> Assuming the highest tonnage of the potential HVAC solutions, and the higher of the range of equipment installations of this caliber, the potential Mechanical Construction cost could reach as high as $1,860,000.00. This would have an engineering fee of $203,574.00.

(Rec. Doc. 62-9.) This report contained no explanation of methodology, source of information

for costs, or any other details that would help explain how Mr. Eyre came up with this figure – a figure which, by his own admission, he was not qualified to provide.

The discovery schedule agreed upon by the parties in this case specified that expert depositions were to end on July 31, 2013. See Rec. Doc. 28. Notably, any opportunity Plaintiffs' counsel may have had to depose Mr. Eyre on the subject of cost passed before Defense counsel provided Mr. Eyre's supplemental report.

### ii. Argument as to Rule 37 Motions for Sanctions

On the morning of August 5, 2013, prior to the commencement of the trial on the merits, the parties spent one hour before this Court arguing the motions for sanctions. The Court deferred ruling on the motions until after the trial itself. (Rec. Doc. 75.)

### iii. The Trial

On August 5, 6 and 7, 2013, a full trial on the merits was held in this matter. Defendants' counsel continued to evade responsibility for the actions giving rise to the sanctions motion, and again disingenuously suggested that the remedial measures implemented on Death Row were authorized by Magistrate Judge Riedlinger. (*See* Rec. Doc. 88 at 15-18.)

During the trial, Plaintiffs presented their case using the data that was collected at Death Row, including on the tiers where awnings were erected. Plaintiffs included in their case evidence that the awnings were effectively preventing temperatures on the two hottest tiers from reaching as high as they otherwise might have during the three-week monitoring period.

At the conclusion of the trial on August 7, 2013, the Court indicated that rulings would be issued as to the merits of the case and as to the sanctions motions, following the Court's site visit on August 12, 2013. (Rec. Doc. 77.)

### iv. This Court's Ruling and Order of Dec. 19, 2013, Regarding Sanctions

On Dec. 19, 2013, this Court issued a ruling and order on the merits of the case (Rec.

Doc. 87), and a separate ruling and order regarding Plaintiffs' motions for sanctions (Rec. Doc.

88). The ruling granted in part and denied in part Plaintiffs' motions, finding that Defendants

were culpable for abuses of the discovery process and spoliation of evidence. (Rec. Doc. 88 at 1-

2.) Since Plaintiffs prevailed on the merits of the case, their remedy with respect to sanctions is

limited to the recovery of attorneys' fees and costs for the time spent on the relevant discovery;

seeking to ascertain the impact of Defendants' actions with regard to the data; and preparing the

instant motions. (Rec. Doc. 88 at 41, 48.)

## II.     ARGUMENT

### a.   Plaintiffs Prevailed on the Motions for Imposition of Sanctions

For purposes of attorneys' fees associated with Plaintiffs' Motions for Imposition of

Sanctions, Plaintiffs have unequivocally prevailed. (Rec. Doc. 88 at 49 "Plaintiffs' Motions are

**GRANTED** to the extent that they seek reimbursement of attorney's fees and costs. Defendants

**SHALL REIMBURSE** Plaintiffs the full value of all attorney's fees and costs associated with

the evidentiary and discovery violations described in this Order.") As such, Plaintiffs are entitled

to recover fees and costs associated with the Motions for Sanctions.[1]

### b.   Calculation of Permissible Fees

#### i.  Lodestar Amount

Reasonable attorneys' fees are the product of the hours reasonably expended multiplied

---

[1] Nothing in the instant motion should preclude Plaintiffs from respectfully requesting or the Court from ordering further fees sanctions in the event that the Court finds that further payment of attorneys' fees are warranted pursuant to the Court's inherent authority. *See* Rec. Doc. 88 at 30; 28 USC §1927 ("Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."). It is undisputable that Defendants' counsels actions were unreasonable and vexatious, particularly where they made misrepresentations to this Court. *See, e.g.*, *Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 246 (1st Cir. 2010) (sanctions warranted for vexatious conduct where attorney made "blatant misrepresentations" to court).

by the applicable hourly rate for the legal services, known as the "lodestar amount." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). A reasonable hourly rate is based on the prevailing market rates in the community for attorneys of comparable skill, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The Fifth Circuit has stated that, generally, "relevant market for purposes of determining the prevailing rate to be paid in a fee award is the community in which the district court sits[.]" *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554, 558 (5th Cir. 1998); *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002); *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993).

In 2011, however, the Fifth Circuit distinguished the situation in which out of district counsel is necessary to the pursuit of civil rights cases. *See McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381-82 (5th Cir. 2011) ("out-of-district counsel may be entitled to the rates they charge in their home districts under certain limited circumstances"). The Fifth Circuit has made clear that where local counsel is required to turn to out-of-district counsel because local lawyers would not participate in the case, the out-of-district counsel's home rates should be used to calculate the lodestar. *McClain*, 649 F.3d at 382 ("To fulfill the purpose of Section 1988 fee awards, while accommodating *Blum*'s and this court's focus on local forum rates for attorney fees, we hold that where, as here, abundant and uncontradicted evidence proved the necessity of [local counsel]'s turning to out-of-district counsel, the co-counsel's 'home' rates should be considered as a starting point for calculating the lodestar amount.") (citing *Blum*, 465 U.S. at 895).

### 1. The hourly rates requested are reasonable.

The rates requested by Plaintiffs' counsel in the instant motion are reasonable. A reasonable fee is one that is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A. ex rel Winn*, 559 U.S. 542,

552. Reasonable hourly rates under § 1988 are the prevailing market rates "in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). However, where, as here, out-of-district counsel is required to litigate the relevant claims, out-of-district counsel's normal hourly rates should be calculated as part of the lodestar. *McClain*, 649 F.3d at 382. As such, Plaintiffs' out-of-district counsel should have their normal hourly rates be factored into the determination of their lodestar, while Plaintiffs' local counsel lodestar should use prevailing rates in the district.

As the attached declarations attest, the rates requested by the attorneys in the instant matter are reasonable. *See* Declarations of Katie Schwartzmann, Mary E. Howell, Justin Harrison, Steven Schulman, David Lash.

## A. Market rates for local counsel

The hourly rates that Plaintiffs' counsel seek are in keeping with the hourly rates in recent fee awards in the Middle District of Louisiana for civil rights cases. *Rushing v. Bd. of Supervisors of Univ. of La. Sys.*, 270 F.R.D. 259, 262 (M.D. La. 2010) (allowing an hourly rate of $300 and $120 for two attorneys, respectively, for "deposition preparation and to prepare motion" for sanctions in a § 1983 case for retaliation where "defendants[] alleged[ly] fail[ed] to cooperate in scheduling depositions."); *Netherland v. City of Zachary, La.,* 2009 WL 3257360, at *2-3 (M.D. La. 2009) (setting the reasonable hourly rate at $255 per hour for attorneys for "[p]revailing plaintiffs in claims for violations of constitutional rights."). Private sector cases in the Middle District also support the fee awards being requested in this case. Recent cases in the Middle District have held attorneys' fees requests of between $250 and $435 to be reasonable. *See, e.g.*, *Labarge Pipe & Steel Co. v. First Bank*, 2011 U.S. Dist. LEXIS 96786 at *15 (M.D. La. 2011) (allowing attorneys' fees billed at rates of $195, $330, $350, $400, and $435 where defendants did not challenge the rates charged, but rather the number of hours.); *K&G Men's Co.*

*v. Carter*, 2010 U.S. Dist. LEXIS, at *7 (M.D. La. 2010) ("$300 represents a reasonable hourly rate even for an attorney with moderate training and experience in intellectual property law.");

*Reassure Am. Life Ins. Co. v. Cilano*, 2010 U.S. Dist. LEXIS 31973, at *8-9 (M.D. La. 2010) (allowing attorneys' fees of $195 and $375 per hour for "two experienced attorneys representing" a plaintiff insurance company).

Market rates in the Eastern District of Louisiana are also relevant here. The Court in *Stogner v. Sturdivant*, 2011 WL 6140670 (M.D. La., 2011) at *2 found:

> Since Katrina, the size of New Orleans and Baton Rouge has become more comparable, resulting in a similar legal market, and the undersigned therefore finds that the associate rates found reasonable in the New Orleans market during the post-Katrina period can therefore be applied to associates in this judicial district.

The federal court for the Eastern District of Louisiana has recently approved hourly rates that are within the range being sought by counsel in the instant case. *See, e.g.*, *Hornbeck Offshore Serv., L.L.C. v. Salazar*, 2011 WL 2214765 (E. D. La. 2011) (finding $420 to be a reasonable rate for more experienced attorneys in the area); *Construction South, Inc. v. Jenkins*, 2011 WL 3892225 (E.D. La. Sept. 2, 2011) (awarding $350/hour for two partners with 36 and 30 years of experience); *Atel Mar. Investors, LP v. Sea Mar Mgmt., LLC*, 2011 WL 2550505 (E.D. La. June 27, 2011) (awarding $300 for partner with 35 years of experience; $250 for a partner with 11 years of experience); *Hebert v. Rodriguez*, 2010 WL 2360718 (E.D. La. June 8, 2010) (awarding $300.00/hour to partner with 33 years of experience); *Gulf Coast Facilities Mgmt, L.L.C. v. BG LNG Servs., L.L.C.*, 2010 WL 2773208 (E.D. La. July 13, 2010) (awarding $300/hour to attorneys with 17 years of experience). Plaintiffs accordingly seek fees in this instant motion at hourly rates that are consistent with market rates in both the Middle and Eastern districts of Louisiana. *See* Affidavits of Montagnes, Compa, and Scheckman.

## B. Market rates for out of town firm counsel

The three Plaintiffs' counsels of the law firm Bird Marella are entitled to recover within the range of their standard hourly rates in their practice. *McClain*, 649 F.3d at 382. In *McClain*, the Fifth Circuit reversed and remanded an Eastern District of Texas court's calculation of the lodestar amount for attorneys' fees by applying Texas rates to the plaintiffs' California-based counsel. *See id.* at 382-384. The Fifth Circuit stated that the district court "legally erred in suggesting that local community rates are always required when out-of-district counsel are employed." *Id.* at 383. The Fifth Circuit made clear that "in the unusual cases where out-of-district counsel are proven to be necessary to secure adequate representation for a civil rights plaintiff, the rates charged by that firm are the starting point for the lodestar calculation." *Id.* (citing *Hadix v. Johnson,* 65 F.3d 532, 535 (6th Cir.1995); *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768–69 (7th Cir.1982)); *Zolfo, Cooper & Co. v. Sunbeam–Oster Co.,* 50 F.3d 253, 259–60 (3d Cir.1995); *Casey v. City of Cabool, Mo.,* 12 F.3d 799, 805 (8th Cir.1993); *Nat'l Wildlife Fed'n v. Hanson,* 859 F.2d 313, 317 (4th Cir.1988); *Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir.1983); *Donnell v. United States,* 682 F.2d 240, 252 (D.C.Cir.1982)). Indeed, in prison litigation cases, courts have permitted such out-of-district adjustments precisely because of the complexity of the issues involved. *See, e.g.*, *Gates v. Deukmejian,* 987 F.2d 1392, 1405 (9th Cir.1992) (allowing out-of-district rates because local counsel could not have handled this litigation and because of "the issues in prisoner civil rights cases are extremely complex and thus require experienced and sophisticated counsel").

Here, Plaintiffs' local counsel was required to turn to out-of-district counsel because local attorneys would not have participated in this litigation for three reasons: (1) the case did not seek damages and therefore there was no possibility of recovery of a portion of damages through a

contingency fee arrangement, (2) the case required initial investment of costs of $40,000 for experts and depositions, (3) the case contained difficult and novel factual and legal questions that would be litigated on behalf of death row inmates in Louisiana State Penitentiary, an obviously marginalized group of individuals with whom many attorneys are unwilling to work in prison rights litigation, and (4) the case was against the State of Louisiana, which a great many local firms represent in some capacity or another such that they were conflicted out of the present litigation even if they had wanted to work on it. Montagnes Aff. at 2-3.[2] Where in-district-counsel is unavailable and unwilling to participate in the relevant litigation, courts have found that application of the out-of-district counsel's normal rates are warranted. *See, e.g.*, *Gates*, 987 F. 2d at 1405 (no abuse of discretion by district court where it used out-of-district rates and evidence showed that in-district-counsel with sufficient experience and expertise to litigate prison rights case were not available).

Moreover, out-of-district counsel were specifically sought because Plaintiffs anticipated the possibility of discovery abuses by Defendants. Plaintiffs anticipated that discovery motion practice and even potential Rule 37 motions could be required to meaningfully represent Plaintiffs in this litigation. Montagnes Aff. at 2. Plaintiffs' anticipation turned out to be prescient, as this Court has itself observed. Thus, Plaintiffs' seeking of out-of-district counsel that was well versed in discovery motion practice and Rule 37 motions was obviously necessary given the nature of the litigation that has unfolded before this Court.

In sum, there is certainly sufficient evidence that out-of-district counsel was required and necessary to adequately represent Plaintiffs in this litigation. This Court should use Plaintiffs'

---

[2] Pursuant to this Court's inherent authority, even in the event that the Court finds attorneys' fees should correspond to the Louisiana market, in this instance the considerations of extraordinary time and opportunity costs should override.

out-of-district counsel's normal rates in calculating the lodestar for those attorneys.

### C. Rates requested for law student interns are reasonable

Plaintiffs also seek hourly rates for unpaid law student interns who were essential in the role of paralegals to litigating the Rule 37 Sanctions motions. The U.S. Supreme Court has long held, in the context of § 1988 actions, "the self-evident proposition that the 'reasonable attorney's fee' provided for by statute should compensate the work of paralegals, as well as that of attorneys." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285 (1989). The sanctions matters in this litigation demanded a great deal of attention in a short timeframe and the attorneys would scarcely have been able to adequately address Defendants' actions without the tireless work of law student interns.

The Promise of Justice Initiative, the nonprofit firm that employs Attorneys Montagnes and Compa, worked with five law student interns in the summer of 2013. Two of those interns devoted substantial time to the matter of Rule 37 sanctions in the instant litigation in a paralegal capacity, analyzing data, conducting legal research, and drafting language for the motions. Plaintiffs' counsel could scarcely have completed those motions within two days absent the law student interns' work. *See* Montagnes Aff.

### ii. Hours requested are reasonable.

A full compensatory fee "will encompass all hours reasonably expended on the litigation." *Hensley v. Eckerhart*, 461 U.S. at 435. Reasonably expended hours may be measured by the litmus test of what could reasonably be billed to a paying client. *Id.* at 433. In turn, the determination of reasonableness looks at "the profession's judgment of the time that may be conscionably billed and not the least time in which it might theoretically have been done." *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1306 (11th Cir. 1998) In the matter of

sanctions, as discussed more fully *infra*, the work Plaintiffs' counsel performed was extremely resource-intensive, especially in light of the time constraints that applied. All hours expended as to sanctions-related matters in this litigation was necessary and compensable. Plaintiffs' counsel spent their time in the following ways:

### A. Time spent reviewing Defendants' insufficient, abusive, and often false discovery responses

As discussed *supra*, Plaintiffs made written interrogatories as to both the costs associated with mechanical cooling and actions taken by Defendants to alter conditions on Death Row. Defendants stalled on answering these interrogatories, forcing Plaintiffs' counsel to review and respond to their recalcitrant written responses and eventual objections. Following Defendants' agreement to supplement their discovery responses, Plaintiffs' counsel were once again forced to review and analyze Defendants' still insufficient and apparently false and misleading responses.

### B. Time spent meeting and conferring with Defendants

As discussed *supra*, Defendants' refusal to answer the relevant interrogatories forced Plaintiffs' counsel to devote 2.5 hours to meeting and conferring with Defendants' counsel about their deficient responses.

### C. Time spent in pretrial conference

As discussed *supra*, Plaintiffs had to raise the matter of Defendants' discovery violations to the Court in the pretrial conference on July 31, 2013. About half an hour of the pretrial conference was devoted to discussing sanctions-related matters, including without limitation a discussion of the effect upon the data being gathered by the third party neutral expert, the need for leave to file the attendant Rule 37 motions and motions in limine, and the need to undertake an analysis of the damage resulting from Defendants' spoliation of evidence.

### D. Time spent preparing and filing Rule 37 sanctions motions

With the Court's permission to file the instant motions, Attorney Vora and Ms. Baniel-Stark spent most of the time between the pretrial conference on the afternoon of July 31, 2013, and the Court's deadline of 5 p.m. on Aug. 2, 2013, preparing the two Rule 37 motions. *See* Vora and Montagnes Affidavits. It is notable that this was time that Attorney Vora and Ms. Baniel-Stark intended to spend preparing for the trial itself. Plaintiffs respectfully submit that the Court should give due consideration to the fact that Defendants' actions ***detracted from Plaintiffs' ability to prepare for trial*** by forcing the preparation of the relevant Rule 37 motions four days prior to trial. The remaining members of the legal team also conducted some research and reviewed drafts of the motions, which, again, was time that could and should have been spent preparing for the upcoming trial. *See* Montagnes, Compa, Kamin, Kornberg, and Scheckman Affidavits.

### E. Time spent arguing sanctions motions in Court

Approximately the first hour that the parties were before this Court on August 5, 2013, immediately prior to the commencement of the trial, was devoted to argument over the sanctions matters.[3]

### F. Time spent on this fees motion

Following this Court's Ruling and Order as to sanctions of December 19, 2013 (Rec. Doc. 88), Plaintiffs' counsel has spent a total of 40.8 hours preparing the instant fee motion. *See* Montagnes, Compa, Scheckman, Vora and Kornberg Affidavits. In addition to being responsible for the time Plaintiffs expended on the Rule 37 motions, Defendants should also compensate Plaintiffs for their time spent preparing this fee motion. Courts have consistently granted fees for

---

[3] Plaintiffs do not presently possess the trial transcripts that indicate the duration of these arguments. To the extent that the transcripts provide better evidence of the time spent arguing the Rule 37 motion, Plaintiffs respectfully request judicial notice of such transcripts and submit that the Court should adjust the lodestar consistent with the record as reflected in the transcript.

time spent seeking and defending fee awards for discovery sanctions. *See, e.g.*, *Aevoe Corp. v. AE Tech Co., Ltd.*, 2013 WL 5324787 (D. Nev. Sept. 20, 2013).[4] Precluding Plaintiffs' counsel from recovering for time spent in preparing this motion for attorneys' fees would diminish the deterrent effect on Defendants and others. Defendants are directly accountable for Plaintiffs required preparation of two separate motions for attorneys' fees in this matter, and should accordingly be responsible for the additional time that Plaintiffs' counsel have had to expend on this motion as a direct result of their abuses.

### iii. Counsel exercised appropriate billing judgment.

The time that Plaintiffs' counsel devoted to sanctions-related matters in this litigation is discrete and identifiable, as reflected in the attached affidavits by counsel. Counsel has carefully documented the time directly and reasonably incurred in arguing their motions for Rule 37 motions, and has made "a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. The exercise of billing judgment is reflected in the affidavits and incorporated billing records or timesheets of all attorneys and intern paralegals. *See Perkins v. Mobile Hous. Bd.*, 847 F.2d 735, 738 (11th Cir. 1988); *see also Harkless v. Sweeny Indep. Sch. Dist., Sweeny, Tex.*, 608 F.2d 594,597 (5th Cir. 1979).

Because this matter unfolded over a short window of time and with trial to commence imminently, Plaintiffs' counsel did not devote an objectively large number of hours to this matter. The hours that were spent on this matter, however, were absolutely necessary and efficiently allocated. Plaintiffs respectfully submit that their written work product attests to the quality of work and time devoted to these matters. Plaintiffs further respectfully submit that in

---

[4]     Even if this Court were to find that Section 1988 and the PLRA govern the award of fees under Ruld 37, the Fifth Circuit has recognized that attorneys may seek such fees on fees. *See Volk v. Gonzalez*, 262 F.3d 528, 536 (5th Cir. 2001) (citing *Cruz v. Hauck*, 762 F.2d 1230, 1233 (5th Cir. 1985)). *See also Hernandez v. Kalinowski,* 146 F.3d 196,199-201 (3d Cir 1998).

light of the demanding nature of the work and the relatively modest sum sought, counsel should be reimbursed to the full extent of the instant request.

### c.   Application of the Johnson Factors to the Sanctions Matter

The lodestar amount may be adjusted based on twelve factors that the Fifth Circuit enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-18 (5th Cir. 1974) ("the *Johnson* factors"). These factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id*. These factors apply to the analysis of the sanctions matter itself for purposes of the instant fee motion, particularly the first, second, third, seventh, eighth and tenth factors.[5]

### i.   Time and labor required

This Court should consider the time and labor required in the instant sanctions matter when evaluating the lodestar amounts. Plaintiffs' time devoted to sanctions matters consisted of reviewing Defendants' relevant discovery responses; strategizing extensively within the team on ways to respond to Defendants' actions; meeting and conferring with opposing counsel; analyzing data coming from Death Row to determine the impact of Defendants' remedial

---

[5] Evidence relevant to discussion of the *Johnson* factors can be found in the record as well as in the affidavit of Nilay U. Vora. For the convenience of the Court, the affidavit of Mr. Vora discusses the facts pursuant to which the *Johnson* analysis should apply. Should the Court so request, additional Plaintiffs' counsel can supplement their affidavits with explicit discussion of the *Johnson* factors.

actions; attending the discovery conference with Magistrate Judge Riedlinger; attending the pretrial conference; and researching and preparing the two motions for Rule 37 Sanctions and a five-page brief regarding the impact of the spoliation on the data collected.

Lead Counsel Mercedes Montagnes spent 40.5 hours on the sanctions matter. Her work as to sanctions consisted of conferring with co-counsel as to Defendants' actions and responsive legal arguments; corresponding with, and meeting and conferring with, opposing counsel; researching and preparing motions for Rule 37 Sanctions; analyzing data coming from Death Row to determine the impact of Defendants' remedial actions; and two hours reviewing this Court's order and discussing the present motion for attorneys' fees with co-counsel. *See* Montagnes Aff.

Attorney Elizabeth Compa spent 78.8 hours on matters relating to the Rule 37 sanctions motions, including 21.4 hours to the instant motion for attorneys' fees. Her work as to sanctions consisted of conferring with clients, co-counsel, and experts; examining Defendants' expert in deposition and at trial; conducting research and reviewing or preparing filings. *See* Compa Aff.

Attorney Nilay Vora spent 75 hours on the sanctions matter including 12.1 hours spent spent in preparing this motion. His work as to sanctions consisted of conferring with co-counsel, expert, and this Court; meeting and conferring with opposing counsel; conducting legal research and preparing filings; and arguing the instant motion in Court immediately before the commencement of trial. *See* Vora Aff.

Attorney Mitchell Kamin spent 7.5 hours on the sanctions matter. His work as to sanctions consisted of conferring with co-counsel and opposing counsel, reviewing discovery responses and correspondence related thereto, and the discovery conference with Judge Riedlinger. *See* Kamin Aff.

Attorney Steven Scheckman spent 2.5 hours on the sanctions matter. His work as to sanctions consisted of conferring with co-counsel and Plaintiffs' expert, defending the deposition of Plaintiffs' expert, and assisting in preparing for deposition of Defendants' expert and trial. *See* Scheckman Aff.

Attorney Jessica Kornberg spent 5 hours devoted to written discovery and reviewing Defendants' discovery responses prior to her maternity leave which began on July 26, 2013, and revising the instant motion. *See* Kornberg Aff.

Law student intern Alessandra Baniel-Stark spent 13.25 hours on the sanctions matter. Ms. Baniel-Stark performed extensive research for the Rule 37 motions during the two days between the July 31 pretrial conference and the Aug. 2 deadline for the motions. *See* Montagnes Aff.

Law student intern Mary Katherine McCarthy spent 91.5 hours on the sanctions matter. She devoted multiple hours per week throughout the data monitoring period analyzing the data reports to determine the impact of Defendants' remedial actions. She also performed research for the Rule 37 motions. *See* Montagnes Aff.

### ii. Novelty and difficulty of issues

This Court should also consider the novelty and difficulty of the issues presented by the sanctions matters in evaluating the lodestar amounts. While Plaintiffs anticipated a potential for discovery abuse, Plaintiffs could not have anticipated that emergency motions for sanctions would be required, and indeed did not fathom that Defendants would be so brazen as to deliberately and obviously attempt to interfere with the collection of accurate data. When Defendants' actions came to Plaintiffs' attention, Plaintiffs' counsel had to respond within a very short timeframe necessitated by the accelerated discovery schedule and were pulled away from

the trial preparation in which they were already engaged. In addition to preparing the two Rule 37 Motions, Plaintiffs had to engage in extensive data analysis to attempt to ascertain the impact of Defendants' actions on the data that were recorded. This data analysis itself involved wholly novel and difficult issues because of the nature of Defendants' spoliation and Defendants' exclusive access to the necessary evidence, namely their ability to know the costs associated with their proposed methods of cooling the Death Row tiers and their access to the temperatures on the Death Row tiers. *See Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 616 (S.D. Tex. 2010) (recognizing "the difficulty and potential for unfairness in requiring an innocent party seeking discovery to show that information lost through spoliation is relevant and prejudicial" and finding "[t]hose concerns are acute when the party seeking discovery cannot replace or obtain extrinsic evidence of the content of deleted information").

The issues in this matter were plainly novel and difficult because they were unexpected, unusual, and occurred (and required a response) within an already accelerated timeframe. An upward adjustment to the lodestar based on this factor is therefore warranted.

### iii. Skill required to perform legal services

This Court should consider the skill required to perform the legal services attendant to the Rule 37 motions and Defendants' actions. Defendants' discovery abuses were unusual and, of course, wholly unexpected. Plaintiffs had to respond within a very short timeframe—just days prior to the commencement of trial. Adequately responding to Defendants' actions in Plaintiffs' interest demanded a high level of skill as to discovery procedures, propriety of sanctions, and oral argument, as well as significant amounts of work in communicating with co-counsel, developing legal arguments, and preparing the Rule 37 motions. An upward adjustment to the lodestar based on this factor is therefore warranted.

#### iv.   Time limitations imposed by the circumstances

This Court should also consider the time limitations imposed by the circumstances of the sanctions motions. All of the instant litigation, including the merits, involved significant time limitations, but this was especially true with respect to the Rule 37 Motions for Sanctions and the events giving rise to those motions. This Court ordered a full trial on the merits some 33 days after hearing Plaintiffs' motion for a preliminary injunction. Within that time, a full three weeks was devoted to data collection. Plaintiffs' learned of Defendants' spoliation – as well as learning of Defendants' unwillingness to provide necessary information as to costs associated with mechanical cooling – as the data collection period and discovery periods were in progress. Plaintiffs' counsel learned of ameliorative measures taken on Death Row beginning July 26 and continuing until July 31. Defendants' counsel did not provide Plaintiffs with their expert Mr. Eyre's cost estimate until Aug. 1, despite the fact that expert discovery had concluded on July 31. Defendants' actions necessitated devoting a significant portion of the legal team's energies to the sanctions matters in the days leading up to trial. Moreover, the instant issues dominated the pretrial conference as well as communications between counsel on both sides in the two weeks preceding the trial. An upward adjustment to the lodestar is therefore warranted.

#### v.   Results obtained

The Court should consider the results obtained in evaluating the lodestar amounts. As discussed *supra*, Plaintiffs prevailed in their Motion for Imposition of Sanctions in this matter. While the Court granted in part and denied in part Plaintiffs' motions, Plaintiffs prevailed insofar as they are entitled to recover fees and costs from Defendants as to the sanctions matter. Indeed, the only reason that the evidentiary and issue sanctions sought by Defendants were not granted was because the Court ultimately found that even the spoliated evidence was sufficient for

Plaintiffs to meet their burden. Defendants should not be permitted to escape an upward adjustment of the lodestar because the Court denied **only in part** Plaintiffs' requested relief. An upward adjustment to the lodestar based on this factor is warranted.

### vi. Undesirability of the case

Finally, this Court should consider the undesirability of the sanctions-related portion of this litigation in evaluating the lodestar amounts. Devoting time during an already accelerated discovery process to responding to rolling reports and incidents of Defendants' wrongdoings was extremely undesirable. Defendants' behavior in the sanctions-related matters complicated an already challenging discovery process and prejudiced the evidence that Plaintiffs were able to present to the Court in proving the merits of their case. Having to engage in writing, in conference and before the Court with opposing counsel who are so stubbornly unwilling to carry out a forthcoming discovery process was a significant burden on Plaintiffs' time. Moreover, this significant burden on Plaintiffs' time constituted an opportunity cost that prevented Plaintiffs' preparation for trial as well as their involvement in matters distinct from this case. Finally, litigation of prison reform cases have long been recognized to be undesirable litigation when viewed from the perspective of an economically rational private attorney. *See, e.g.*, *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995) ("The predominant reason institutional reform plaintiffs usually have difficulty finding counsel, as the Supreme Court observed in connection with contingent-fee arrangements, is that 'in any legal market where the winner's attorney's fees will be paid by the loser ... attorneys [are likely to] view [the] case as too risky (i.e., too unlikely to succeed).'") (citing *City of Burlington v. Dague,* 505 U.S. 557, 564 (1992)). An upward adjustment to the lodestar based on this factor is therefore warranted.

### d. Johnson factors confirm lodestar amount and support an upward adjustment in the lodestar amount.

In light of the previously discussed factors, the lodestar amount for each attorney and paralegal is certainly fair and justified remedy to award to Plaintiffs. In fact, the *Johnson* factors support an upward adjustment of the lodestar amount. Plaintiffs respectfully request any upward adjustment of the lodestar amount based on the Johnson factors that the Court in its discretion and inherent authority deems appropriate.

### e. Sanctions claims are not limited by PLRA cap

The PLRA provides in relevant part that "in any action brought by a prisoner who is confined to any . . . correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that . . . the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988." 42 USC §1997e.

The Fifth Circuit has yet to determine whether the PLRA limits awards in the form of attorneys' fees for sanctions. Plaintiffs respectfully submit that the cap on attorney's fees under the Prison Litigation Reform Act (PLRA) (42 USC § 1997e(d)(3)) should not apply to this Motion. Here, the sanctions in the form of attorneys' fees and costs are not sought under the authority of 42 U.S.C. § 1988, but under Rule 37 or the inherent authority of the court (*see Hutto v. Finney*, 437 U.S. 678 (1978)). These sanctions and resulting attorneys' fees and costs, therefore, should not governed by the PLRA fees provisions. *See Edwin G. v. Washington*, 2001 WL 196760 (C.D.Ill., Jan. 26, 2001) (holding that fees sought as discovery sanctions were not subject to PLRA); *Aaron Fillmore*, v. *Thomas F. Page, et al.*, Civil No. 97-844-CJP, (S.D. Ill., 1998) (fees on motion for discovery sanction were not capped by PLRA because fees were not sought under § 1988).

This interpretation of the statute is consistent with the statute's language requiring that the

fee limitation applies where "the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights . . . *pursuant to which a fee may be awarded under section 1988.*" 42 USC §1997e. Here, Plaintiffs sought sanctions not pursuant to Section 1988, but rather pursuant to Rule 37. Indeed, Plaintiffs sought such sanctions precisely because these fees were not directly and reasonably incurred in proving the actual violations, but because of Defendants' spoliation of evidence that was exclusively within the control of Defendants and Defendants' intransigence in complying with Magistrate Judge Riedlinger's discovery orders. It is plain that Plaintiffs were seeking sanctions under statutory authority *outside of Section 1988*. As such, the PLRA cap that would *explicitly apply to fees under Section 1988 should not apply*.

Plaintiffs acknowledge that some courts in other circuits have decided this question differently, applying the PLRA cap to a sanctions fees motion. *See Webb v. Ada County*, 285 F.3d 829, 835-837 (9th Cir.) (finding district court did not abuse its discretion in awarding fees for contempt and discovery motions governed by PLRA limitations, even though they were authorized by separate statute and rule, because they were "directly related" to the underlying § 1983 claims). *Webb*, however, involved factual scenarios largely different from the instant case.

In *Webb*, the fees were incurred in the course of enforcing the terms of an injunctive order—i.e. enforcing the terms of an order made to enforce the prisoners' civil rights. *Id.* at 837. To the extent that *Webb* involved sanctions for discovery conduct, it was for defendants' "refusal to turn over documents." *Id.* In the instant litigation, by contrast, the sanctions were not incurred in order to enforce an already existing injunctive order. Nor did Defendants' conduct merely amount to a refusal turn over documents. Rather, the extraordinary nature of the Defendants' misconduct included some of the most extreme discovery abuses possible: namely, spoliation of evidence that was exclusively within Defendants' control and the withholding of responsive

26

information relating to the costs of remedial measures that Defendants had been ordered to produce by Magistrate Judge Riedlinger.

A fair evaluation of Defendants' intransigence, the corresponding difficulty that it presented to Plaintiffs' counsel, and the need to deter such conduct, should override the constraints of the PLRA. Indeed, awarding this higher level of sanctions is consistent with the interests in deterring spoliation of evidence and violations of court orders. Moreover, it is ***not inconsistent with the PLRA's purpose*** as outlined by *Webb*, *i.e.* "to curtail frivolous prisoner's lawsuits and to minimize the costs-which are borne by taxpayers-associated with those suits." *Id*. In other words, the PLRA's purpose is best served when frivolous lawsuits are deterred, but no legitimate purpose will be served by diminishing the deterrent effect of sanctions as a consequence for Defendants' and Defendants' counsels' plainly egregious behavior. Defendants should not profit from Plaintiffs' status as prisoners where they have committed procedural abuses and displayed a lack of candor to the Court that in any other context would demand the full weight of sanctions, and such could not have been Congress's intent in passing the PLRA. As one court put it, "Sanctions provide the district court with an effective means of ensuring that litigants will comply with discovery orders. The award of attorney's fees as sanctions under Fed. Rule Civ. Pro. Rule 37(a)(4)(A) is distinct from an award that might be forthcoming under 42 U.S.C. § 1988, if the plaintiffs ultimately prevail in this suit. Sanctions are not based upon the defendants' liability for the alleged claims. Sanctions are applied for conduct during the discovery process. Therefore, the award of attorney fees as a sanction is outside of the PLRA." *Washington*, 2001 WL 196760 at *2.

For these reasons, Plaintiffs respectfully submit that, consistent with the decision of other federal district courts, this Court should not apply the PLRA cap to the instant case.

### III. Division of labor

In this litigation, the legal team has made concerted efforts to efficiently divide the work in order to avoid repetition or any unnecessary time expended. Indeed, due to the unusually short timeframe of discovery in this litigation, the unexpected nature of Defendants' actions to tamper with data collection, and this Court's short timeframe for filing the Rule 37 motions, it was essential for the team to triage the most urgent tasks and maximize each person's effectiveness, paralegals as well as attorneys. The attached attorney affidavits discuss the specific tasks performed by each member of the legal team including the law student interns under the supervision of Ms. Montagnes.

### IV. Costs

Plaintiffs incurred $5,025 in costs due related to sanctions matters as discussed *infra*. *See* Montagnes Aff.; Bill of Costs Form AO-133.[6]

#### a. Expert costs

With respect to spoliation of data, Plaintiffs had to consult with their expert David Garon as to the impact of what awnings on two tiers might do to affect the data being recorded there, and what the possible impact of misting the building might be. Mr. Garon reviewed our law student intern's demonstrative chart showing the change in temperature disparity between a tier with awnings and one without, to demonstrate the impact of the awnings, to confirm that the data showed what he expected would result from the installation of awnings, which is a lessening of the temperature due to decreased solar load. (Rec. Doc. 88 at 37-38.) As to the costs of installing air conditioning or other mechanical cooling, Plaintiffs' counsel discussed this question with

---

[6] Plaintiffs note that the Bill of Costs submitted with the instant fees motion applies only to costs directly related to the Rule 37 sanctions. Plaintiffs reserve the right to seek recovery of additional costs in a subsequent motion for attorneys' fees.

David Garon at some length in the absence of any indication from Defendants of what they thought was feasible or even possible. When Plaintiffs' counsel received Defendants' cost estimate of $1.86 million after the close of discovery, Plaintiffs' counsel likewise consulted with Mr. Garon as to the parameters of this estimate and how it might be challenged. Mr. Garon spent about 2.5 hours working with counsel on these tasks, including time spent preparing for and discussing these topics during his deposition. Mr. Garon's rate for those hours was $110. *See* Montagnes Aff.; David Garon Fee Schedule.

Furthermore, three of the four hours of Plaintiffs' deposition of Mr. Eyre was devoted to the matter of costs of installing mechanical cooling, including attempting to understand Mr. Eyre's $1.86 million estimate as well as other cost figures that Mr. Eyre made reference to in preparing his report. Neither Defendants nor Mr. Eyre have sought to recover from Plaintiffs for this time. Therefore, while Plaintiffs do not at this time seek a specific sum as an expert cost as to the time spent discussing sanctions-related matters in Mr. Eyre's deposition, Plaintiffs reserve the right to seek a specific sum for that purpose in the future should it be necessary.

### b.  Other costs

Plaintiffs' counsel also retained consultant Peter Jackson to assist in data analysis and development of graphical representations of the data recorded at Death Row. Mr. Jackson spent one quarter of his hours in this litigation analyzing the effects of the remedial measures on the Death Row tiers, including identifying the impact of the awnings on the temperatures recorded on the hottest tiers. This sanctions-related time comprised 23.75 hours of a total 95 hours Mr. Jackson spent on this litigation. *See* Montagnes Aff. at 5; Peter Jackson Invoice. Mr. Jackson's rate for those hours was $200 per hour. Absent Defendants' actions giving rise to these sanctions, Mr. Jackson likely would have saved most if not all of those 23.75 hours.

## V.    Conclusion

For the foregoing reasons, Plaintiffs hereby respectfully request that the Court award attorneys' fees and costs in this matter as to sanctions at $66,576.25 in fees and $5,025.00 in costs.

Date: Jan. 21, 2014

Respectfully submitted,

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287 (Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org

Mitchell A. Kamin, Ca. Bar No. 202788
Jessica C. Kornberg, Ca. Bar No. 264490
Nilay U. Vora, Ca. Bar No. 268339
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks & Lincenberg, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel. (310) 201- 2100
Fax (310) 201- 2110

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana 70113
Tel. (504)581-9322
Fax (504)581-7651
Email: steve@sswethicslaw.com

CERTIFICATE OF SERVICE

I do hereby certify that on Jan. 21, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s/ Mercedes Montagnes
MERCEDES MONTAGNES, LSBA #33287
Attorney at Law
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955