**DECLARATION OF SUSI VASSALLO, M.D., F.A.C.E.P., F.A.C.M.T.**

February 11, 2016

1.  My name is Susi Vassallo, MD. I am board certified in Emergency Medicine and Medical Toxicology and have been on the Faculty of the New York School of Medicine / Bellevue Hospital Center since 1987.

2.  I have been retained by the Plaintiffs' attorneys in this matter to render opinions concerning the risks of heat-related illness and access to medical care for Death Row inmates confined to Death Row at the Louisiana State Penitentiary at Angola ("Angola"). Specifically, I have now been asked to render an opinion on the Angola defendants' Second Heat Remediation Plan.

3.  I reviewed the Plan filed with the court as well as all attachments. I have also reviewed the Fifth Circuit court opinion in this case, the spreadsheet of death row temperatures recorded by the prison, and the deposition transcript of Raman Singh, M.D. I have previously visited the Death Row unit and observed the conditions there. In my opinion, and as detailed below, the Second Heat Remediation Plan is wholly insufficient to address the serious risk to the Plaintiffs' health posed by the extreme temperature conditions on Death Row.

**I. Heat-Related Illness**

4.  As I have previously discussed in this matter in declarations, deposition and testimony, heat-related illnesses occur when the body's temperature control system is overloaded. The risk for heat-related illnesses soars when the heat index exceeds $88^0$ F. Persistent heat stress may lead to heatstroke, a life threatening medical emergency. In heatstroke, the body's temperature rises rapidly. Very high body temperatures damage the brain and other vital organs. Heatstroke can cause death or permanent disability if emergency treatment is not provided.

5.  Although heatstroke is the best known illness that results from a hot environment, death from all causes increases during prolonged heat stress. This critical fact was addressed directly over twenty years ago by the publication of the CDC Morbidity and Mortality weekly report (MMWR) of June 30, 1995: "deaths listed with an underlying

1

cause of hyperthermia represent only a portion of heat-related excess mortality because increased mortality from cardiovascular, cerebrovascular and respiratory causes also occurs during heat waves."

6.     In several studies, the mortality from heatstroke is 30-80%. Survivors of heatstroke may have significant heat-related morbidity, such as inability to walk and talk. Permanent neurological damage occurs in up to 17% of survivors. Individuals with illnesses such as coronary artery disease and hypertension, or pulmonary diseases such as asthma and chronic obstructive pulmonary disease, are much more likely to succumb to these conditions when under heat stress.

7.     Heat-related illness is a preventable disease, and the risks are well known. Certain medications, including those that the Plaintiffs in this matter are prescribed, also elevate the risk of heat-related illness, as I have previously discussed in this matter. Classical heat stroke is most common among those who have no access to air conditioning during heat waves. Simple measures such as increasing fluid intake and access to air conditioning can reduce heat-related mortality. During a heat wave, air conditioning is not a luxury but a lifesaver, especially for individuals at heightened risk for heat-related illness. Having a working air conditioner was associated with an 80% reduction in the risk of death due to heat and cardiovascular disease and a 66% reduction in mortality due to cardiovascular disease. In one study it was estimated that 50% of the deaths related to a heat wave could have been prevented with a working air conditioner. The Centers for Disease Control (CDC) recommends that people who cannot afford air conditioning in their homes should spend at least some time each day during hot weather in an air-conditioned environment: exposure to air conditioning for even a few hours a day will reduce the risk of heat-related illness. The CDC also recommends frequent cool showers if exposure to heat cannot be avoided. Electric fans may provide some degree of comfort. However, fans alone do not prevent – and can in fact elevate the risk of – heat stroke when heat and humidity become extreme.[1]

---

[1] The medical science – and consensus – are clear on this point: in plain language, as stated in the Excessive Heat Events Guidebook published by the EPA in 2006, citing the American Medical Association Council on Scientific Affairs, 1997, and the CDC, 2004,

2

**II. Inadequacy of Second Heat Remediation Plan**

8.     It is my opinion, based on my training, experience, and familiarity with the extensive body of medical literature on the subject of thermoregulation, and my familiarity with this case, that the Second Heat Remediation Plan (the "Plan") that the Angola defendants proposed is wholly insufficient to address the serious risk to Plaintiffs' health posed by the extreme heat conditions.

9.     The most readily identifiable problem with the Plan is that it does not actually address or mitigate the source of the risk to the Plaintiffs: the ambient temperature, and more specifically the heat index – how hot it "feels," which translates directly to the body's ability to dissipate heat in order to maintain a body temperature within the normal range – in the death row cells.  The risk of heat-related illness soars when the heat index exceeds $88^0$ F, yet this plan does not even purport to manage the ambient temperature and humidity conditions.

10.    The Plan seems to be little more than a continuation of the remedial measures that were already in place: fans, ice, and cool water.[2]  These measures do not sufficiently address the risk of heat-related illness.

11.           As I have previously discussed, fans only provide comfort rather than lessening the risk of heat-related illness.  Crucially, when the heat index exceeds the body temperature, as has been demonstrated to be the case on death row for extended periods of time,[3] fans may elevate the risk of heat-related illness, increasing the heat load on the

---

"[P]ortable electric fans are not the simple cooling solution they appear to be. Because of the limits of conduction and convection, using a portable electric fan alone when heat index temperatures exceed 99°F actually increases the heat stress the body must respond to by blowing air that is warmer than the ideal body temperature over the skin surface. In these conditions, portable electric fans provide a cooling effect by evaporating sweat. The increased circulation of hot air and increased sweat evaporation can, however, speed the onset of heat-attributable conditions (e.g., heat exhaustion)." (37)

[2] These were also the remedial measures ordered in the *Gates* litigation.  It is my opinion that *Gates*-type relief can lessen – but not to a medically acceptable level – the significant health risks the extreme heat poses to Plaintiffs in this matter.

[3] I have not had access to humidity data from Death Row since the trial in this matter, and it is my understanding that the prison has not been measuring this data.  However, it is clear from the temperature data alone that temperatures on Death Row during the summer months regularly exceed 88°F.  I find these data seriously concerning, even in the

3

body by moving hot air across the skin. Therefore providing additional fans to the Plaintiffs does nothing to address the health risks of the extreme temperatures.

12.     Consumption of ice and/or cold water is integral to maintaining the body temperature in extreme heat environments. I understand that the Plan purports to prevent situations as previously reported in which there is no ice available to prisoners on the death row tiers. However, the provision of additional ice, on its own, does not mitigate the risk of heat-related illness.

13.     The provision of cool showers described in the plan is also inadequate. As I have previously discussed, the CDC recommends cool showers during periods of extreme heat to help mitigate health risks. One 15-minute shower window that may have to be split with a hot (hygienic) shower would not fulfill this role. If the purpose of showers is to wet the body to enhance evaporative cooling, the high humidity and the high heat index at Death Row severely limits the effectiveness of evaporation. If the purpose of the showers is to lower the body temperature, the literature centers around water temperature of 54°F. In a cooling unit that uses evaporative cooling to treat heatstroke, the cool mist spray is 15°C (54°F). In studies using cold water immersion after exercise, or cold water immersion to cool firefighters' body temperatures so that they can return to the fire fight, the temperature of the cold water in these reports ranges around 54°F.

14.     I have previously discussed in this matter my thought that transmitting some cool air from the death row facility's central pod to the housing tiers, for instance by opening the tier doors, could be a means to lower the ambient temperature on the tiers. However, it is clear from the Plan and its attachments that this is not feasible, both from the standpoint of security as well as engineering. As these are not my areas of expertise I have no grounds to dispute these assertions.

15.     I found Dr. Singh's comments during his deposition to the effect that medicine is "reactive" rather than "proactive" with regard to heat-related illness to reflect a poor appreciation of and familiarity with this area of science. Environmental heat illness is responsible for more deaths than all other natural disasters combined. A given instance of

---

absence of humidity information, which would surely provide a more complete picture of the heat stress.

heat-related illness might strike rapidly. "Onset of heatstroke can be rapid with progression to life-threatening illness within minutes" (MMWR, June 30, 1995, Vol. 44 No. 25).

16.    Dr. Singh states that certain medications have very strong – what's called "anticholinergic side effects" (p. 31 line 23-25,) "And that impairs thermal regulation". (p. 32 line 3-4) Of course, there are other medications that impair thermoregulation through physiological mechanisms other than anticholinergic effects. I have elaborated on these medications and the mechanisms of action in my previous report.

17.    On page 49, (line 11-15), Dr. Singh addresses that "a patient may not be coming out telling you that they're feeling bad." He attributes this to mental health medications. Another reason the patient may not be coming out telling you he is feeling bad is that the patient is suffering from heatstroke, which impairs mentation.  The condition itself impairs the ability to ask for help. The  patient caught in this catch 22 is at risk of his life.

18.    Dr. Singh said in his deposition that "human physiology hasn't changed and the scientific understanding of human physiology hasn't changed" (p. 8, lines 15-18). Certainly our understanding of human physiology is expanding daily.  Entering only the search term "heatstroke" in the search engine OVID, and limiting the study period from 2013 to 2016, 125  articles were found. Simply entering the word heatstroke into Pub med, the US National Library of Medicine National Institutes of Health search engine, there are 744 articles on heatstroke if the search is limited to the last five years,  and over a thousand publications if the search is limited to ten years.  The review of heatstroke in 2015 by Leon and Bouchama (*Compr Physiol* 5:611-647, 2015) reviews some of the areas of increased understanding. Each of these areas concerning heat and its effects on the human body leads to additional research reports, expanding our understanding. For example, there is an increasing body of evidence that the warming of the climate is proceeding at an unprecedented rate. There is an ever expanding literature concerning heat related mortality projections for cardiovascular and respiratory disease  (Li et al: Scientific Reports 5:11441, August 2015).

19.    With regards to cooling as treatment for heatstroke, Dr. Singh should be aware that the last years have provided new science regarding cooling and treatment of heatstroke. From the Mayo Clinic:

> Ice water immersion remains the most effective intervention to lower core temperature quickly and reduce morbidity and the risk of fatality (Pryor et al., 2015; Newport and Grayson, 2012; Casa et al., 2007b; Costrini, 1990). The theoretical concern that ice cold water immersion might fail to cool down core temperature because of reflex peripheral vasoconstriction or shivering has been strongly refuted by empirical evidence of consistently superior cooling rates with cold water immersion as compared to other modalities (Casa et al., 2007b). Cooling blankets are ineffective (Atha, 2013). (Chesire Thermoregulatory disorders and illness related to heat and cold stress) in Autonomic Neuroscience, 2016.

These are but a couple of examples of the advancement of the science of heatstroke physiology, the changing risk of heat stroke and exacerbation of underlying conditions with increasing global temperatures, and the study of cooling for treatment. I find it deeply concerning that a physician responsible for so many lives demonstrates such a rudimentary understanding of the subject at hand.

20. There are specific, vetted strategies for reducing the risk of such illness to a medically acceptable level. These strategies are precisely what I have discussed in my involvement in this litigation to date. My recommendation was, and remains, that the heat index not exceed $88^0$F in the prisoner housing tiers on death row, because this is the threshold beyond which the risk of heat-related illness soars.

21. It is nearly certain that, even if the measures put forth in the Plan are put in place, the dangerous temperature conditions on death row – which the Plan does not address – will result in illness, permanent disabilities, and premature death to prisoners incarcerated in such conditions, including these Plaintiffs.

22. Even if the terms of this Plan were implemented in full, the Plaintiffs would still be in grave danger of heatstroke and heat-related illness. My previous reports and testimony should not have been read to suggest that these measures would be sufficient to lessen the risk of heat-related illness to an acceptable level. They would not.

23. Specifically, the Fifth Circuit opinion stated: "Plaintiffs' own expert, Dr. Vassallo, explained that there are many acceptable remedies short of facility-wide air

6

conditioning. For example, the Defendants could divert cool air from the guards' pod into the tiers; allow inmates to access air conditioned areas during their tier time; allow access to cool showers at least once a day; provide ample supply of cold drinking water and ice at all times; supply personal ice containers and individual fans; and install additional ice machines." (19)  This statement mischaracterizes my testimony on the most basic level: I have explained in my expert report and through testimony that the remedial measures cited by the Fifth Circuit (and proposed by the prison in the Plan) are insufficient to address the grave risk of heat-related illness posed by the heat conditions on Death Row. I have explained that it is my opinion that the risk to the health of these Plaintiffs posed by the excessive heat will only be addressed if the heat index is at 88°F or below.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 12th day of February 2016.

*S Vassallo M.D.*
_____
Susi Vassallo, MD