UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ELZIE BALL, NATHANIEL CODE, AND JAMES MAGEE | * * * | CIVIL ACTION NO. 13-368 |
| VS. | * * | JUDGE: BAJ |
| JAMES M. LEBLANC, SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL. | * * * * | MAGISTRATE: EWD |

# **PLAINTIFFS' POST-EVIDENTIARY HEARING BRIEF**

In an effort to provide additional argument on the narrow issue of the effectiveness of Defendant's heat remediation plan, Plaintiffs' submit this brief.

## I. **THE SECOND HEAT REMEDIATION PLAN DOES NOT REMOVE THE SUBSTANTIAL RISK OF SERIOUS HARM TO PLAINTIFFS.**

### A. **Dr. Vassallo's uncontroverted testimony made clear that Defendants' provision of ice, water, fans, and cool showers was insufficient.**

Defendants' Second Heat Remediation Plan (the "Second Plan") does nothing more than provide additional fans, increase access to ice, and add one cool shower per day. Defendants stated under oath that they were aware of no evidence—scientific, medical, or otherwise—that the Second Plan would remove the substantial risk of serious harm. *See* Rec. Doc. 290 at 7–9; Rec. Doc. 290-1 through 290-7.

Plaintiffs' expert Dr. Vassallo testified that the Second Plan is insufficient to address the serious risk posed to Plaintiffs by the extreme heat. Dr. Vassallo testified that scientific evidence demonstrated that fans do not prevent heat-related illness in the conditions on Death Row. Tr. 77:7–79:11; Tr. 84:10–85:13. She also testified that fifteen minutes of a cool shower are similarly not protective. Tr. 86:12–87:14. Dr. Vassallo cited research that showed no statistically

significant benefit to the use of fans or cold showers. Tr. 88:15–94:15; Exhibit 3.[1] Moreover, Dr. Vassallo explained that evaporative cooling—the mechanism by which fans and cool showers reduce the heat stress on the body—is impossible at the types of temperatures and humidity levels found on the Death Row tiers. Tr. 79:12–80:17; Tr. 84:10–85:13. She also made clear that the provision of increased access to ice did not reduce the risk of heat-related illness to Plaintiffs. Tr. 94:19–96:2. Finally, Dr. Vassallo testified that all the measures in combination do not reduce the substantial risk of serious harm to Plaintiffs. Tr. 96:3–24.

Dr. Vassallo's ultimate expert opinion was that the core cause of the substantial risk to Plaintiffs was that the heat index was too high. Tr. 96:25–97:10. Dr. Vassallo testified that the only way to prevent heat-related illness or death is to lower the temperature and humidity levels to which individuals are exposed. Tr. 75:11–77:6.

### B. Defendants provided no evidence to refute Dr. Vassallo's opinion.

Defendants introduced no evidence to contradict Dr. Vassallo's expert opinion. Defendants' own medical expert, Dr. Raman Singh, had previously admitted at his deposition that he could not opine on measures that would reduce the risk of heat-related illness because, according to Dr. Singh, medical science is "usually reactive" rather than proactively seeking to prevent health harms. Singh Dep. 18:4–20:14 (Rec. Doc. 290-7). At the evidentiary hearing, Dr. Singh never testified that providing fans, ice, cool showers, and water would remove the substantial risk of serious harm to Plaintiffs.[2]

Dr. Singh himself described Dr. Vassallo's testimony as "impressive." Tr. 275:13. He agreed with Dr. Vassallo that fans could increase the heat stress on the body when the heat index

---

[1] Exhibits referred to in this briefing are those introduced by Plaintiffs in the June 15, 2016, evidentiary hearing.
[2] Dr. Singh's testimony suggesting that acclimatization would reduce the risk to individuals in Louisiana (Tr. 265:11–266:15) was inconsistent with medical research cited by Dr. Vassallo. Indeed, the Petitti study discussed by Dr. Vassallo was conducted on the general population of Maricopa County and found that heat-related deaths drastically increased when the heat index exceeded 82.4 degrees. Tr. 101:11–111:10; 114:7–129:12; Exhibit 5.

2

exceeds 98.6°F. Tr. 268:3–273:9. Dr. Singh testified that providing cold water would only assist in rehydrating the body to permit further sweating and otherwise was only helpful in providing comfort, as opposed to safety. Tr. 266:16–267:22. Dr. Singh also testified that cold showers would improve comfort by creating a cooler temperature surrounding the skin. Critically, Dr. Singh *did not dispute* that sweating or cold showers cool the body through evaporative cooling and that evaporative cooling is ineffective when the humidity reaches the extreme levels recorded on the Death Row tiers.

## II. ADDITIONAL EVIDENCE CONFIRMS THE ONGOING SUBSTANTIAL RISK OF SERIOUS HARM TO PLAINTIFFS.

### A. New medical evidence bolsters this Court's previous findings.

In addition to scientific and medical evidence upon which this Court relied in crafting its previous factual findings, Dr. Vassallo testified extensively about a new article in the medical literature that post-dated her February 2016 expert report. Specifically, Dr. Vassallo testified extensively about a study titled *Multiple Trigger Points for Quantifying Heat-Health Impacts: New Evidence from a Hot Climate* and authored by Diana B. Petitti, et al. *See* Exhibit 5. This study examined the heat index at which the 3.9 million people in Maricopa County, Arizona (which includes the city of Phoenix) had substantial increases in risks of negative health-related events. Tr. 114:16–114:23. The study looked for "trigger point" temperatures and heat indexes that correlated with increased relative risk of visits to the emergency department, hospitalizations, or death. Tr. 114:24–115:15. The relative risk measured was the increase in the risk as compared to the risk without high heat and humidity. That is, the relative risk measures the increase in the risk that would result from the heat and humidity. Tr. 122:11–123:4. Graphs showed the correlation between the increases in the heat index and the relative risks of adverse health events, including death. Exhibit 5 at 180.

3

As Dr. Vassallo explained, these serious health events are significant because even emergency room visits or hospitalizations are indications that permanent damage may have occurred, creating greater risk of death in the near future. Tr. 121:10–122:10. The findings of the Petitti study further corroborated the Court's previous factual findings that the likelihood of serious harm becomes substantial when the heat index exceeds 88°F. When the $HI_{mean}$ exceeded 32-33°C (89.6-91.4°F), Maricopa County saw a rapid increase in the relative risk of emergency department visits, hospitalizations, and heat-related deaths. Tr. 118:4–123:4.[3] When the $HI_{max}$ exceeded 38-39°C (100.4-102.2°F), Maricopa County saw a serious increase in the relative risk of emergency department visits, hospitalizations, and heat-related deaths. Tr. 116:2–117:12. When the $HI_{min}$ exceeded 27-28°C (80.6-82.4°F), Maricopa County saw a serious increase in the relative risk of emergency department visits, hospitalizations, and heat-related deaths. Tr. 127:8–130:4. The best depiction of the trigger points described here is the series of graphs found in Exhibit 5 at 180 (Figure 5).

Dr. Vassallo explained that the Petitti study was consistent with her recommendation of a maximum 88 degree heat index for Plaintiffs because of the underlying conditions and prescription medications they are required to take that increase their risk of heat-related morbidity or mortality beyond the general population studied by Petitti. Tr. 119:13–120:13; Tr. 125:1–127:4. Though this evidence could support establishing a maximum heat index of 83°F, Dr. Vassallo's proposed 88 degree threshold comports with Supreme Court precedent recommending caution and restraint under the PLRA. *Brown v. Plata*, 563 U.S. 493, 540-41, 131 S. Ct. 1910, 1945, 179 L. Ed. 2d 969 (2011) ("Although the three-judge court concluded that the evidence in support of a 130% limit is strong, it found that some upward adjustment was

---

[3] The study defined $HI_{min}$ to be the minimum heat index over a 24-hour period, the $HI_{max}$ to be the maximum over a 24-hour period, and the $HI_{mean}$ to be the mean (average) over a 24-hour period. Tr. 117:13–118:3.

4

warranted in light of the caution and restraint required by the PLRA. . . . The PLRA's narrow tailoring requirement is satisfied so long as these equitable, remedial judgments are made with the objective of releasing the fewest possible prisoners consistent with an efficacious remedy. In light of substantial evidence supporting an even more drastic remedy, the three-judge court complied with the requirement of the PLRA in this case.").

When the Petitti study's findings as explained by Dr. Vassallo are compared with the heat index measurements from the Death Row tiers—which were taken after implementation of the Second Plan—it is clear that Plaintiffs remain exposed to a substantial risk of serious harm. During the period from June 8, 2016 at 12:00 pm to June 28, 2016 at 12:00 pm, the minimum heat index on at least one of the Death Row tiers in which Plaintiffs are confined exceeded 82°F on all 20 days (counted as 24 hour periods from 12:00 pm to 12:00 pm). The mean heat index exceeded 89.6°F on 18 of those days. Finally, the maximum heat index exceeded 100.4°F on 4 days. ***In sum, every day between June 8, 2016 and June 28, 2016, the heat indexes on Death Row exceeded at least one trigger point, and sometimes more, past which which there is a substantial risk of an emergency room visit, hospitalization, or death.*** That all of this occurred despite implementation of the Second Plan indicates that Plaintiffs remain at substantial risk of serious harm.[4]

### B. Limiting exposure to high heat indices is supported by all examples of contemporary standards of decency.

Heat-related illness and mortality are one of the few types of medical harms that can be prevented with virtual certainty by preventing exposure to extreme environmental heat conditions, as Dr. Vassallo testified. Tr. 75:11–77:6. Public health agencies as well as the medical community agree that exposure to air-conditioning is the only method of preventing

---

[4] Heat indexes, which have regularly exceeded 100 degrees, reached 105.48 degrees on June 26 at 9:30 pm in tier H. All the data discussed here were collected well before the height of the summer.

5

heat-related illness and death in extreme heat. Tr. 76:11–77:6. As Dr. Vassallo explained, leading researcher Dr. Edward M. Kilbourne, who studies the impact of extreme environmental heat and heat-related illness, stated in 2002 that air-conditioning protects against health dangers posed by environmental heat, but electric fans do not. Tr. 98:15–100:7; Exhibit 4 at 171. Dr. Kilbourne also wrote that cooling a dwelling in the summer is as important as heating a dwelling in the winter. Tr. 99:11–100:7; Exhibit 4 at 171.

New evidence introduced at the evidentiary hearing indicates that society has begun to take into account the need for air-conditioning in newly constructed multi-family residential buildings. Specifically, the US Census shows that from 2000 until 2015 (the last year for which data was available), 100% of multi-family units built in the Census South region of the United States had central air-conditioning. Exhibit 10 at 4. This evidence is consistent with evidence previously presented at trial that indicated that the ASHRAE standards[5] call for an upper limit of 78°F and relative humidity of 50%, significantly below the 88 degree threshold at issue. Rec. Doc. 128 at 349:2–350:2; Rec. Doc. 129 at 327:6–328:4.

That the Death Row facility is inconsistent with contemporary standards is furtherdemonstrated by the testimony of Defendants' expert Frank Thompson. When asked whether the Death Row facility meets all applicable building standards, Mr. Thompson testified that it did because "a commercial building is only required to be heated, not air-conditioned." Tr. 229:2-7. Mr. Thompson's description of Death Row as a "commercial building" is puzzling. The Death Row tiers—where Plaintiffs are held at least 23 hours per day—can scarcely be called "commercial." Indeed, evidence provided at trial made clear that at least twenty-three states, including Texas and Louisiana, have some policies in place to maintain a maximum heat index

---

[5] ASHRAE is the professional organization known as the American Society of Heating, Refrigerating and Air-Conditioning Engineers.

or otherwise maintain certain temperature ranges. Rec. Doc. 86; Rec. Doc 55 and attached exhibits (Rec. Doc. 55-1 to 55-34).

### III. DEFENDANTS' INABILITY TO CRAFT AN EFFECTIVE REMEDY DEMONSTRATES THAT THE FIRST PLAN DOES NOT VIOLATE THE PLRA.

#### A. Defendants failed to address the core cause of the constitutional violation.

The Fifth Circuit's decision remanding this case specifically enumerated potential remedial measures that could address the core cause of the Eighth Amendment violation—Plaintiffs' exposure to high heat and humidity. *See Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) (stating that Defendants could "divert cool air from the guards' pod into the tiers" or "allow inmates to access air conditioned areas during their tier time"). Indeed, the Fifth Circuit has since clarified that the provision of ***Gates-type relief such as ice, fans, water, and cold showers may be insufficient*** to remove the substantial risk of serious harm. *See Webb v. Livingston*, No. 14-40579, 618 F. App'x 201, 209 n.7 (5th Cir. 2015) (unpublished) (noting Fifth Circuit's prior affirmance of Eighth Amendment violations "***despite evidence that the officials implemented the remedial measures approved in Gates***, where such measures proved inadequate to protect inmates from the extreme heat") (citing *Ball v. LeBlanc*, 792 F.3d at 592–93 and *Blackmon v. Garza*, 484 Fed. App'x 866, 871–72 (5th Cir. 2012) (per curiam)).

The Fifth Circuit has further clarified in the context of qualified immunity that prisoners like Plaintiffs have a clearly established right to be free from extreme temperatures. *See, e.g., Webb*, 618 F. App'x at 209 n.7 ("Our precedent establishes that an inmate has a constitutional right to be free from extreme temperatures.") (*citing Wilson*, 501 U.S. at 304; *Gates*, 376 F.3d at 339–40; *Sullivan*, 553 F.2d at 381; *Valigura v. Mendoza*, 265 Fed.Appx. 232, 236 (5th Cir. 2008) (per curiam)). Addressing the high heat and humidity is the only appropriate mechanism for removing the Eighth Amendment violation. *Cf. Brown v. Plata*, 563 U.S. 493, 521 (2011)

(affirming district court's conclusion that overcrowding was the primary cause of inadequate medical care in violation of the Eighth Amendment and crafting of injunctive relief to remedy the cause of the violation—*i.e.* overcrowding).

Contrary to this precedent, Defendants rejected each and every remedy suggested by the Fifth Circuit that would have exposed Plaintiffs to lower heat and humidity. *See* Rec. Doc. 290.

**B.     Defendants failed to consider any remedy that would reduce the heat index.**

Plaintiffs have previously documented Defendants' failure to consider any remedy other than air-conditioning that would reduce the heat index to a constitutionally acceptable level. Rec. Doc. 290. The Court admonished Defendants that the Second Plan did nothing to reduce the exposure of Plaintiffs to heat indexes so extreme as to cause a substantial risk of serious harm and encouraged Defendants to consider alternatives. *See* Rec. Doc. 315-1 (Motion to Modify Injunctive Relief) at 3-4 n.8 (citing March 7, 2016 Hearing Transcript at 54:14-20). Defendants did not do so despite Defendants' expert's suggestion ***three years ago*** that there could be a number of ways to reduce maximum heat index on the death row tiers to below 88°F. Rec. Doc. 129 at 334:6-19.

Defendants' position appears to be that because the Fifth Circuit has purportedly barred air-conditioning as a remedy—an assessment Plaintiffs strongly dispute and which this Court has rejected—providing the remedies of ice, fans, water, and a single cool shower per day must be constitutionally sufficient. This argument fails for at least three reasons.

First because the Fifth Circuit itself suggested remedies ***which included exposure to air conditioning***. *See Ball*, 792 F.3d at 599. ***The Fifth Circuit plainly contemplated the need for remedial measures beyond ice, showers and fans.*** Indeed, in a subsequent opinion, the Fifth Circuit clarified that the remedial measures offered to mitigate the extreme heat as a condition of confinement must ***actually remove the substantial risk of serious harm***. *Webb*, 618 F. App'x at

209 n.7 ("[T]he mere presence of remedial measures would not end the inquiry, as such measures must be adequate. Indeed, we have affirmed determinations that prison officials violated the Eighth Amendment despite evidence that the officials implemented the remedial measures approved in *Gates,* where such measures proved inadequate to protect inmates from the extreme heat.") (*citing Ball v. LeBlanc,* 792 F.3d at 592–93). The uncontroverted evidence in this case has shown that Plaintiffs remain at substantial risk of serious harm whenever the heat index exceeds 88° ***despite implementation of the Second Plan***.

Second, as noted above, *Webb* made clear that extremely high temperatures are *per se* unconstitutional, regardless of remedial measures provided. *See Webb*, 618 F. App'x at 209 n.7. Indeed, the Fifth Circuit interpreted its decision in *Ball v. LeBlanc* to have affirmed factual findings that confinement to a cell in which the heat index exceeds 88°F creates a substantial risk of serious harm. *Id.* (stating that Fifth Circuit, in *Ball v. LeBlanc*, 792 F.3d at 592-93, "***affirm[ed] the district court's finding*** that evidence of inmates' heightened vulnerability to high temperatures coupled with high temperatures in inmate housing posed a substantial risk of harm."). Based on this precedent and this Court's previous findings, bolstered by the additional evidence introduced by Plaintiffs, it is clear that barring the heat index from reaching levels where such substantial risk occurs is the only appropriate injunctive remedy.

Finally, the Fifth Circuit has not—and could not—categorically bar the use of air-conditioning to remedy the Eighth Amendment violation. Defendants' sole citation in support of this assertion is the ***dissenting opinion*** from *Hinojosa v. Livingston*, 807 F.3d 657 (5th Cir. 2015). *See* Rec. Doc. 318 at 2. The majority opinion in *Hinojosa* explicitly states that a reasonable prison official would know that placing inmates in air-conditioning for at least some period of time might be necessary to remedy the Eighth Amendment violation. *Hinojosa*, 807

F.3d at 670. The majority in *Hinojosa* rejected the precise argument advanced by Defendants—that air-conditioning could not be required as a remedy. *Hinojosa*, 807 F.3d at 669 (rejecting argument that "there is no clearly established right to an air-conditioned cell" because the argument "confuses right with remedy"). While no Fifth Circuit case has previously upheld an order requiring air-conditioning to remedy the Eighth Amendment, no authority explicitly **bars** the use of air-conditioning as a remedy.

Any decision categorically barring air-conditioning would be inconsistent with Supreme Court precedent requiring federal courts to take into account evolving standards of decency and medical knowledge to fashion practical remedies given the complexity of prison administration. *See Brown v. Plata*, 563 U.S. 493, 526 (2011) ("The PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations. . . . Courts should presume that Congress was sensitive to the real-world problems faced by those who would remedy constitutional violations in the prisons and that ***Congress did not leave prisoners without a remedy*** . . . .") (emphasis added); *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) ("No static test can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." (citations and quotations omitted)).[6]

It is now apparent that only the First Heat Remediation Plan both remedies the underlying constitutional violation and is sufficiently narrow so as not to disrupt the effective administration

---

[6] Any interpretation of the Fifth Circuit's decision as holding that the PLRA prohibits Defendants from providing constitutionally adequate conditions of confinement should be strongly disfavored, since that would call into question the constitutionality of the PLRA itself. *See Brown v. Plata*, 563 U.S. at 526 (stating that interpreting the PLRA to bar the remedy of population limits "would raise serious constitutional concerns"). *Cf. Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 841 (1986) ("[F]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality.").

of the facility. Tellingly, Defendants agreed that mechanical cooling of the entire Death Row facility would be narrower and less intrusive than moving Plaintiffs to an already air-conditioned camp.[7]

## IV. **CONCLUSION**

The Fifth Circuit's decision overturned this Court's injunctive order requiring implementation of Defendants' First Heat Remediation Plan because (1) the Fifth Circuit believed that there were acceptable remedies "short of facility-wide air conditioning" such as "divert[ing] cool air from the guard's pod" and "allow[ing] inmates to access air-conditioned areas" and (2) the previous record on appeal had "no showing that the Constitution mandated more relief for [Mssrs. Ball, Code, and Magee]" than the prisoners in *Gates*. *Ball*, 792 F.3d at 599-600. Evidence in the record on remand makes clear that each of these bases for the Fifth Circuit's decision are no longer valid.

As to the first, Defendants have not only rejected the lesser remedies suggested by the Fifth Circuit, but also failed to craft any remedy to otherwise reduce the high temperature and humidity. As to the second, medical and scientific evidence makes clear that the Second Plan's provision of additional *Gates*-type relief does not remove the substantial risk of serious harm to Plaintiffs. Rather, through uncontroverted evidence presented at the evidentiary hearing of contemporary standards of decency and medical literature, Plaintiffs showed that Defendants must implement their First Heat Remediation Plan to prevent exposure to extreme temperatures and humidity that cause a substantial risk of serious harm.

---

[7] Rec. Doc. 329. The Parties' stipulation must be given substantial weight in evaluating whether the First Heat Remediation Plan is the narrowest, least intrusive mechanism of remedying the Eighth Amendment violation. 18 U.S.C. §3626(a)(1)(A) ("The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."). The Court should also give substantial weight to Warden Cruze's deposition testimony that he has no security concerns with the First Heat Remediation Plan, Rec. Doc. 290-5 at 49:3-6, and that he needs to have the discretion to move inmates between tiers for security purposes, Rec. Doc. 290-5 at 24:17–26:17.

Respectfully submitted this 11th day of July, 2016.

*For the Plaintiffs:*

/s/ Mercedes Montagnes
Mercedes Montagnes, La. Bar No. 33287 (Lead Counsel)
Elizabeth Compa, La. Bar No. 35004
The Promise of Justice Initiative
636 Baronne Street
New Orleans, LA 70113
Tel. (504) 529-5955
Fax (504) 558-0378
Email: mmontagnes@thejusticecenter.org

Steven Scheckman, La. Bar No. 08472
Schiff, Scheckman, & White LLP
829 Baronne Street
New Orleans, Louisiana 70113
Tel. (504)581-9322
Fax (504)581-7651
Email: steve@sswethicslaw.com

Nilay U. Vora, Ca. Bar No. 268339, *admitted pro hac vice*
Jeffer Mangels Butler & Mitchell LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Tel. (310) 203-8080
Fax (310) 203-0567
Email: NVora@jmbm.com

CERTIFICATE OF SERVICE

I do hereby certify that on July 11, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/EF system which will send a notice of electronic filing to all CM/ECF participants.

/s/ Mercedes Montagnes
MERCEDES MONTAGNES, LSBA #33287
Attorney at Law
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955
Local Counsel