## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

ELZIE BALL, ET AL.                                   CIVIL ACTION

VERSUS

JAMES M. LEBLANC, ET AL.                    NO.: 13-00368-BAJ-EWD

### RULING AND ORDER

Before the Court is the **Motion to Modify Injunctive Relief (Doc. 315)** filed
by Plaintiffs. Plaintiffs – three seriously ill death-row inmates who are currently
incarcerated at the Louisiana State Penitentiary in Angola, Louisiana ("Angola") –
seek an order compelling Defendants – the Louisiana Department of Public Safety
and Corrections and its Secretary, the Warden of Angola, and the Assistant Warden
in charge of the death-row facility at Angola – to implement Defendants' initial Heat
Remediation Plan (Doc. 118), which proposed the installation of air-conditioning
throughout the death-row facility as a remedy to the constitutional violations found
by this Court following a non-jury trial on the merits. Defendants oppose the Motion.
(*See* Doc. 318). On June 15, 2016, the Court held an evidentiary hearing on this
matter, and the parties filed post-hearing briefs. (*See* Docs. 353, 354). Subsequently,
the Court held two additional evidentiary hearings. For reasons explained herein,
Plaintiffs' **Motion to Modify Injunctive Relief (Doc. 315)** is **GRANTED IN
PART and DENIED IN PART**.

## I.   BACKGROUND

Plaintiffs Elzie Ball ("Ball"), Nathaniel Code ("Code"), and James Magee ("Magee") (collectively, "Plaintiffs") filed this lawsuit on June 10, 2013, pursuant to 42 U.S.C. § 1983; the Eighth Amendment to the United States Constitution, U.S. Const. amend. VIII; the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as modified by the Americans with Disabilities Act Amendments Act, 42 U.S.C. § 12131 *et seq.*; and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.   (Doc. 1).   Plaintiffs alleged that Defendants had violated their rights by subjecting them to excessive heat, thereby endangering their health and safety.   (*Id.* at ¶ 12).   Plaintiffs sought declaratory and injunctive relief from this Court, requesting that Defendants be required to, among other things, develop and implement a long-term plan to maintain the heat index in Angola's death-row tiers at or below 88 degrees Fahrenheit.[1]   (Doc. 12 at p. 4).   Defendants denied all liability. (*See* Doc. 38).

Following a non-jury trial on the merits, this Court found that the extreme heat that Plaintiffs endured in the death-row tiers at Angola subjected Plaintiffs to a substantial risk of serious harm and that Defendants acted with deliberate indifference to that substantial risk of serious harm, in violation of Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment.[2]   *See Ball v.*

---

[1] Any subsequent reference to a measurement of degrees in this Ruling and Order, unless otherwise noted, utilizes the Fahrenheit scale.

[2] The Court denied Plaintiffs' claims under the Americans with Disabilities Act, as modified by the Americans with Disabilities Act Amendments Act, and the Rehabilitation Act. *See Ball v. LeBlanc,*

*LeBlanc*, 988 F. Supp. 2d 639 (M.D. La. 2013), *aff'd in part*, *vacated in part*, *remanded*, 792 F.3d 584 (5th Cir. 2015).  The Court found that the uncontroverted evidence established that "inmates housed in each of the death row tiers were frequently subjected to heat indices above 100 degrees," *id.* at 664, and that "the temperature, humidity, and heat index recorded *inside* the death row tiers was, more often than not, the same or *higher* than the temperature, humidity, and heat index recorded *outside* of the death row tiers," *id.* at 653.  Further, the Court found that "inmates housed in . . . two tiers were subjected to heat indices as high as 110.3 degrees."  *Id.* at 664.  Even healthy individuals are at risk of serious harm in such conditions of extreme heat, but according to expert testimony, the risk of harm to Plaintiffs is exacerbated because their various medical conditions and the pharmaceuticals prescribed to them to treat those illnesses inhibit Plaintiffs' abilities to thermoregulate (i.e., regulate their body temperatures).  *Id.* at 666.  The evidence established that Defendants had knowledge of the substantial risk of serious harm that the extreme heat posed to Plaintiffs and that Defendants nevertheless failed to take any remedial action to protect them, thereby disregarding the substantial risk of serious harm to Plaintiffs' health and safety.  *Id.* at 672-73, 679.  Accordingly, the Court enjoined Defendants to "immediately develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees."  *Id.* at 689. Defendants' initial Heat Remediation Plan proposed that, in addition to providing Plaintiffs with a daily cold shower and access to ice and cold drinking water, air-

---

988 F. Supp. 2d 639, 687 (M.D. La. 2013), *aff'd in part*, *vacated in part*, *remanded*, 792 F.3d 584 (5th Cir. 2015).  The denial of those claims was affirmed on appeal.  *See Ball*, 792 F.3d at 598.

conditioning systems would need to be installed in each of the death-row facility's eight tiers in order to maintain the heat indices in all of the tiers at or below 88 degrees. (Doc. 118).

Defendants appealed. (*See* Doc. 176). The United States Court of Appeals for the Fifth Circuit affirmed this Court's finding that Defendants had subjected Plaintiffs to conditions of confinement that violate the Eighth Amendment by "housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related injury." *Ball*, 792 F.3d at 596. The Court of Appeals, however, held that the *scope* of the Court's injunction violated the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. *Ball*, 792 F.3d at 598. The Court of Appeals held that this Court erred, first, by "order[ing] a type of relief – air conditioning – that is unnecessary to correct the Eighth Amendment violation" and, second, by "award[ing] relief facility-wide, instead of limiting such relief to Ball, Code, and Magee." *Id.* at 599. The Court of Appeals held that under the PLRA, a district court may only order injunctive relief that "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs," suggesting that "there are many acceptable remedies short of facility-wide air conditioning":

> For example, the Defendants could divert cool air from the guards' pod into the tiers[,] allow inmates to access air conditioned areas during their tier time[,] allow access to cool showers at least once a day[,] provide ample supply of cold drinking water and ice at all times[,] supply personal ice containers and individual fans[,] and install additional ice machines. *Id.*

4

Accordingly, the Court of Appeals vacated this Court's injunction, *id.* at 600, and remanded the proceedings, instructing the Court to "limit its relief to these types of remedies," *id.* at 599.

As a result, the Court ordered Defendants to submit a new plan to ameliorate the Eighth Amendment violation that would be consistent with the opinion of the Court of Appeals. Defendants submitted their Second Heat Remediation Plan on October 23, 2015, (Doc. 251), which subsequently was revised on April 8, 2016, (Doc. 299) (collectively, "Second Plan"). Under the Second Plan, Defendants (1) installed two water-valve controllers in the showers on each tier, which allow inmates to select between hot and cold water for their daily, fifteen-minute showers; (2) provided one three-gallon ice container and a smaller ice container that is designed to hold six twelve-ounce cans, both of which were replenished with ice by staff or orderlies during their shifts from the death-row facility's existing ice machine and/or an additional ice machine that Defendants subsequently purchased and installed; and (3) installed additional fans to ensure that each Plaintiff was provided a fan of his own. (*See* Docs. 251, 299). In response to the suggestion of the Court of Appeals that conditioned air be diverted from the guards' pod to a tier in which Plaintiffs are confined, Defendants asserted that doing so would cause the premature mechanical failure of the death-row facility's air-conditioning system due to the system's inability to handle such an increased load. (Doc. 251 at p. 2). Additionally, Defendants asserted that diverting conditioned air from the guards' pod would cause the humid, outdoor air to be pulled into the pod due to the resulting negative air balance, thereby causing water damage

5

to the pod and rendering the building susceptible to mold growth. (*Id.* at p. 3). Finally, Defendants claimed that in order to divert the conditioned air from the guards' pod to the tier – as suggested by the Court of Appeals – the door connecting the two areas of the structure would be required to remain open, creating security concerns. (*Id.*).

On May 16, 2016, Plaintiffs filed the present Motion to Modify Injunctive Relief, urging the Court to enjoin Defendants to implement their initial Heat Remediation Plan, which called for the installation of a facility-wide air-conditioning system to maintain the heat indices in the death-row tiers at or below 88 degrees. (Doc. 315). Plaintiffs argue that because the heat indices in the death-row tiers rose above 88 degrees in spite of the measures implemented pursuant to Defendants' Second Plan, Plaintiffs remain exposed to a substantial risk of serious harm due to the conditions of extreme heat, and the Second Plan thus has proven to be insufficient to remedy the Eighth Amendment violation found by this Court and affirmed on appeal. (*Id.*). Plaintiffs assert that "Defendants' failure to propose an effective remedy," after being given wide latitude and a full opportunity to do so, demonstrates that "this Court's original injunction was a necessary, narrowly-tailored, and non-intrusive remedy." (Doc. 315-1 at p. 7). Defendants oppose the Motion, arguing that the Court of Appeals vacated this Court's finding that exposing Plaintiffs to heat indices in excess of 88 degrees places them at substantial risk of serious harm. (Doc. 318 at p. 4). Defendants assert that because the Court of Appeals held that air-conditioning was an unnecessary remedy to ameliorate the Eighth Amendment

6

violation and the only mechanism to lower the heat indices in the death-row tiers below 88 degrees is mechanical air-conditioning, the 88-degree benchmark was vacated by the Court of Appeals. (*Id.*). Thus, Defendants contend, the only remedies that are necessary to correct the Eighth Amendment violation are those endorsed by the Court of Appeals in *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004), namely, the provision of cold showers, ice, and additional fans. (*Id.* at p. 6). Because Defendants have provided such "*Gates*-type" remedies, Defendants' argument follows, the Eighth Amendment violation has been sufficiently remedied. (*Id.* at pp. 6-7).

## II.   FINDINGS OF FACT

The following findings of fact are uncontroverted or supported by the evidence in the record. If a particular fact was controverted, the Court weighed the evidence and determined that the evidence presented by the party supporting that fact was more persuasive.

### A.   Defendants' Second Plan

1. Defendants' Second Plan consists of (1) the installation of two water-valve controllers in the showers on each tier, which allow inmates to select between hot and cold water for their daily, fifteen-minute showers; (2) the provision to each Plaintiff of one three-gallon ice container and a smaller ice container that is designed to hold six twelve-ounce cans, both of which are to be replenished with ice by staff or orderlies during their shifts from the death-row facility's preexisting ice machine and/or an additional ice machine that Defendants

subsequently purchased and installed; and (3) the installation of additional fans to ensure that each Plaintiff is provided a fan of his own.  (Docs. 251, 299).

2. The provision of a daily, fifteen-minute cold shower, standing alone, does not sufficiently reduce the substantial risk of serious harm to Plaintiffs.  A brief cold shower may provide temporary relief to Plaintiffs, but such relief is limited to the time that Plaintiffs spend in the shower and a brief period afterward. Once Plaintiffs exit the shower, they are again exposed to a substantial risk of serious harm due to the conditions of extreme heat present in the death-row tiers.  The Court heard compelling, uncontroverted testimony from Dr. Susan Vassallo, M.D. – who has been on the faculty of the New York University School of Medicine since 1983; is an attending physician in emergency medicine at Bellevue Hospital Center in New York, New York; is a certified correctional health professional; and is an expert on the effects of drugs and illness on an individual's ability to thermoregulate – regarding the effectiveness of the measures implemented under Defendants' Second Plan.  Regarding the provision of a daily, fifteen-minute cold shower to Plaintiffs, Dr. Vassallo testified that "a fifteen-minute shower out of twenty-four hours a day, in these temperatures, [is] absolutely not a safety measure."  (Doc. 346, Hr'g Tr. at p. 141, ll. 1-3).  Citing scholarly studies, which reported that there is no statistically significant value to providing a brief cold shower under similar conditions, Dr. Vassallo explained that as the cold shower water on Plaintiffs' skin evaporates following their showers, "to the extent that [their skin] is able

8

to cool, given the humidity in the air, the individuals for that period of time will feel cooler." (*Id.* at p. 87, l. 25; *id.* at p. 88, ll. 1-3). However, Dr. Vassallo continued: "[B]y the time the evaporative cooling is completed, the story is over. The [cooler] temperature is no longer and that individual will be . . . subjected for another twenty-three hours and forty-five minutes to the heat ind[ices] that are existing at the Louisiana State [Penitentiary] cells where these folks here are being confined." (*Id.* at p. 140, ll. 19-25).

3. Plaintiffs similarly testified, from a layman's perspective, regarding the ineffectiveness of cold showers. Plaintiff Code testified that because it is "very hot" in the showers, the cold showers offer the limited benefit of providing him time to dry and clothe himself before his body begins to perspire again due to the extreme heat. (*Id.* at p. 47, l. 5). Plaintiff Magee testified that the cold showers help relieve some of his heat-related symptoms, but merely *while* he is taking a shower. (*Id.* at p. 58, l. 8).

4. The provision of a cold shower for as long as one hour, standing alone, is similarly ineffective at reducing the substantial risk of serious harm to Plaintiffs. Even if Plaintiffs were permitted to remain in the shower for one hour, the conditions of extreme heat present in the death-row tiers continue to place Plaintiffs at risk during the remaining twenty-three-hour period of the day after the evaporative cooling from the showers has ceased. Dr. Vassallo testified that an hour-long cold shower would not reduce the risk of heat stress to Plaintiffs: "The reason is . . . that the other twenty-three hours where they're

9

sitting under those conditions, environmental conditions [that] have been well described, are long and dangerous. One hour outside of that condition [by providing a one-hour cold shower] is insufficient to protect – to be protective." (*Id.* at p. 167, ll. 1-7).

5. The use of fans in conditions of extreme heat such as those present in the death-row tiers, standing alone, does not sufficiently reduce the substantial risk of serious harm to Plaintiffs. Dr. Vassallo testified to a clear scientific consensus "that fans are not protective" when they are utilized in "the kinds of heat indices that we see on death row where these gentlemen are . . . incarcerated." (*Id.* at p. 77, ll. 17-19). For example, Dr. Vassallo cited a clear scientific consensus that at temperatures of 90 degrees with humidity of 35%, "there was absolutely no protection from fans." (*Id.* at p. 79, ll. 5-6). On the contrary, the use of fans in such conditions may *increase* the risk of harm to Plaintiffs because, according to Dr. Vassallo, "there is a temperature at which when you start to blow hot air across the skin, there's simply an increase in heat stress." (*Id.* at p. 78, ll. 17-20).

6. The regular provision of ice in the ice containers provided to Plaintiffs, standing alone, does not sufficiently reduce the substantial risk of serious harm to Plaintiffs. Dr. Vassallo testified that in her thirty years of experience as a clinician, she had never seen evidence that a heat stroke was prevented by a person's having "ice in their drink or ice in their cooler." (*Id.* at p. 95, l. 25).

10

7. Additionally, the provision of an unlimited amount of ice, coupled with a container that would permit Plaintiffs to lie down in and become encased in the ice, is not a workable remedy.  Although such a configuration is used by medical professionals to treat patients who *already* have suffered a heat stroke, Dr. Vassallo testified that because of the "degree of pain and discomfort associated with that . . . as soon as our [heat stroke patients are] conscious, they have to come out of that ice bath."  (*Id.* at p. 161, ll. 3-8).  Further, Dr. Vassallo testified that the benefits of such an ice bath would "only last[] for the period" in which a person is immersed in the ice, (*id.* at p. 161, l. 23), and that a configuration in which Plaintiffs were immersed in an ice bath for twenty-three to twenty-four hours a day "would be intolerable for them . . . and, also, absolutely unimaginable," (*id.* at p. 162, ll. 1-2).

8. During the implementation of the Defendants' Second Plan, the heat indices in each tier in which Plaintiffs were confined rose above 88 degrees. During the implementation of the Second Plan, Plaintiffs were confined on Tiers B, F, and G.  (Doc. 339 at p. 1).  In the period between May 12, 2016, and June 10, 2016 – during which Defendants had implemented the measures under the Second Plan – heat indices exceeded 88 degrees on three days in Tier B, eight days in Tier F, and five days in Tier G.  (*See* Doc. 328 at p. 2; Doc. 339-2; Doc. 339-6; Doc. 339-7).

9. Plaintiffs suffer from certain medical conditions and take certain prescription medications that place them at an increased risk for heat-related illness.

11

Plaintiff Ball suffers from diabetes, hypertension, venous insufficiency, and hyperlipidemia; regarding medication, Ball takes Lasix, Claritin, potassium, Keppra, Tenormin, Cozaar, Norvasc, metformin, insulin, and Zocor. (Doc. 346, Hr'g Tr. at p. 19, ll. 11-20). Plaintiff Code suffers from hypertension, Hepatitis C, and hypothyroidism; regarding medication, Code takes Synthroid, Cozaar, and amlodipine. (*Id.* at p. 19, ll. 21-25). Plaintiff Magee suffers from depression, Hepatitis C, and hyperlipidemia; regarding medication, Magee takes Remeron, Catapres, fluoxetine, Norvasc, and cholestyramine. (*Id.* at p. 20, ll. 1-5; *see id.* at p. 223, ll. 16-18). Dr. Vassallo, who had reviewed the medical records of all Plaintiffs and was familiar with all of Plaintiffs' medical conditions, (*id.* at p. 100, ll. 8-12), testified that "the conditions and the . . . medication that [Plaintiffs are] receiving for those conditions interfere with the ability to respond to heat," (*id.* at p. 126, ll. 20-23).

10. Plaintiffs continued to experience heat-related symptoms during the implementation of Defendants' Second Plan. Plaintiff Code testified that during the implementation of the Second Plan, he continued to experience periods of prolonged dizziness and "profuse perspir[ation]." (*Id.* at p. 43, l. 8). Plaintiff Magee testified that during the implementation of the Second Plan, he experienced the "same [symptoms] that [he] had before," namely, dizziness, nausea, and perspiration. (*Id.* at p. 54, l. 23). Plaintiff Ball testified that during the implementation of the Second Plan, he experienced the "normal every year symptoms that [he experiences] when it start[s] to get hot." (*Id.* at

p. 60, ll. 18-19).  Specifically, Ball testified that he continued to experience "headaches," which resemble "passing out almost," (*id.* at pp. 61, ll. 4-5), as well as "tingling" and "pain" in his fingers and his feet, a sensation that Ball described as "like . . . someone was beating [his finger] with a hammer," (*id.* at p. 60, ll. 18-23).

11. The measures implemented pursuant to Defendants' Second Plan do not, either individually *or in combination*, sufficiently reduce the substantial risk of serious harm to Plaintiffs as a result of their exposure to the conditions of extreme heat present in Angola's death-row tiers.  When asked whether the measures implemented pursuant to the Second Plan – the installation of additional fans, the provision of two ice containers so that Plaintiffs have increased access to ice, and the availability of a fifteen-minute cold shower – removed the substantial risk of serious harm to Plaintiffs as a result of the conditions of extreme heat to which they are exposed in the death-row tiers, Dr. Vassallo unequivocally answered, "Absolutely not." (*Id.* at p. 96, l. 24). When asked whether the measures implemented pursuant to the Second Plan can be used to lower an individual's elevated body temperature, Dr. Vassallo responded: "I completely disagree with that.  And I have thirty years of clinical experience trying to lower a body temperature.  And I can tell you 100 percent that will not work." (*Id.* at p. 162, ll. 14-17).

12. The only sufficient means to reduce the substantial risk of serious harm to Plaintiffs as a result of their exposure to the conditions of extreme heat present

in Angola's death-row tiers is to lower the temperature and heat indices to which Plaintiffs are exposed. According to Dr. Vassallo: "The temperature and the heat index [are] the risk here. That is the cause of risk. To remove the risk, the temperature has to be lowered." (*Id.* at p. 97, ll. 3-5). Dr. Vassallo testified unequivocally that "in [her] expert opinion, [she did] not have any other idea . . . how to protect these prisoners other than to reduce the temperature," (*id.* at p. 147, ll. 9-12), and that the "[Second P]lan does not do that," (*id.* at p. 74, ll. 15-16).

13. The risk of serious harm due to exposure to conditions of extreme heat significantly increases when an individual is exposed to heat indices of 88 degrees or greater. Dr. Vassallo testified that, according to the findings of a recent study published in February 2016, "hospitalizations [due to heat-related illnesses] take a rather abrupt increase at the [mean] heat index . . . of 32 degrees [Celsius]." (*Id.* at p. 121, ll. 5-7). Thirty-two degrees Celsius equates to 89.6 degrees Fahrenheit. (*Id.* at p. 123, ll. 22-23). Given the information contained in that study, along with her previous findings, Dr. Vassallo concluded that the "number of 88 degree[s] is a reasonable and scientifically . . . substantiated number" as a benchmark for the heat index at which individuals are subjected to a substantial risk of serious harm due to heat-related illness, (*id.* at p. 124, ll. 20-22), the same benchmark that the National Weather Service sets as the "top number in caution range," (*id.* at p. 129, ll. 14-15).

14

**B.      Defendants' Additional Remedial Measures Implemented Subsequent to the Implementation of the Second Plan (Defendants' "Third Plan")**

1.   At some time around June 26, 2016, Defendants implemented remedial measures in addition to those implemented pursuant to Defendants' Second Plan (collectively, "Third Plan"). (Doc. 369, Hr'g Tr. at p. 15, ll. 8-10).

2.   Under the Third Plan, Defendants (1) moved Plaintiffs to Tier C, which was otherwise unoccupied; (2) assigned Plaintiffs to the three cells closest to the door that connects the tier to the guards' pod (e.g., cells C-1, C-2, and C-3); (3) installed a 27" x 34" air vent in the door that connects Tier C to the guards' pod, allowing conditioned air from the guards' pod to flow into Tier C; (4) installed a "curtain" constructed of heavy plastic between cells C-4 and C-5, in an attempt to keep the newly diverted cool air from escaping to the areas of Tier C in which neither Plaintiffs nor any other inmates were confined; (5) provided each Plaintiff with an individual cooling mechanism, commonly referred to as an "IcyBreeze unit" or a "Cajun cooler," which essentially consists of an ice chest, a fan, and a duct that – when the ice chest is filled with ice and the fan is powered on – emits cool air; (6) installed a water-valve controller in the showers on Tier C, which allowed Plaintiffs to select between hot and cold water for their daily, fifteen-minute showers (a continued measure from the Second Plan); (7) provided to each Plaintiff one three-gallon ice container and a smaller ice container that is designed to hold six twelve-ounce cans, both of which were replenished with ice by staff or orderlies during their shifts from

15

the death-row facility's preexisting ice machine and/or an additional ice machine that Defendants subsequently purchased and installed (a continued measure from the Second Plan); and (8) installed additional fans to ensure that each Plaintiff was provided a fan of his own (a continued measure from the Second Plan). (Doc. 360 at p. 3). The Court only learned of the additional measures implemented under the Third Plan through communication with the Special Master appointed in this case, Paul J. Hebert. Although both parties expressed to Special Master Hebert their desire to withhold from the Court the details regarding the specific measures implemented pursuant to the Third Plan, in spite of the fact that those measures were apparently successful in remedying the constitutional violation, Special Master Hebert disclosed to the Court the additional remedial actions that were implemented by Defendants, testifying that he "felt it was an obligation on [his] part to advise the Court that the prisoners were in a situation that did not continue to . . . subject [them] to the conditions which amounted to the constitutional violation." (Doc. 369, Hr'g Tr. at p. 18, ll. 7-12).

3. The IcyBreeze units emit air that measures approximately 57.8 degrees in temperature. (Doc. 374 at p. 2).

4. In order to maintain the temperature of the air emitted from the IcyBreeze units at a cool level, the ice-chest portion of the unit must be filled with ice and the ice must be replenished regularly. (Doc. 375, Hr'g Tr. at p. 20, ll. 11-15).

5. The IcyBreeze units were positioned in the corridor outside of each Plaintiff's cell, approximately twelve inches from the bars of each cell.[3] (*Id.* at p. 12, ll. 22-23). According to the testimony of Shane M. Hernandez – a professional engineer who, in conjunction with Special Master Hebert, was retained by the Court to evaluate the measures implemented pursuant to Defendants' Third Plan – a person who is in "close proximity" to the IcyBreeze unit is able to feel the cool air being emitted, but a person who is "more than . . . five feet away" cannot. (*Id.* at p. 27, ll. 18-20).

6. IcyBreeze units are effective at lowering the *temperature* of a small space, but do not reduce the *humidity* level in that space. (*Id.* at p. 29, ll. 11-14).

7. The installation of the 27" x 34" air vent in the door connecting Tier C to the guards' pod permitted the conditioned air in the guards' pod to flow into Tier C. According to Mr. Hernandez's testimony, Tier C is a "highly negative space" in terms of air pressure, which caused the conditioned air in the guards' pod to flow through the air vent and into the space in which Plaintiffs were confined. (*Id.* at p. 16, ll. 13-15). The conditioned air subsequently exited the structure through the tier's exhaust system. (*Id.* at p. 16, ll. 18-19).

8. The conditioned air that flowed into Tier C from the guards' pod via the air vent reduced the humidity in the area in which Plaintiffs were confined. Mr. Hernandez testified that when he inspected the death-row facility, he did not

---

[3] As of the date of this Ruling and Order, the Court does not possess information regarding the locations and cell assignments of Plaintiffs. The Court proceeds under the assumption that Plaintiffs are no longer being confined in Tier C and are not being availed of the remedial measures implemented under Defendants' Third Plan due to the seasonal changes in weather.

take any humidity measurements, but noticed that when comparing Tier C – which had conditioned air flowing into it from the guards' pod through the air vent – to Tier H – which is located on the opposite side of the death-row facility and did not have an air vent connecting it to the guards' pod – the difference between "the humidity levels w[as] very drastic." (*Id.* at p. 10, ll. 23).  Mr. Hernandez testified that he "could tell that the relative humidity was probably somewhere in the 60 percent range" in Tier C; in contrast, Mr. Hernandez estimated that the humidity level in Tier H was between 70% and 90%, which roughly "matched [the humidity level] outside." (*Id.* at p. 10, ll. 24-25; *id.* at p. 11, ll. 2-4).  In sum, Mr. Hernandez testified that "Tier C was much more comfortable." (*Id.* at p. 10, ll. 23-24).

9. While all of the measures of the Third Plan were implemented, the temperature inside the control center in the air-conditioned guards' pod was measured to be 73.1 degrees.  (Doc. 374 at p. 2).

10. While all of the measures of the Third Plan were implemented, the temperature inside the corridor in the air-conditioned guards' pod was measured to be 76.2 degrees.  (*Id.*).

11. While all of the measures of the Third Plan were implemented, the temperature in front of cell C-3 – in which one of the Plaintiffs was confined – was measured to be 78.5 degrees.  (*Id.*).

12. While all of the measures of the Third Plan were implemented, the heat index in the portion of Tier C in which Plaintiffs were confined remained below 80

18

degrees.  Special Master Hebert testified that aside from the first two days in which the Third Plan was implemented, the heat indices in the portion of Tier C in which Plaintiffs were confined "hardly approach[ed] 80 degrees."  (Doc. 369, Hr'g Tr. at p. 23, l. 5).

13. In the period between July 7, 2016, and August 31, 2016 – during which the heat index remained below 80 degrees in the portion of Tier C in which plaintiffs were confined – the heat index reached or exceeded 100 degrees in *each of the other tiers* of the death-row facility on at least six, and as many as thirty, days.  The heat index reached or exceeded 100 degrees on twenty days in Tier A, six days in Tier B, twenty-three days in Tier D, thirty days in Tier E, twenty-three days in Tier F, nineteen days in Tier G, and eighteen days in Tier H.  (Doc. 376).

14. Although the fans installed by Defendants in the portion of Tier C in which Plaintiffs are confined, standing alone, do not reduce the substantial risk of serious harm to Plaintiffs because the fans do not reduce the temperature of the space, when used in conjunction with the IcyBreeze units, the fans help circulate the cool air that the IcyBreeze units emit.  Frank Thompson, a professional engineer who specializes in HVAC systems and is the designer of record for the death-row facility, testified that the fans provided to Plaintiffs do not lower the temperature, but rather "are just circulating air in the space." (Doc. 346, Hr'g Tr. at p. 244, ll. 13-14).  Given the testimony of Mr. Hernandez that a person who is "more than . . . five feet away" cannot feel the cool air

19

being emitted from the IcyBreeze units, (Doc. 375, Hr'g Tr. at p. 27, l. 19), and the fact that Plaintiffs' cells measure more than five feet in depth, (*see id.* at p. 27, l. 24), the fans provided to Plaintiffs aided in circulating the cool air that is emitted from the IcyBreeze units to broader areas of Plaintiffs' cells in Tier C.

15. Providing ice to Plaintiffs, when it is provided in conjunction with the other measures implemented under Defendants' Third Plan, is a humane measure. Dr. Vassallo described the desire for ice as a matter of human instinct when an individual is hot: "It's about being humane. . . . We want ice when we're hot." (Doc. 346, Hr'g Tr. at p. 153, ll. 8-9).

16. Providing Plaintiffs access to daily cold showers reduces the substantial risk of serious harm to Plaintiffs while they are in the shower area, removed from their individual IcyBreeze units. The individual IcyBreeze units were positioned in the corridor outside of each Plaintiff's cell, approximately twelve inches from the bars of each cell. (Doc. 375, Hr'g Tr. at p. 12, ll. 22-23). Plaintiffs thus did not have access to the IcyBreeze units in the shower area because the units were located directly in front of their cells. (*See id.*). A cold shower, however, can produce evaporative cooling during the shower and the brief time following the shower, (*see* Doc. 346, Hr'g Tr. at p. 140, ll. 18-21), which can protect Plaintiffs from the substantial risk of serious harm while they are removed from the IcyBreeze units for the purpose of bathing themselves.

20

17. The measures implemented pursuant to Defendants' Third Plan sufficiently reduce the substantial risk of serious harm to Plaintiffs due to the conditions of extreme heat to which they are exposed in the death-row tiers at Angola. Expert testimony established that the risk of serious harm due to heat-related illness dramatically increases when the heat index exceeds 88 degrees, (*see id.* at p. 124, ll. 20-22), and that the only way to remove the risk is to lower the temperature and heat index, (*see id.* at p. 97, ll. 3-5). The measures implemented under the Third Plan, collectively, lowered the heat index in the portion of Tier C in which Plaintiffs were confined below 80 degrees, (Doc. 369, Hr'g Tr. at p. 23, ll. 3-5), while the tiers that did not benefit from the remedial measures exhibited heat indices of over 100 degrees on multiple days, (Doc. 376). This reduction of the heat indices to levels below 88 degrees sufficiently reduces the substantial risk of serious harm to Plaintiffs. (*See* Doc. 346, Hr'g Tr. at p. 124, ll. 20-22).

18. The total cost of implementing all of the measures pursuant to the Third Plan was less than $2,000. (Doc. 369, Hr'g Tr. at p. 23, ll. 19-21). Specifically, the cost of the plastic "curtain" was $785.40, and the cost of the IcyBreeze units was $519.95. (*Id.* at p. 26, ll. 15-17). Testimony established that the total cost of implementing all of the measures was less than $2,000. (*Id.* at p. 23, ll. 19-21).

19. The costs of alternatives to the Third Plan vastly exceed $2,000. The cost of installing a mechanical system that would provide "neutral air" solely in the

portion of Tier C in which Plaintiffs were confined, in order to create balanced air pressure between that portion of Tier C and the guards' pod, would be approximately $75,000 to $100,000. (Doc. 375, Hr'g Tr. at p. 22, l. 24). The cost of installing a mechanical system that would provide "neutral air" in the entirety of Tier C, in order to create balanced air pressure between Tier C as a whole and the guards' pod, would be approximately $250,000 to $300,000. (*Id.* at p. 22, ll. 8-10).

C.   **Potential for Mold Growth as a Result of Defendants' Third Plan**

1.   Due to the design of the IcyBreeze units, the cool air that is emitted from the units does not contain any water vapor, and therefore the IcyBreeze units do not contribute to any moisture- or condensation-related problems in the portion of Tier C in which Plaintiffs were confined. It appears that, according to Mr. Hernandez's testimony, "the IcyBreeze unit is a sealed heat exchanger," and thus the unit's fan is not "able to capture . . . liquid." (*Id.* at p. 13, ll. 7-10). Upon inspecting the IcyBreeze units and Plaintiffs' cells, Mr. Hernandez did not observe any moisture at the base of the unit, on the steel bars of Plaintiffs' cells, or on any of Plaintiffs' belongings inside their cells. (*Id.* at p. 12, ll. 19-25; *id.* at p. 13, ll. 1-2). There was some condensation around the ducts that emit cool air from the IcyBreeze units, "but not much." (*Id.* at p. 12, ll. 17-19).

2.   Because the materials from which Tier C was constructed are not conducive to mold growth, mold-related problems are not likely in the portion of the tier in which Plaintiffs were confined. The tier was constructed from nonorganic

22

materials, such as steel and concrete, upon which it would be "very, very difficult" for mold to grow because, according to Mr. Hernandez, such materials do not "act as food." (*Id.* at p. 14, ll. 12-13).

3.  Due to the installation of the air vent in the door connecting Tier C to the guards' pod – and the consequential flow of conditioned air from the guards' pod to Tier C through the air vent – humid, outdoor air had begun to infiltrate the guards' pod during the implementation of the Third Plan. According to Mr. Hernandez, the "sucking action" created as a result of the conditioned air's flowing from the guards' pod to Tier C through the air vent "cause[s] humid air to go through the exterior walls of the air conditioned area." (*Id.* at p. 16, l. 25; *id.* at p. 17, ll. 1-2).

4. The infiltration of humid, outdoor air increases the potential for mold growth in the guards' pod, and the areas behind the walls of the guards' pod are at the highest risk for mold growth. According to Mr. Hernandez, the "potential for mold growth would probably be in concealed spaces behind the walls." (*Id.* at p. 26, ll. 10-11).

5. Organic materials, which are conducive to mold growth, were utilized to construct the guards' pod. Mr. Hernandez testified that such organic material acts as "food for the mold." (*Id.* at p. 41, l. 6).

6. There is no certainty that mold growth will result from the infiltration of humid, outdoor air into the guards' pod. According to Mr. Hernandez, "it's questionable whether or not [mold growth] would happen or occur." (*Id.* at p.

17, ll. 4-5).  Mr. Hernandez reiterated that he could not "guarantee that there'll be mold growth," (*id.* at p. 39, ll. 17-18), and testified that there simply was a "potential for mold growth," (*id.* at p. 39, ll. 21-22).

7.  The death-row facility currently exhibits no evidence of mold growth.  Mr. Hernandez testified that he "did not observe any kind of mold growth . . . at all in the facility" during his investigation, (*id.* at p. 26, ll. 15-16), and repeated later that he "did not see any evidence whatsoever of mold," (*id.* at p. 39, l. 25).

### D.  Potential Alterations to Defendants' Third Plan in the Event of Mold Growth

#### 1.  *Sealing the Air Vent in the Door Connecting Tier C to the Guards' Pod*

1.  If prison officials sealed the air vent in the door connecting Tier C to the guards' pod, the potential for mold growth in the guards' pod would be reduced or perhaps eliminated.  Sealing the air vent would return the death-row facility "to the original condition," according to Mr. Hernandez, in which no conditioned air from the guards' pod would be diverted to Tier C, and humid, outdoor air thus would not infiltrate the guards' pod.  (*Id.* at p. 17, ll. 11-12).

2.  If officials sealed the air vent, however, the heat indices in the portion of Tier C in which Plaintiffs were confined would rise.  Mr. Hernandez testified that if officials sealed the air vent, the lower heat indices in the portion of Tier C in which Plaintiffs were confined could not be maintained without an additional cooling mechanism.  (*Id.* at p. 20, ll. 8-10).

3. In the event that officials sealed the air vent, additional IcyBreeze units could be installed in the portion of Tier C in which Plaintiffs were confined in order to attempt to maintain the heat indices at the same levels that prevailed with the air vent open. "If you add additional IcyBreeze units," Mr. Hernandez testified, "I think you can overcome the cooling from the ventilation." (*Id.* at p. 37, ll. 20-21).

4. Even if additional IcyBreeze units were introduced into the portion of Tier C in which Plaintiffs were confined in the event that officials sealed the air vent, the humidity in the space would rise because the IcyBreeze units have no effect on the humidity level of a space. Mr. Hernandez testified that in the event that officials sealed the air vent and additional IcyBreeze units were installed, "the temperature would come down," but "the humidity would rise." (*Id.* at p. 45, ll. 19-20). The elevated humidity would necessitate the installation of additional IcyBreeze units to lower the temperature to a level that, after factoring in the elevated humidity, resembled the heat-index level of the space prior to the sealing of the air vent. Mr. Hernandez testified that in order to maintain the heat indices at the levels that prevailed with the air vent open, "you would [have to] attack[] or address[] the temperature to try to get the temperature down to where . . . your perceived temperature wouldn't be as hot." (*Id.* at p. 45, ll. 21-24).

5. Although the precise number of IcyBreeze units that would be necessary to maintain the lower heat-index levels in the portion of Tier C in which Plaintiffs

were confined in the event that officials sealed the air vent cannot be determined, the number that would be required does not appear to be impracticable.   In the estimation of Mr. Hernandez, it would not "take that many" additional IcyBreeze units to achieve the desired result.   (*Id.* at p. 38, l. 2).

6. Additionally, an existing louver on the far end of Tier C, as far away as possible from the portion of Tier C in which Plaintiffs were confined, could be opened in an attempt to limit the amount of cool air emitted by the IcyBreeze units that exits the tier through the tier's exhaust system.   This action would consist of merely opening an existing window.   (*Id.* at p. 18, ll. 18-22).

7. If officials sealed the air vent in the door connecting Tier C to the guards' pod due to the proliferation of mold growth in the guards' pod, it nevertheless is probable that the substantial risk of serious harm to Plaintiffs could sufficiently be reduced by the introduction of additional IcyBreeze units and the opening of a louver in Tier C as far as possible from the portion of the tier in which Plaintiffs were confined.   Such a configuration, according to Mr. Hernandez, "has a high potential of success."   (*Id.* at p. 19, ll. 9-10).

### 2.   *Decreasing the Size of the Air Vent in the Door Connecting Tier C to the Guards' Pod*

1. Decreasing the size of the air vent in the door connecting Tier C to the guards' pod would not appreciably reduce the potential for mold growth in the guards' pod.   Mr. Hernandez testified that initially, reducing the size of the air vent merely will "increase the velocity of the air coming through."   (*Id.* at p. 23, l.

26

25; *id.* at p. 24, l. 1).  While the flow of air through the air vent eventually may decrease if officials reduced the size of the air vent, Mr. Hernandez testified that the "negative effect" in the guards' pod would remain and that the humid, outdoor air would continue to infiltrate the guards' pod, thereby presenting a potential for mold growth.  (*Id.* at p. 24, ll. 9-11).

## III.   DISCUSSION

The measures implemented pursuant to Defendants' Second Plan fail to remedy the Eighth Amendment violation, and Fifth Circuit precedent does not limit this Court solely to those measures when fashioning injunctive relief.  The measures implemented pursuant to Defendants' Third Plan, however, sufficiently remedy the constitutional violation, and an injunction requiring that Defendants continue to implement those measures complies with the limitations on injunctive relief imposed by both the PLRA and the Court of Appeals.  Although Defendants voluntarily implemented the measures under the Third Plan and those voluntary measures remedy the constitutional violation, the Court finds that the issuance of an injunction nevertheless is necessary because there is a cognizable danger that Defendants, in the absence of an injunction, may revert to measures that will cause the recurrence of the constitutional violation.

A.   **Defendants' Third Plan Sufficiently Reduces the Substantial Risk of Serious Harm to Plaintiffs, Is Narrowly Drawn, and Is the Least Intrusive Means to Correct the Eighth Amendment Violation**

Pursuant to the PLRA, the Court may order injunctive relief to remedy a constitutional violation "with respect to prison conditions," but the injunctive relief that this Court fashions "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."   18 U.S.C. § 3626(a)(1)(A).   Additionally, the Court must find that the injunctive relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."   *Id.*   Further, this Court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief," *id.*, but "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).   Although "plaintiffs are not entitled to the most effective available remedy[,] they are entitled to a remedy that eliminates the constitutional injury." *Ball*, 792 F.3d at 599.

The constitutional injury in this case is the "housing [of] these prisoners in very hot cells without sufficient access to heat-relief measures," *id.* at 596, which was found by this Court and the Court of Appeals to place "these prisoners . . . at a substantial risk of serious harm," *id.* at 594.   Defendants suggest that the measures implemented pursuant to their Second Plan – the installation of additional fans, the provision of two ice containers so that Plaintiffs have increased access to ice, and the

28

availability of a fifteen-minute cold shower – are all that is required in order to remedy the constitutional violation and to remove that substantial risk.  The Court heard compelling and uncontroverted expert testimony, however, that these measures, whether standing alone or in combination, "absolutely" do not reduce the substantial risk of serious harm to Plaintiffs due to the conditions of extreme heat present in Angola's death-row tiers.  (Doc. 346, Hr'g Tr. at p. 96, l. 24).  The measures implemented pursuant to the Second Plan are not remedies because Plaintiffs remain at substantial risk of serious harm *in spite of* those measures; the measures do not "eliminate[] the constitutional injury."  *Id.* at 599.  On the contrary, this Court heard expert testimony that one of the remedies – providing each Plaintiff with an individual fan – may even *exacerbate* the constitutional injury because of the increased heat stress on the body that results from "blow[ing] hot air across the skin." (*Id.* at p. 78, ll. 18-19).  This expert testimony is bolstered by the testimony of Plaintiffs themselves, who all testified that they continued to experience heat-related symptoms *during* the implementation of Defendants' Second Plan.  (*See id.* at p. 43, ll. 2-8; *id.* at p. 54, ll. 23-25; *id.* at p. 60, ll. 18-24; *id.* at p. 61, ll. 4-6).

Nor, as Defendants suggest, is this Court limited in fashioning injunctive relief to the measures implemented pursuant to the Second Plan as a result of Fifth Circuit precedent.  Defendants argue that because the measures implemented pursuant to the Second Plan are the same measures that the Court of Appeals endorsed in *Gates*, these *Gates*-type measures are all that Defendants are required to implement, and Defendants assert that any additional measures thus are foreclosed by Fifth Circuit

precedent.  That argument is misplaced, however.  The Court of Appeals, in the opinion remanding this case back to this Court, suggested several potential remedial measures that *exceed* the measures ordered to be implemented in *Gates*, including "divert[ing] cool air from the guards' pod into the tiers" and "allowing inmates to access air conditioned areas during their tier time."  *Id.*  The Court of Appeals opined that "[t]hese are precisely the types of remedies that this court endorsed in *Gates* and that the PLRA requires."  *Id.*  Thus, the interpretation of the Court of Appeals *itself* is that remedial measures beyond the provision of fans, ice, and cold showers do not conflict with Fifth Circuit precedent.

In sum, based on compelling expert testimony, the measures implemented under Defendants' Second Plan "absolutely" do not reduce the substantial risk of serious harm to Plaintiffs, (*id.* at p. 96, l. 24), and Plaintiffs continued to experience heat-related symptoms during the implementation of the Second Plan, (*see id.* at p. 43, ll. 2-8; *id.* at p. 54, ll. 23-25; *id.* at p. 60, ll. 18-24; *id.* at p. 61, ll. 4-6).  The *only* means to reduce the substantial risk of serious harm to Plaintiffs, and thereby remedy the Eighth Amendment violation in this case, is to lower the temperatures and heat indices to which Plaintiffs are exposed.  (*Id.* at p. 97, ll. 3-5; *id.* at p. 147, ll. 10-12).  Defendants' Second Plan, according to expert testimony, "does not do that." (*Id.* at p. 74, ll. 15-16).

Defendants' Third Plan, on the other hand, lowers the heat indices to which Plaintiffs are exposed – thereby sufficiently reducing the substantial risk of serious harm to Plaintiffs and remedying the Eighth Amendment violation – and is

consistent with both the limits that the PLRA places on injunctive relief and the suggestions of the Court of Appeals.

As a result of the measures implemented pursuant to the Third Plan, both the temperatures and heat indices to which Plaintiffs were exposed remained below 80 degrees. According to the testimony of Special Master Hebert, the heat indices to which Plaintiffs were exposed "hardly approach[ed] 80 degrees." (Doc. 369, Hr'g Tr. at p. 23, l. 5). These heat indices were below the 88-degree benchmark at which, as established through expert testimony, the risk of serious harm due to heat-related illness dramatically increases. (Doc. 346, Hr'g Tr. at p. 124, ll. 20-22). Thus, the implementation of the Third Plan, as Special Master Hebert testified, placed the "prisoners . . . in a situation that did not continue to . . . subject [them] to the conditions which amounted to the constitutional violation." (Doc. 369, Hr'g Tr. at p. 18, ll. 9-12).

Not only do the measures implemented pursuant to Defendants' Third Plan remedy the constitutional violation, they are also consistent with the limitations of the PLRA and the suggestions of the Court of Appeals. First, the measures implemented under the Third Plan only afford relief to Plaintiffs and no other portion of the death-row population at Angola. *See* 18 U.S.C. § 3626(a)(1)(A) ("Prospective relief . . . shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."). Plaintiffs have been isolated in Tier C, which is otherwise unoccupied, and the measures implemented pursuant to the Third

31

Plan only lower the heat indices in the portion of Tier C in which Plaintiffs were confined.

Second, the measures implemented under the Third Plan are consistent with the suggestions of the Court of Appeals, rendering the measures "narrowly drawn [and] extend[ing] no further than necessary to correct the violation of the Federal right." *Id.* The Third Plan involves diverting cool air from the guards' pod to the portion of Tier C in which Plaintiffs were confined, *see Ball*, 792 F.3d at 599 ("Defendants could divert cool air from the guards' pod into the tiers . . . ."); providing a cooling mechanism that is essentially an ice chest with an attached fan, *see id.* ("Defendants could . . . supply personal ice containers and individual fans . . . ."); and providing daily cold showers, access to ice, and individual fans, *see id.* ("Defendants could . . . allow access to cool showers at least once a day[,] provide ample supply of . . . ice at all times[, and] supply . . . individual fans . . . ."). The Court of Appeals held that all of these remedies "are precisely the types of remedies this court endorsed in *Gates* . . . and that the PLRA requires," instructing this Court to "limit its relief to these types of remedies." *Id.* The remedies implemented pursuant to the Third Plan are in fact so limited, and thus they are consistent with the limitations of the PLRA.

Third, the measures implemented pursuant to the Third Plan are "the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). This Court, by enjoining Defendants to implement the measures pursuant to their Third Plan, is not intruding upon the province of prison officials, but rather ordering Defendants merely to implement a Plan of their own creation.

Fourth, this Court has "give[n] substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.* Although there presently is no evidence of mold growth in the guards' pod as a result of the implementation of the measures under the Third Plan, this Court has identified alternative measures that could be implemented in the event that mold growth is detected, taking due account of the potential adverse effects that this injunction may have on prison officials due to their possible exposure to mold spores. Additionally, the total cost of the implementation of the Third Plan was less than $2,000 – far below the costs of alternative remedial measures – which is an amount that will neither unduly burden Angola's budget nor have any "adverse impact on . . . the operation of a criminal justice system." *Id.*

Therefore, the measures implemented pursuant to Defendants' Third Plan remedy the constitutional violation found by this Court and affirmed by the Court of Appeals by lowering the heat indices in the area in which Plaintiffs were confined, which is the only means of sufficiently reducing the substantial risk of serious harm to Plaintiffs, and those measures are consistent with both the PLRA and the limitations that the Court of Appeals set on this Court in fashioning relief.

**B.    The Court Must Enjoin Defendants to Implement the Measures of the Third Plan Because Without an Injunction, There Exists a Danger that Defendants Will Revert to the Insufficient Measures of the Second Plan**

"[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). When a party has voluntarily discontinued illegal conduct, "[t]he necessary determination is

that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.*

Although Defendants voluntarily implemented the measures under the Third Plan in June 2016, they continue to assert that those measures are "temporary and experimental," (Doc. 375, Hr'g Tr. at p. 47, ll. 12-13), and that the measures implemented pursuant to the Second Plan "are sufficient," (*id.* at p. 46, l. 22). The Court has found that the measures implemented under the Second Plan are insufficient to remedy the Eighth Amendment violation in this case, and thus if Defendants were to revert to those measures, a recurrent constitutional violation would result. Therefore, given the Defendants' characterization of the measures voluntarily implemented pursuant to the Third Plan as "temporary and experimental" and Defendants' insistence that the measures implemented under the Second Plan are sufficient to remedy the Eighth Amendment violation – which they are not – the Court finds that there is a "cognizable danger of recurrent violation" and that it is necessary to issue an injunction. *Id.*

## IV.  CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Plaintiffs' **Motion to Modify Injunctive Relief (Doc. 315)** is **GRANTED IN PART and DENIED IN PART.**

**IT IS FURTHER ORDERED** that Defendants are **ENJOINED** to implement the remedial measures under the Third Plan during any period in which the heat

34

index in the death-row tiers exceeds 88 degrees Fahrenheit.  Specifically, when the heat index in the death-row tiers in which Plaintiffs are confined exceeds 88 degrees Fahrenheit:

1) Defendants are enjoined to relocate Plaintiffs to Tier C, which otherwise is to remain unoccupied during the time of such relocation;

2)  Defendants are enjoined to assign Plaintiffs to cells C-1, C-2, and C-3;

3) Defendants are enjoined to install and/or unseal a 27" x 34" air vent in the door that connects Tier C to the guards' pod, which will divert conditioned air from the guards' pod to the portion of Tier C in which Plaintiffs are confined;

4) Defendants are enjoined to install a "curtain" constructed of heavy plastic between cells C-4 and C-5, in order to keep the newly diverted cool air inside the portion of Tier C in which Plaintiffs are confined;

5) Defendants are enjoined to provide to each Plaintiff an IcyBreeze unit, the front of which is to be located no more than twelve inches from Plaintiffs' cells;

6) Defendants are enjoined to fill Plaintiffs' IcyBreeze units with ice and replenish that ice regularly so that the IcyBreeze units function properly and emit cool air;

7) Defendants are enjoined to install or maintain a water-valve controller in the showers in Tier C that allows Plaintiffs to select between hot and cold water for their showers;

8)  Defendants are enjoined to permit Plaintiffs to take one daily shower;

9)  Defendants are enjoined to provide to each Plaintiff an ice container;

10) Defendants are enjoined to fill those ice containers with ice and replenish that ice regularly;

11) Defendants are enjoined to provide to each Plaintiff a fan;

12) In the event that mold growth proliferates in the guards' pod of the death-row facility due to the measures prescribed by this injunction, Defendants are enjoined to seek leave from this Court, and upon receiving such leave, Defendants are enjoined to seal the air vent and provide a sufficient number of additional IcyBreeze units to each Plaintiff in order to maintain the heat index of the portion of Tier C in which Plaintiffs are confined below 88 degrees Fahrenheit; and

13) Defendants are enjoined to regularly monitor the heat index of the portion of Tier C in which Plaintiffs are confined.

Baton Rouge, Louisiana, this 22nd day of December, 2016.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**